**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SUSAN DARDARIAN and
WILLIAM CHURCH,

       *Plaintiffs*,

v.

U.S. DEPARTMENT OF DEFENSE,
1600 Defense Pentagon
Washington, D.C. 20301,

PETE HEGSETH, in his official capacity as
Secretary of Defense,
1600 Defense Pentagon
Washington, D.C. 20301,

STEPHEN FEINBERG, in his official
capacity as Deputy Secretary of Defense,
1600 Defense Pentagon
Washington, D.C. 20301, and

SEAN PARNELL, in his official capacity as
Assistant to the Secretary of Defense for Public
Affairs and Senior Advisor,
1600 Defense Pentagon
Washington, D.C. 20301,

       *Defendants*.

Case No.

**COMPLAINT**

**INTRODUCTION**

1.      This action challenges the U.S. Department of Defense's ("DoD") efforts to exert unprecedented control over Stars and Stripes ("Stripes")—the military's independent news source since the Civil War—and to erode its longstanding editorial independence and First Amendment protections.  As early as World War I, military command made clear that Stripes would not be subject to interference by military officials.  *See* Cindy Elmore, *A unique American newspaper's historical struggle against military interference and control*, Media History, Vol. 16, No. 3, 302 (Aug. 2010), https://perma.cc/QKC4-9PTF.  During World War II, then-General Dwight D. Eisenhower repeatedly directed military commanders to not interfere with Stripes, emphasizing that "Stars and Stripes is the soldiers' paper, and we won't interfere."  Editorial Board, *Why is the Stars and Stripes military newspaper on Trump's chopping block?*, Wash. Post (June 26, 2020), https://perma.cc/B2NZ-GRRV.  Stripes' historical editorial independence is critical to its core mission of providing unbiased, credible journalism to the U.S. military community, particularly servicemembers and their families stationed overseas.

2.      For more than three decades, DoD regulations governing Stripes have preserved Congress's deliberate decision to ensure that Stripes operates as an independent news source for members of the military, insulated from military command influence.

3.      Until they were rescinded by DoD under Secretary Hegseth, DoD regulations established, *inter alia*, that "the DoD policy for the Stars and Stripes is that there shall be a free flow of news and information to its readership without news management or censorship" that is "in keeping with the principles of the First Amendment to the U.S. Constitution."  32 C.F.R. §§ 246.4(b), (f)(2) (2025) reserved by 91 Fed. Reg. 1,707 (Jan. 15, 2026).  Those regulations also created the position of ombudsman, "[a] highly qualified journalist hired from outside [DoD]" to

1

"independently advise[]" DoD leadership, Stripes leadership, and Congress on matters of interest to Stripes' readers. *Id.* § 246.3(d) (2025) reserved by 91 Fed. Reg. 1,707 (Jan. 15, 2026).

4.     Until recently, therefore, Stripes has operated free from interference by military commanders or DoD leadership and retained the editorial independence to report on matters that may reflect adversely on the U.S. military or government.   In furtherance of its mission to keep the military community informed, Stripes has built a sustained record of award-winning, high-impact journalism.

5.     This past January, however, DoD's spokesman announced that the agency intended to "refocus" the news organization away "from woke distractions that syphon morale."  Sean Parnell (@SeanParnellASW), X (Jan 15, 2026), https://perma.cc/D2G2-W457.   He added that "Stars & Stripes will be custom tailored to our warfighters. It will focus on warfighting, weapons systems, fitness, lethality, survivability, and ALL THINGS MILITARY." *Id.*  And there will be "[n]o more repurposed DC gossip columns; no more Associated Press reprints." *Id.*  That same day, DoD summarily rescinded the decades-old regulations that protected Stripes' editorial independence, asserting that notice and an opportunity to comment were "unnecessary." *See* Stars and Stripes Media Organization, 91 Fed. Reg. 1,706, 1,706 (Jan. 15, 2026) ("Repeal Rule"). Subsequently, the Stripes' ombudsman was abruptly terminated at the instruction of DoD leadership after publicly raising concerns about threats to the newspaper's editorial independence.

6.     In place of its longstanding regulations, DoD unilaterally issued a memorandum—without providing notice and an opportunity for public comment, and without consulting or even notifying Stripes' leadership or staff—that eliminates protections for the newspaper and undermines its editorial independence.  Among the numerous policy changes made by the DoD Memorandum, it:  (i) prohibits Stripes from purchasing commercial news content, eliminating AP

and Washington Post coverage of major national and international events, opinion, and commentary on which Stripes had previously relied heavily; (ii) restricts the publication of broad categories of information by requiring that all Stripes content be "consistent with good order and discipline of the military"—a standard enforceable through criminal prosecution—and by prohibiting publication of Controlled Unclassified Information ("CUI"), an expansive and amorphous category of material, thereby chilling publication of substantial amounts of information that Stripes has historically published; (iii) increases DoD control over Stripes' operations, including by requiring that the Stripes' publisher be "fully accountable" to DoD leadership for "budget, performance, and strategic modernization"; and (iv) strips the ombudsman of her role as an independent advisor to Congress, requiring her to funnel her views through the military chain of command.  Ex. A, Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and Dow Field Activity Directors (Mar. 9, 2026), https://perma.cc/XQ8E-RJB9 ("DoD Memorandum").

7.      DoD's decisions to repeal the longstanding regulations governing Stripes and issue a memorandum dismantling Stripes' editorial independence violate the Administrative Procedure Act ("APA") because they were done without the requisite notice and comment and are arbitrary and capricious.  In addition, DoD's memorandum violates the First Amendment by restraining rights guaranteed to the press and denying readers access to Stripes' content, including its editorial discretion to curate and assemble reporting and commentary from both its own journalism and selected commercial sources in a single publication tailored to the informational needs of military communities.  The Court should therefore vacate and set aside DoD's unlawful actions in order to preserve Stripes' historical editorial independence at a time when the military community's access to accurate, credible news information from a trusted source is particularly critical.

**JURISDICTION AND VENUE**

8.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because the claims arise under federal law, including the APA, 5 U.S.C. § 551 *et seq.*

9.      The Court has authority to enter a declaratory judgment and to provide preliminary and/or permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.  The APA further authorizes the Court to stay, set aside, enjoin, or vacate agency action that is without observance of procedure required by law; arbitrary, capricious, or contrary to constitutional right; or is otherwise not in accordance with law.  5 U.S.C. §§ 705–706.

10.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because at least one Defendant resides in this District.  *See Bartman v. Cheney*, 827 F. Supp. 1, 2 (D.D.C. 1993) (venue for lawsuit against the Secretary of Defense was proper in D.C. because he "performs a significant amount of his official duties in the District of Columbia"); *Chin-Young v. Esper*, No. 18-cv-2072, 2019 WL 4247260, at *5 (D.D.C. Sept. 6, 2019) (same).

**THE PARTIES**

11.      Plaintiff Susan ("Suki") Dardarian is a reader and subscriber of Stripes and a member of its publisher's advisory board.  Now retired, she spent more than three decades in senior editorial leadership positions, including senior editor and executive at the Tacoma News Tribune, managing editor at the Seattle Times, and senior vice president at the Minnesota Star Tribune.  She oversaw numerous Pulitzer Prize-winning projects and was the 2025 recipient of the National Press Foundation's Benjamin Bradlee Editor of the Year Award.  She was also an active board member (including time as president) of the Associated Press ("AP") Managing/Media Editors group, a national organization of editors that seeks to improve journalism practice, and served as an advisor

4

to the AP.

12. Plaintiff William ("Bill") Church is a reader and subscriber of Stripes and a member of its publisher's advisory board. He is currently the executive editor of the Santa Fe New Mexican and director of the New Mexican Public Service Journalism Fund. He was previously the executive editor for the Sarasota Herald-Tribune when it won a Pulitzer Prize for investigative reporting. He was also an active board member (including time as president) of the AP Managing/Media Editors group. He has been a Stripes reader since age 12, growing up in a military family that lived in Japan, Germany, and across the United States, where he read his father's copies of the paper.

13. Defendant U.S. Department of Defense is a federal agency of the United States.

14. Defendant Pete Hegseth is the Secretary of the U.S. Department of Defense. He is sued in his official capacity.

15. Defendant Stephen Feinberg is the Deputy Secretary of the U.S. Department of Defense. He is sued in his official capacity.

16. Defendant Sean Parnell is the chief spokesman for the U.S. Department of Defense and Assistant to the Secretary of Defense for Public Affairs. He is sued in his official capacity.

## BACKGROUND

### I. Stripes Has Independently Served the U.S. Military and Veteran Communities for Decades

17. Stripes has a long tradition of providing independent news and information to the U.S. military community, including active-duty servicemembers, DoD civilians, veterans, contractors, and their families. The newspaper was first published by Union troops during the Civil War and has been published continuously since World War II. *See* Library of Congress, *Stars and Stripes: U.S. Military Newspapers in the Library of Congress*, Research Guides (Oct. 5,

5

2023), https://perma.cc/6664-HN2Y.   Since then—and until recent events—it has strived to operate independently and without editorial interference from the military chain of command.

18.    For more than 80 years, Stripes has provided commercially available U.S. and international news together with objective, staff-produced reporting relevant to the military community.  Its coverage includes national and international news, opinion, sports, comics, and reporting on the countries and local communities where U.S. forces are stationed.  This coverage supports military readiness and helps servicemembers and their families—including those stationed in remote and isolated locations—remain informed and engaged citizens.  Consistent with the 1994 regulations that, until now, governed Stripes, *see infra* Part II, Stripes has supplemented its original reporting with content from wire services and other news organizations, including the AP and Washington Post, to provide readers with broad and diverse coverage that both provides access to news that is comparable to U.S. commercial daily newspapers as well as provides news specific to the military community's interests.

19.    AP content has long been an important component of the Stripes news product. By combining AP reporting with its own original journalism, Stripes provides readers with a curated source of information that brings together military-focused reporting and broader national and international news.  AP content has enabled Stripes to present readers with a more complete snapshot of developments affecting military communities and the world in which they serve, which is especially valuable to servicemembers and their families who may not have access to a wide range of other news sources when deployed.

20.    As reflected in its mission statement, Stripes is "editorially independent of interference from outside its own editorial chain-of-command" and, "[u]nique among Department of Defense authorized news outlets, Stars and Stripes is governed by the principles of the First

6

Amendment." *See About Stars and Stripes*, Stars and Stripes (2026), https://perma.cc/9KFX-ZFJA. Stripes has been unusual not only within DoD, but also among modern democracies, because while it is partially funded by and housed within the military, it has historically been editorially independent and free to publish reporting that may be unfavorable to the U.S. military or government.[1]

21.    In fact, Stripes has regularly published reporting that examines government misconduct and, at times, coverage that is critical of or unfavorable to the military or sitting presidential administration.

22.    For example, Pulitzer Prize-winning cartoonist Bill Mauldin—then a soldier in World War II—rose to prominence at Stripes. Through his famous "Willie and Joe" cartoons, Mauldin portrayed the hardships and absurdities of frontline Army life from the perspective of ordinary infantrymen. His irreverent depictions of military bureaucracy angered General George S. Patton, who threatened to ban Stripes from his command, prompting then-General Dwight Eisenhower to intervene and defend the paper's editorial independence from interference. Cindy Elmore, *A unique American newspaper's historical struggle against military interference and control*, Media History, Vol. 16, No. 3, 305 (Aug. 2010), https://perma.cc/QKC4-9PTF.

23.    Mauldin's experience was not an isolated episode but part of a longstanding institutional commitment to editorial independence. That commitment remains visible in the newspaper's contemporary coverage. For example, in its January 7, 2019 issue, Stripes published an AP report describing concerns that groundwater near Georgia military bases remained

---

[1] The DoD funding that makes up roughly half of Stars and Stripes' annual budget is primarily used to print and distribute the newspaper to troops scattered across the globe, including in warzones. *About Stars and Stripes*, Stars and Stripes, https://perma.cc/9KFX-ZFJA. The other half of Stripes' budget comes from traditional newspaper revenue streams such as subscriptions and advertisements. *Id.*

contaminated by toxic firefighting foam used by the Air Force.  AP, *Groundwater near Ga. military bases potentially toxic*, Stars and Stripes (Jan. 7, 2019), https://perma.cc/S74A-SVEF.  In their December 29, 2025 issue, Stripes published a Washington Post article reporting on several judicial setbacks to President Trump's "effort to punish opposing lawyers."  Julian Mark, *Trump suffers several defeats in effort to punish opposing lawyers*, Stars and Stripes 7 (Dec. 29, 2025), https://perma.cc/Q5AL-GAYN.  And in the same issue, Stripes published a political cartoon satirizing the highly combative and misleading nature of White House press briefings:



Wiley Miller, *Non Sequitur,* Stars and Stripes 17 (Dec. 29, 2025), https://perma.cc/Q5AL-GAYN.

24.    For generations of U.S. service members, Stripes comics were a daily morale booster, with "Beetle Bailey" becoming especially popular for its humorous portrayal of Army life, including a comic strip published in Stripes' December 16, 2025 issue that satirized DOGE-driven federal workforce cuts by depicting former federal employees arriving at Camp Swampy as Army recruits:



Mort Walker, *Beetle Bailey*, Stars and Stripes 17 (Dec. 16, 2025), https://perma.cc/UZ35-MM42.

25.    Stripes maintains news bureaus in Europe, the Pacific, and the Middle East to

8

provide firsthand reporting on events affecting the military community. It also has one of the widest distribution ranges of any newspaper in the world, reaching countries across the globe where U.S. bases, posts, servicemembers, ships, or embassies are located.

26. Stripes has earned national recognition for its investigative reporting, including award-winning coverage of exploited Filipina women serving U.S. troops and revelations that the Pentagon was profiling journalists embedded with military units in Afghanistan. *Stripes' Military Reporting Earns Two Awards*, Stars and Stripes (Oct. 15, 2010), https://perma.cc/EYY5-QGPK. The publication also broke the story exposing inaccuracies in NBC anchor Brian Williams' accounts of his wartime experiences. *Stars and Stripes Wins Public Service News Award*, Stars and Stripes (Mar. 23, 2010), https://perma.cc/N5VK-C352.

27. Stripes' staff includes both civilians and active-duty servicemembers. It is led by a civilian publisher and a civilian editor-in-chief, and its newsroom consists of civilian journalists and active-duty servicemembers serving one- to three-year assignments who work alongside and are mentored by civilian staff.

28. Stripes also maintains a publisher's advisory board ("the Board"), which is composed of current and former editors and senior executives of external news media organizations and advises Stripes' publisher on the management of a newspaper dedicated to First Amendment principles. The Board meets regularly with Stripes' publisher to discuss and advise on issues regarding Stripes' publication, including business operations and the conduct of newsgathering and content publishing activities. It also actively participates in the interview and selection process for Stripes' ombudsman and editor-in-chief, has offered feedback as the publisher crafted and implemented Stripes' mission, core values, and strategic plans, and provided input on DoD rulemakings.

9

29.     Stripes publishes a print edition Monday through Thursday and a special weekend edition on Fridays.  It also publishes several weekly and monthly publications and numerous special supplements.  It maintains a digital edition that enables online access for readers and subscribers, but it also distributes physical newspapers to deployed servicemembers, including those stationed in remote and isolated locations and those with limited connectivity.  Stripes also has roughly a dozen newsletters and connects with readers through social-media accounts.

30.     Stripes' digital subscription costs $49.99 per year, and its mail subscription cost varies based on whether delivery is in the United States or overseas, but is roughly $150 to $200 per year.  *See Home Delivery*, Stars and Stripes, https://perma.cc/9GXT-TS68.  Stripes is free of charge to deployed servicemembers.  *Id.*

31.     Stripes reaches an estimated 1.4 million readers daily across its print and digital platforms.  *See About Stars and Stripes*, Stars and Stripes, https://perma.cc/9KFX-ZFJA.  In 2024 (the most recent year that Stripes publicly shared data), Stripes distributed more than 6.2 million editions of its U.S. Weekly edition, distributed more than 3.6 million special publications in the United States and overseas, and had 26 million page views on its premier Stripes.com website.

32.     Over the past year, Stripes' efforts to modernize the newspaper and improve its online presence have resulted in significant increases in page views, engagement, and subscribers.  *See* Rose L. Thayer, *Pentagon plan expands oversight of Stars and Stripes, limits content,* Stars and Stripes (Mar. 13, 2026), https://perma.cc/B6L2-S2YT.

## II. DoD Regulations Have Protected Stripes' Editorial Independence over the Last Three Decades

33.     Since its inception, Stripes functioned as an editorially independent newspaper to inform military communities of worldwide and local news.  In response to evidence of censorship from military commanders in the late 1980s, both Congress and DoD reasserted Stripes' editorial

independence and commitment to First Amendment principles.  For more than thirty years, and until recently, DoD regulations prevented improper military command influence and protected Stripes' editorial independence.

34.     In 1988 and 1989, Congress directed the U.S. Government Accounting Office ("GAO") to study allegations of censorship of Stripes by military commanders.  *See* National Defense Authorization Act ("NDAA") for FY 1988 and 1989, Pub. L. No. 100-180, § 321, 101 Stat. 1019, 1078 (1987); Stars and Stripes: Inherent Conflicts Lead to Allegations of Military Censorship, GAO/NSIAD-89-60 (Dec. 14, 1988), https://perma.cc/EMZ7-WNLH.  The GAO concluded that military commanders had "repeatedly attempted to influence the reporting of news" and that, despite DoD's intent to prevent censorship, an "inherent cultural conflict" between "civilian journalists who must execute the First Amendment mission and commanders who must execute the military mission" undermined those protections.  *Id.* at 3.  It further found that military commanders had improperly restricted investigative reporting and, through an advisory board chaired by a senior military public affairs official, influenced news decisions by delaying, withholding, or pressuring editorial judgment.  *Id.* at 24.  The GAO accordingly recommended replacing military leadership in the editor-in-chief roles with civilian editors hired on fixed terms and abolishing the advisory board as it was then constituted if Stripes was to function like a First Amendment–protected commercial newspaper.  *Id.* at 50, 52.

35.     When GAO testified to Congress about the report, it emphasized that "DOD stated that its primary goal, as always, is to provide DOD personnel and their families overseas the right to a free press under the provisions of the First Amendment."  Management and Censorship Issues of Stars and Stripes, GAO/T-NSIAD-89-4, at 6 (Feb. 22, 1989), https://perma.cc/4NWW-MRNY.

36.     In response to the GAO's finding of evidence of military censorship of Stripes, the

11

House Committee on Armed Services recommended in the report accompanying the FY1990–91 NDAA the establishment of an ombudsman to report jointly to the Department of Defense and Congress. H.R. Rep. No. 101-121, at 844 (1989).

37.　DoD reaffirmed that Stripes should be protected by First Amendment principles and should inform the military community in the same manner as commercial daily newspapers published and sold across the United States by codifying its mission and editorial independence in binding regulations, first issued as a proposed rule for public comment on August 5, 1993, and then finalized on April 22, 1994. *See* Stars and Stripes (S&S) Newspaper and Business Operations, 58 Fed. Reg. 41,671 (Aug. 5, 1993); 59 Fed. Reg. 19,137 (Apr. 22, 1994) ("1994 regulations").[2]

38.　The 1994 regulations, which amended 32 C.F.R. Parts 246 and 247, required that there "be a free flow of news and information to [Stripes'] readership without news management or censorship," 32 C.F.R. § 246.4(b) (2025), that Stripes include commercial news and opinion available to commercial papers along with Stripes' staff-generated content, *see id.* § 246.4(f)(2) & Appendix D (2025), that circumstances under which military officials may prevent Stripes' publication of information be strictly limited, *see id.* § 246.4(e)(1) (2025), and that the position of ombudsman be created to report directly to Congress and DoD leadership and therefore enforce Stripes' independence, *see id.* § 246.3(d) (2025).

39.　On October 5, 1993, DoD also issued Directive 5122.11, which mirrors the content of the 1994 regulations. The DoD Directive was certified as current on March 5, 2004, and

---

[2] The 1994 regulations were issued pursuant to 10 U.S.C. § 136, which provides the Under Secretary of Defense for Personnel and Readiness authority to "perform such duties and exercise such powers as the Secretary of Defense may prescribe in the areas of military readiness, total force management, military and civilian personnel requirements, military and civilian personnel training, military and civilian family matters, exchange, commissary, and nonappropriated fund activities, personnel requirements for weapons support, National Guard and reserve components, and health affairs."

incorporated non-substantive revisions on March 7, 2025.  *See* DoD Directive 5122.11, Stars and Stripes (S&S) Newspapers and Business Operations, https://perma.cc/KYY5-AK4A.

40. Since then, Congress has repeatedly reaffirmed Stripes' editorial and operational independence, including in 2013, when it mandated that Stripes remain physically separated from other organizations housed under the DoD subcomponent Defense Media Activity, rather than consolidated at Fort Meade, "in order to preserve the actual and perceived editorial and management independence."  NDAA for FY 2013, Pub. L. No. 112-239, § 593, 126 Stat. 1632, 1770–1771 (2013).

41. In 2020, when the first Trump administration attempted to permanently shutter Stripes, a bipartisan group of 15 senators urged the Secretary of Defense to maintain support for the newspaper.  *Bipartisan Group of Senators Urges Esper to Keep Funding Stars and Stripes*, *Stars and Stripes* (Sept. 2, 2020), https://perma.cc/4L3Q-SEDG.  In a separate letter, Senator Lindsey Graham (R-S.C.), who had served as an Air Force Reserve lawyer, wrote: "As a veteran who has served overseas, I know the value that the Stars and Stripes brings to its readers." *Pentagon Rescinding Order to Shutter Stars and Stripes Newspaper*, CBS News (Sept. 11, 2020), https://perma.cc/2APP-K7DE.  Following public backlash, the Department of Defense reversed its decision to shut down the newspaper after President Trump publicly expressed support for the publication, calling it "a wonderful source of information" for military personnel.  *Id.*  Congress responded in the FY 2021 NDAA by preserving Stripes' funding and requiring DoD to evaluate its business operations and whether there are alternatives for independent military reporting. NDAA for FY 2021, Pub. L. No. 116-283, § 643, 134 Stat. 3388, 3684 (2021).

42. On April 23, 2024, DoD published a proposed rule for public comment in the Federal Register to "reaffirm Stripes' authorities and responsibilities as the only DoD-authorized

13

organization to provide First Amendment-type reporting and editorially independent media products for the benefit of the U.S. military community, including veterans, families of veterans and current service members, and contractor personnel, as well as current service members and DoD civilian employees." *See* Stars and Stripes Media Organization, 89 Fed. Reg. 30,296, 30,297 (Apr. 23, 2024) ("Proposed Rule"). The Proposed Rule also "reaffirm[ed] the Stripes Ombudsman position and purpose" to "defend[] the independence of Stripes on behalf of its readers by ensuring that the Stripes newsroom is free from command interference or censorship." *Id.* It also proposed the removal of limited provisions of the 1994 regulations that constitute internal management procedures, such as the delineation of the publisher's job responsibilities. *Id.*[3]

### III. DoD Asserts Undue Control over Stripes

#### A. DoD's chief spokesperson calls Stripes "woke" and announces intent to "refocus" the newspaper

43.    On January 15, 2026, Defendant Sean Parnell, DoD's chief spokesperson and Assistant to the Secretary of Defense for Public Affairs, posted on X that DoD "is returning Stars & Stripes to its original mission" and "will . . . refocus its content away from woke distractions that syphon morale." Sean Parnell (@SeanParnellASW), X (Jan. 15, 2026), https://perma.cc/D2G2-W457. Parnell wrote that "Stars & Stripes will be custom tailored to our warfighters. It will focus on warfighting, weapons systems, fitness, lethality, survivability, and ALL THINGS MILITARY." *Id.* And there will be "[n]o more repurposed DC gossip columns; no more Associated Press reprints." *Id.*

---

[3] As explained below, *infra* p. 16, the Proposed Rule was withdrawn by DoD as a part of their repeal of the 1994 regulations.



*Id.*

44.   Parnell's remarks marked a sharp departure from the newspaper's tradition of editorial independence from government and military leadership.  They also made clear that senior DoD officials intended to exert editorial control over Stripes by imposing DoD-directed content priorities and prohibiting certain categories of coverage.

45.   According to an AP news report, DoD also said that half of the outlet's content would be generated by DoD (rather than Stripes' professional journalists), and that it would no longer publish material from the AP or other news services.  *See* David Bauder, *Defense Department says military newspaper Stars and Stripes must eliminate 'woke distractions'*, AP (Jan. 16, 2026), https://perma.cc/7Z8E-Y6YD.

46.   Parnell's X post was issued the day after the Washington Post reported that applicants for jobs at Stripes were being asked what they would do to support President Donald Trump's policies.  *See* Liam Scott, *Stars and Stripes job applicants are asked if they back Trump policies*, Wash. Post (Jan. 14, 2026), https://perma.cc/86U2-ZKHF.

47.   Parnell's statements immediately generated concern among journalists, military

families' and veterans' organizations, and press-freedom advocates because they suggested that senior DoD officials intended to condition continued institutional support for the newspaper on compliance with the DoD's preferred editorial viewpoint.  For example, the National Military Family Association ("NMFA"), an association that works with families to identify and solve the unique challenges of military life, responded to Parnell that: "Independent reporting is not a distraction from readiness; it's a part of it."  *See* Corey Dickstein, *Military families advocacy group urges Pentagon to reconsider Stars and Stripes overhaul*, Stars and Stripes (Jan. 29, 2026), https://perma.cc/FCN5-CFWE.  "Our service members and families deserve facts and not filtered messaging, and it would really be more than a shame. It would be harmful to our military and their families for this to happen," NMFA wrote.  *Id.*

**B. DoD repealed decades-old regulations protecting Stripes without notice and opportunity for public comment**

48.    The same day that Parnell posted on X that DoD would strip Stripes of its purportedly "woke" content, DoD repealed the 1994 regulations protecting Stripes' editorial independence without notice or opportunity for public comment.  *See* Repeal Rule.

49.    In a one-and-a-half-page Federal Register document predominantly comprising boilerplate text, DoD explained that it had  determined that the Proposed Rule "is not necessary," the 1994 regulations are "outdated," and notice and comment for the Repeal Rule "is unnecessary" because the 1994 regulations "address[] internal agency policies and procedures and its removal has no impact on the public." *Id.* at 1,706.  DoD did not explain further.  Nor did DoD acknowledge that it had reversed its previously stated position—most recently articulated in the Proposed Rule—that the 1994 regulations contained substantive, binding rules that could be rescinded only through notice-and-comment rulemaking.  *Cf. Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (Agencies must "use the same procedures when they amend or repeal a rule as they used to

issue the rule in the first instance."). DoD advised that it will continue to publish procedures related to Stripes in DoD Directive 5122.11. 91 Fed. Reg. at 1,706.

### C. DoD subsequently issues DoD Memorandum to expand agency control over Stripes' operations and restrict its content

50. In March 2026, Deputy Secretary of Defense Stephen Feinberg issued a memorandum described by DoD as a "modernization" initiative for Stripes. *See* DoD Mem. Although the DoD Memorandum paid lip service to the notion that the newspaper would continue to have editorial independence, it imposed unprecedented restrictions on newsroom operations and content that directly contradict that independence. The DoD Memorandum took effect immediately, directing Stripes to "immediately begin implementing the guidance in this memorandum and its attachment" and stating that DoD officials "will oversee Stripes' implementation of these changes and address any issues that may arise." *Id.* at 1. It also directed the Assistant to the Secretary of Defense for Public Affairs to update DoD Directive 5122.11 to "incorporate the guidance in this memorandum . . . as expediently as possible." *Id.* The DoD Memorandum includes, *inter alia*, the below provisions:

i. **Strips ombudsman of role as independent advisor to Congress.** The memorandum eliminates the ombudsman's role as an independent advisor to Congress and instead requires the ombudsman to route all congressional communications through DoD leadership, including coordinating with DoD officials who review and transmit materials to Congress without independent submission by the ombudsman. *See* DoD Mem. §§ 4(b), (d).

ii. **Prohibits Stripes' aggregation and publication of purchased commercial news content.** The memorandum prohibits Stripes from "purchasing or contracting for news stories, features, syndicated columns, comic strips, and editorial cartoons

17

from commercial news media services or sources," unless an exception is approved by senior DoD leadership, thereby eliminating a significant portion of content previously used by the publication and valued by its readers and subscribers. *Id.* § 2(a)(2)(c). That content did more than supplement Stripes' original reporting. It enabled Stripes to provide readers with a curated and comprehensive news product that combined military-focused journalism with broader national and international developments, opinion, and other content of interest to military communities. The prohibited content helped make Stripes a single source through which readers could stay informed about both military affairs and the wider events affecting their lives.

iii. **Chills the publication of large swaths of previously distributed content.** It extends publication limitations beyond classified information to material designated "controlled unclassified information" (CUI)—a broad framework that is otherwise inapplicable to journalists covering the military and encompasses more than 100 categories—as well as any content deemed inconsistent with "good order and discipline of the military"—a term from the Uniform Code of Military Justice to describe violations of military law, potentially subject to criminal penalties. *Id.* §§ 1(b), 2(a)(2)(e).

iv. **Mandates that the Stripes' publisher appoint DoD personnel to a new advisory group.** It requires the appointment of federal officers, DoD employees, or active-duty military personnel—selected with DoD concurrence—to a new "Stars and Stripes Advisory Group." *Id.* § 3(h)(1).

v. **Increases DoD control over Stripes' operations.** The memorandum places Stripes under increased oversight by the Secretary of Defense's public affairs

18

apparatus, requiring: (1) the newspaper to operate as a "fiscally sound and efficient business enterprise, fully accountable to [Department of Defense] leadership for budget, performance, and strategic modernization," *id.* § 1(c)(1); (2) the publisher to report to the Director of the Department of War Information Activity, *id.* § 3(b); and (3) "Stripes briefings or reports to and non-newsgathering engagements with Congress [to] be coordinated beforehand with the Office of the Assistant Secretary of War for Legislative Affairs," *id.* § 1(f).

51.     The DoD Memorandum was written without Stripes' input.  Stripes' publisher was not contacted directly by anyone from DoD about the changes.  *See* Rose L. Thayer, *Pentagon plan expands oversight of Stars and Stripes, limits content*, Stars and Stripes (Mar. 13, 2026), https://perma.cc/B6L2-S2YT.

52.     Press-freedom advocates, members of Congress, and the Stripes' ombudsman warned that the new restrictions undermine the First Amendment and will severely impair Stripes' ability to inform deployed service members and the military community.

53.     PEN America wrote that "[t]he Department of Defense's new directive inserting itself into editorial decisions by Stars and Stripes will break down and undermine the longstanding firewall between Pentagon leadership and the independent news organization."  Suzanne Trimel, *Alarm Over Pentagon Move to Impose Restrictions on Stars and Stripes' Editorial Independence*, Press Freedom (Mar. 13, 2026), https://perma.cc/QNQ9-3QHA.  It continued: "We are alarmed that a Pentagon memo claims to preserve the independence of Stars and Stripes while simultaneously imposing new restrictions that undermine it. Service members and military families rely on Stars and Stripes for independent reporting, not for material shaped or dictated by the very officials the paper is supposed to hold accountable."  *Id.*

19

54.     U.S. Senators wrote that "DoD's new policy threatens the credibility of Stars and Stripes, and the reliable flow of unbiased news to service members" and urged DoD leadership "to immediately rescind DoD's new policy and restore editorial independence guaranteed by the First Amendment to Stars and Stripes."  Press Release, *Warren, Blumenthal, Gallego, Duckworth, Hirono, Kelly Slam Pentagon's Restrictions on Editorial Independence of Stars and Stripes, Call for Department to Reverse Policies that Violate Press Freedom* (Apr.  9,  2026), https://perma.cc/6VXW-UHMM.

55.     And 39 members of the U.S. House of Representatives wrote to DoD leadership "to express [their] great alarm about recent reports of political interference with the editorial independence of Stars and Stripes" and explain that "[a]ny effort to censor, influence, control, or suppress the paper's reporting raises profound constitutional and institutional problems."  Press Release, *Raskin, Colleagues to Hegseth: Keep Stars and Stripes, Pentagon Press Corps Free and Independent*, (April 15, 2026), https://perma.cc/PHS5-FZHT.

56.     There was also widespread disappointment among Stripes' readers in response to the announcement, including the decision to ban comic strips.  *See* Jacqueline Smith, *Stars and Stripes readers insist: Bring back our color comics!*, Stars and Stripes (Apr. 8, 2026), https://perma.cc/E24Y-NAG2.

57.     Stripes' then-ombudsman published an article calling DoD's ban on syndicated content—including news reports and comics—"censorship" and "an infringement on Stripes' editorial independence." *Id.*

**D.  DoD terminates Stripes' ombudsman after she criticized its new restrictions**

58.     As noted above, Stripes' then-ombudsman Jacqueline Smith publicly defended Stripes' editorial independence and criticized DoD's new restrictions. She published multiple columns warning that "[g]iven the overall press restrictions and the moves to take over editorial

20

control of Stars and Stripes, the future of the reputable newspaper that dates to the Civil War is in danger," and stating that her "alarm [at DoD's changes to Stripes] is not exaggerated." Jacqueline Smith, *Pentagon wants a 'refocus,' but Stripes hasn't wavered from its true mission*, Stars and Stripes (Jan. 20, 2026), https://perma.cc/CV8A-4FTV. She further wrote that it was "imperative that Congress gets involved," *see* Jacqueline Smith, *Ombudsman column: Readers react to Pentagon plans for Stripes*, Stars and Stripes (Feb. 3, 2026), https://perma.cc/23SZ-WUGK, and later jokingly remarked that "Pete Hegseth doesn't want you to see cartoons in this newspaper anymore," *see* Jacqueline Smith, *Stars and Stripes readers insist: Bring back our color comics!*, Stars and Stripes (Apr. 8, 2026), https://perma.cc/E24Y-NAG2.

59.    In late April, DoD fired Ms. Smith from her position as Stripes' ombudsman. Erik Wemple, *Pentagon Fires Stars and Stripes' Advocate for Independence*, N.Y. Times (Apr. 23, 2026), https://perma.cc/9QX8-DXSQ. DoD did not provide a reason for her dismissal, though she had been told it was "not grievable." *Id.* Ms. Smith responded with a final column in Stripes, writing that "[a]pparently the Pentagon also doesn't want you to hear from me anymore about threats to the editorial independence of Stars and Stripes." Jacqueline Smith, *Ombudsman column: The Pentagon is trying to silence me*, Stars and Stripes (Apr. 23, 2026), https://perma.cc/W8UE-M4DV. She further stated that she had "told House and Senate Armed Services committees in recent months of [her] great and growing concern about attempted control of the newspaper by the Pentagon," and added: "No one should be surprised that they're kicking out the one person charged by Congress with protecting Stars and Stripes' editorial independence." *Id.*

60.    Like the DoD Memorandum, DoD's firing of the ombudsman drew sharp concern from press-freedom advocates and members of Congress, particularly given that the timing and circumstances of Ms. Smith's removal reinforced fears that DoD was seeking to exert greater

21

control over Stripes' operations and editorial content.

61.     The National Press Club stated: "The firing of the ombudsman at Stars and Stripes is deeply alarming and demands immediate answers."  Beth Francesco, *National Press Club statement on the firing of Stars and Stripes ombudsman*, National Press Club (Apr. 24, 2026), https://perma.cc/KBZ3-J9M3.  It continued: "The ombudsman is a role established and charged by Congress to provide independent oversight and protect the paper's editorial integrity. Removing that voice raises serious concerns about potential interference in a newsroom that is meant to operate free from government pressure." *Id.*

## IV. Plaintiffs Are Stripes Readers, Subscribers, and Advisory Board Members Harmed by the Repeal Rule and DoD Memorandum

62.     The new policies wrought by the Repeal Rule and DoD Memorandum were effective immediately and have harmed Plaintiffs as Stripes readers, subscribers, and members of the publisher's advisory board.

63.     Because DoD failed to provide notice and an opportunity to comment on their intent to repeal the 1994 regulations and replace them with the policies set forth in the DoD Memorandum (as the APA requires), Plaintiffs, as well as the millions of people who read Stripes on a daily basis and others who are alarmed by DoD's changes to Stripes, were deprived of the opportunity to submit comments raising their significant concerns with the new policies.

64.     As a result of the Repeal Rule and DoD Memorandum, Plaintiffs—like millions of other Stripes readers—have lost the benefit of Stripes' editorial curation.  Plaintiffs previously relied on Stripes to assemble and present, in a single publication, reporting and commentary drawn from both Stripes' own journalism and selected outside sources.  By combining military-focused reporting with broader national and international news, Stripes provided readers with a curated snapshot of developments most relevant to military communities.  Because Stripes may no longer

22

include purchased content from commercial news providers, Plaintiffs can no longer rely on Stripes as a comprehensive, one-stop source for the information that Stripes' editorial staff has determined is most relevant to its readership.  Plaintiffs must instead devote additional time and effort to identifying and consulting multiple sources to obtain comparable coverage.

65.    This loss of editorial curation is reflected in the elimination of substantial categories of content that previously appeared in Stripes.  As a result, Plaintiffs can no longer access, as part of their subscriptions, the Washington Post's reporting on the federal government, defense matters, and issues specific to Washington, D.C.—subjects on which the newspaper is particularly well situated to report.  Plaintiffs also have lost access to the Washington Post's opinion and commentary content, as well as the extensive national and international news coverage previously provided by the AP.  Plaintiffs have also lost access through Stripes to syndicated comic strips and editorial cartoons, including content that occupied eight pages of prior weekend editions.  As a result, Stripes no longer provides the same depth and breadth of content that its editorial staff previously selected and assembled for its readership.

66.    For the same reasons, Plaintiffs are no longer receiving the full range of content for which they paid.  Their annual subscriptions to Stripes are therefore worth less than they were before the Repeal Rule and DoD Memorandum took effect.  Stripes no longer includes substantial categories of content that previously formed part of the Stripes product, including the AP's national and international news reporting, the Washington Post's reporting on the federal government, defense, and Washington, D.C.–specific issues, the Washington Post opinion and commentary, syndicated columns, comic strips, and editorial cartoons.

67.    To mitigate the harm caused by the Repeal Rule and DoD Memorandum, Ms. Dardarian had to re-subscribe to the Washington Post in May when her previous subscription

23

lapsed in order to get a more fulsome report on political and military coverage. And because Stripes' wire offerings are now limited, Plaintiffs can no longer rely on Stripes as a one-stop shop for reporting relevant to the military community and must now go beyond Stripes to find the content and context Stripes previously provided.

68.    In addition, the policy changes resulting from the Repeal Rule and DoD Memorandum have undermined Stripes' longstanding editorial independence. Plaintiffs have relied on Stripes not merely as a source of information, but as an independent journalistic institution whose reporting and editorial judgments they trusted.

69.    The erosion of Stripes' editorial independence threatens the quality of the publication itself. Stripes' credibility is critical to its ability to recruit and retain journalists, cultivate sources, and produce robust reporting. To the extent the Repeal Rule and DoD Memorandum diminish that credibility, they impair Stripes' ability to gather news and produce original journalism. As a result, Plaintiffs face not only restrictions on the content available through Stripes, but also a decline in the quality, depth, and breadth of the reporting on which they have long relied.

70.    Plaintiffs' ability to carry out their jobs as members of the publisher's advisory board has also been adversely affected by the changes brought about by the Repeal Rule and the DoD Memorandum. The Board meets with the publisher regularly to advise him on the management of a newspaper dedicated to First Amendment principles and issues regarding Stripes' newsgathering and publication. In recent weeks, the Board has met with the publisher on a more frequent basis in an effort to work quickly to diminish the harm to Stripes that has resulted from the Repeal Rule and DoD Memorandum. But the Board's ability to advise on, and influence, those issues has been severely limited because the policy changes brought about by the Repeal

Rule and DoD Memorandum have diminished the discretion of the publisher and Stripes' staff on a whole host of issues, and the publisher is no longer the primary decision-maker with regard to Stripes' management and content.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the APA, 5 U.S.C. § 706(2)(D) – Failure to Observe Required Procedure
(Repeal Rule)**

71.     The paragraphs above are incorporated and reasserted as if fully set forth here.

72.     A reviewing court must "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

73.     With limited exceptions not applicable here, the APA requires agencies to issue rules through a notice-and-comment process. *See id.* § 553.

74.     To issue a valid rule, an agency must publish in the Federal Register a "[g]eneral notice of proposed rule making" that includes "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3). After providing notice of a proposed rule, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

75.     The Repeal Rule is a legislative or substantive rule that is not otherwise exempt from the APA's notice-and-comment requirements under 5 U.S.C. § 553(b)(A).

76.     The Repeal Rule was not presented for notice and comment.

77.     As a result, Plaintiffs were deprived of the opportunity to comment and raise their serious concerns with the Repeal Rule.

78.     This Court should hold unlawful and set aside the Repeal Rule because it violates the APA's notice-and-comment requirement. 5 U.S.C. § 706(2)(D).

25

## COUNT II
### Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious
### (Repeal Rule)

79.     The paragraphs above are incorporated and reasserted as if fully set forth here.

80.     A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).

81.     The APA's arbitrary-and-capricious standard requires that agencies make reasonable decisions and provide adequate explanations for those decisions.  Agency action violates this requirement if the agency has relied on factors that "Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

82.     Under the APA, agencies cannot depart from prior policies without explaining their reasons for doing so, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and must specifically consider the reliance interests of those who may be impacted by a change in their policies, *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30–31 (2020).

83.     The Repeal Rule is arbitrary and capricious in numerous respects, including because Defendants did not adequately explain their decision, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, failed to explain their reversal in position, and failed to consider the reliance interests of Stripes, its staff, or its readers.

84.     For example, Defendants failed to provide a reasoned explanation for reversing their prior position that the 1994 regulations were substantive, binding rules requiring notice-and-

26

comment procedures to amend or repeal, and they did not adequately address the significant reliance interests developed over decades within Stripes and the broader military community that depends on its editorial independence. They also failed to explain why the prior regulatory framework was no longer necessary or why its purported "outdated" nature justified a complete repeal rather than a narrower modification, particularly given that DoD had previously contemplated a more limited revision. Defendants also relied on the unsupported conclusion that the Repeal Rule has no "impact or burden to the public," a determination that is inconsistent with the rule's practical effects and is therefore insufficient under the APA.

85. As a result, the Repeal Rule is arbitrary and capricious and must be set aside and vacated.

## COUNT III
### Violation of the APA, 5 U.S.C. § 706(2)(D) – Failure to Observe Required Procedure (DoD Memorandum)

86. The paragraphs above are incorporated and reasserted as if fully set forth here.

87. A reviewing court must "hold unlawful and set aside agency action" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

88. Because the 1994 regulations are legislative rules promulgated by DoD through notice-and-comment rulemaking, any amendment to the regulations must occur through notice-and-comment rulemaking as well. *See Perez*, 575 U.S. at 101 (explaining that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

89. The DoD Memorandum effectively amends or modifies the 1994 regulations because it is irreconcilable with multiple provisions of the regulations. That makes it a substantive or legislative rule under the APA. *See Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710,

27

718 (D.C. Cir. 2015) ("[I]f a second rule . . . is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." (citation omitted)).

90.     DoD did not undertake notice-and-comment rulemaking before adopting the DoD Memorandum.

91.     Plaintiffs were deprived of the opportunity to comment and raise their serious concerns with the DoD Memorandum.

92.     As a result, the DoD Memorandum was adopted without the procedure required by law and must be set aside and vacated.

## COUNT IV
### Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious
### (DoD Memorandum)

93.     The paragraphs above are incorporated and reasserted as if fully set forth here.

94.     A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).

95.     The APA's arbitrary-and-capricious standard requires that agencies make reasonable decisions and provide adequate explanations for those decisions.  Agency action violates this requirement if the agency has relied on factors that "Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

96.     Under the APA, agencies cannot depart from prior policies without explaining their reasons for doing so, *Fox Television Stations, Inc.*, 556 U.S. at 515, and must specifically consider

28

the reliance interests of those who may be impacted by a change in their policies. *Regents of the Univ. of California*, 591 U.S. at 30–31.

97.     The DoD Memorandum is arbitrary and capricious in numerous respects, including because Defendants did not adequately explain their decision, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, failed to explain their reversal in position, and failed to consider the reliance interests of Stripes, its staff, or its readers.

98.     For example, the DoD Memorandum concluded that the Department would no longer pay for commercial content because such content is available through other digital sources, however, it did not address the reality that readers would then bear those costs themselves through additional subscriptions to access the omitted content.  Nor did the DoD Memorandum account for the value of Stripes' editorial curation of news and information most relevant to military communities, which readers would otherwise need to assemble with additional time, effort, and cost by consulting multiple other news sources.  In addition, it failed to consider that deployed servicemembers may lack reliable access to digital content due to local restrictions or limited internet connectivity, thereby overlooking Stripes' core mission of keeping servicemembers informed regardless of their location or circumstances.

99.     In addition, Defendants' asserted rationale that the decision was necessary to modernize the delivery of news and information to servicemembers is pretextual because the DoD Memorandum instead diminishes access to relevant news and information by eliminating benefits uniquely provided by Stripes, including its curation of editorial content, and compromises the perception of Stripes as an editorially independent, trusted news source.

100.    As a result, the DoD Memorandum is arbitrary and capricious and must be set aside

and vacated.

## COUNT V
### Violation of the APA, 5 U.S.C. § 706(2)(B) - Contrary to First Amendment
### (DoD Memorandum)

101. The paragraphs above are incorporated and reasserted as if fully set forth here.

102. A reviewing court must "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C.§ 706(2)(B).

103. The DoD Memorandum violates the First Amendment by restraining rights guaranteed to the press, unlawfully chilling protected speech, unlawfully discriminating based on viewpoint, and denying readers access to certain information and ideas.

104. For example, Defendants have deprived Stripes and its staff of their First Amendment rights to freedom of speech and freedom of the press by increasing DoD control over Stripes' operations, imposing substantive content restrictions on Stripes' stories, and restricting Stripes' access to commercial news content. Defendants eliminated regulations that protected Stripes' editorial independence and discretion, and have chilled news coverage. By interfering with the content of coverage and Stripes' oversight, Defendants have prevented Stripes from making independent decisions about what news to cover and how to cover it, in violation of the First Amendment.

105. Defendants have also deprived Plaintiffs and other readers of their "First Amendment right to 'receive information and ideas'" by increasing DoD control over Stripes' operations, imposing substantive content restrictions on Stripes' stories, restricting Stripes' publication of commercial news content, and chilling reporting by imposing vague and unduly broad restrictions—with possible criminal penalties—on publication. *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

106. Defendants' explanation that the DoD Memorandum is intended to "modernize" the newspaper does not satisfy any level of First Amendment scrutiny.

107. Accordingly, the DoD Memorandum violates the First Amendment and therefore must be set aside and vacated.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Declare the Repeal Rule unlawful under the APA;

b. Set aside, vacate, and/or permanently enjoin the Repeal Rule;

c. Declare the DoD Memorandum unlawful under the APA and First Amendment;

d. Set aside, vacate, and/or permanently enjoin the DoD Memorandum;

e. Award Plaintiffs their attorney's fees and costs for this action; and

f. Award other relief as the Court deems just and proper.

June 3, 2026                                     Respectfully submitted,

*/s/ Allyson R. Scher*
Allyson Scher (D.C. Bar 1616379)
Paul R.Q. Wolfson (D.C. Bar 414759)
Elena Goldstein (D.C. Bar 90034087)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ascher@democracyforward.org
pwolfson@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*

31