**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Susan Dardarian *et al.*,<br><br>   *Plaintiffs*,<br><br>v.<br><br>U.S. Department of Defense *et al.*,<br><br>   *Defendants*. | Case No. 1:26-cv-1965 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 2

I. Stripes' Mission and Editorial Independence ...................................................................... 2

II. The Regulations That Protected Stripes' Editorial Independence ............................................ 5

III. DoD Repeals the Regulatory Framework and Restricts Stripes ............................................. 8

LEGAL STANDARD ................................................................................................................ 13

ARGUMENT ............................................................................................................................ 13

I. Plaintiffs Have Standing ................................................................................................. 13

    A.    Economic harm ............................................................................................ 15

    B.    Deprivation of right to receive information ...................................................... 18

II. The Repeal Rule Is Unlawful ......................................................................................... 21

    A.    The Repeal Rule violates notice-and-comment requirements ............................. 22

    B.    The Repeal Rule is arbitrary and capricious ..................................................... 26

III. The DoD Memorandum Is Unlawful ............................................................................... 30

    A.    The DoD Memorandum violates notice-and-comment requirements ................... 31

    B.    The DoD Memorandum is arbitrary and capricious ........................................... 35

    C.    The DoD Memorandum violates the First Amendment ...................................... 38

IV. Vacatur Is the Proper Remedy ........................................................................................ 43

CONCLUSION .......................................................................................................................... 43

**INTRODUCTION**

Stars and Stripes ("Stripes") has been the military's independent newspaper since the Civil War.  This past January, the U.S. Department of Defense ("DoD") rescinded its own regulations ("Stripes Regulations") that for more than three decades had guaranteed that Stripes would operate "without news management or censorship."  It did so through a final rule ("Repeal Rule"), issued with no notice, opportunity for comment, or reasonable explanation.  DoD's chief spokesperson announced the real objective the same day: to "refocus [Stripes'] content away from woke distractions," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints."

Two months later, a memorandum from the Deputy Secretary of Defense (the "DoD Memorandum") made good on that promise.  It prohibited Stripes from purchasing news, opinion, comics, and editorial cartoons from wire services and other news outlets that its readers have relied on for generations; barred Stripes from publishing more than 100 categories of unclassified information, along with anything DoD deems inconsistent with the "good order and discipline of the military"; stripped the Stripes ombudsman of her congressionally endorsed role as an independent voice; and placed the newsroom under the direct oversight of DoD's public-affairs apparatus.  For the servicemembers and families stationed at remote posts around the world—for whom Stripes is often the only independent news within reach—the Pentagon now decides what they may read.

The Stripes Regulations' protections were not abstract.  DoD adopted them, through notice-and-comment rulemaking, precisely because its own commanders had interfered before.  After a congressionally mandated investigation found in 1988 that military commanders had "repeatedly attempted to influence the reporting of news" at Stripes, DoD committed itself by regulation to a "free flow of news and information" to Stripes' readership "without news management or censorship."  The Repeal Rule and the DoD Memorandum resurrect the very interference those rules were written to end.

Defendants' actions are unlawful several times over.  The Repeal Rule rescinded binding

1

legislative rules without the notice and comment the APA requires—on the untenable premise that regulations shielding journalists and readers from censorship are internal "procedures" with "no impact on the public."  It is also arbitrary and capricious.  DoD never acknowledged that it was reversing course, never weighed the obvious alternatives, or the reliance three decades of protection had built, and offered a rationale that bears no resemblance to the objectives it publicly announced.  The DoD Memorandum compounds each error.  It overrides the still-binding Stripes Regulations without notice and comment, repeating the same failures of reasoned decisionmaking, and abridging Plaintiffs' First Amendment right to receive the news and information Stripes has long delivered.

Plaintiffs Susan Dardarian, William Church, Walter Baranger, and Brian Brooks are longtime Stripes subscribers and accomplished career journalists.  Ms. Dardarian and Mr. Church are civilian editors who serve on Stripes' publisher's advisory board; Mr. Baranger and Mr. Brooks are military veterans—part of the community Stripes was founded to serve—and Mr. Brooks, a former Stripes editor, is the board president of the Stars and Stripes National Museum. Plaintiffs respectfully ask the Court to grant summary judgment and to vacate both the Repeal Rule and the DoD Memorandum.

## BACKGROUND

### I.  Stripes' Mission and Editorial Independence

Stars and Stripes has informed the American military community for generations. Tracing its origins to Union soldiers during the Civil War and published continuously since World War II, Stripes serves active-duty servicemembers, civilian employees, contractors, veterans, and their families.  Throughout, its mission has never changed: independent journalism for the military community, free from the chain of command.

That independence is not new—it has been defended since the paper's earliest days. During World War II, then-General Dwight D. Eisenhower repeatedly directed military commanders not to interfere with Stripes, declaring that "Stars and Stripes is the soldiers' paper, and we won't interfere."  Editorial, *Why is the Stars and Stripes military newspaper on Trump's*

2

*chopping block?*, Wash. Post (June 26, 2020), https://perma.cc/B2NZ-GRRV.  The principle was soon tested.  When Pulitzer Prize-winning cartoonist Bill Mauldin—then an Army soldier—published his famous "Willie and Joe" cartoons depicting the hardships of frontline life and mocking military bureaucracy, an incensed General George S. Patton threatened to ban the paper from his command.  Eisenhower intervened and defended its editorial independence.  Cindy Elmore, *A unique American newspaper's historical struggle against military interference and control*, Media History, Vol. 16, No. 3, 305 (Aug. 2010), https://perma.cc/QKC4-9PTF.  Mauldin's experience was no aberration: from the top down, the military recognized that Stripes' credibility depended on its freedom from command interference.

That tradition is reflected in how Stripes has been run—at least until now.  It has been traditionally led by a civilian publisher and is required to be helmed by a civilian editor-in-chief, and its newsroom pairs civilian journalists with active-duty servicemembers who rotate through one- to three-year assignments alongside—and mentored by—civilian staff.  *See* Declaration of Susan Dardarian ¶ 32 (Dardarian Decl.), 32 C.F.R. § 246.3(f) (2025); About Stars and Stripes, Stars and Stripes, https://perma.cc/9KFX-ZFJA.  Stripes is funded roughly half by DoD—and uses those funds specifically to print and distribute the newspaper to troops scattered across the globe, including in warzones—and the other half from traditional newspaper revenue streams such as subscriptions and advertisements.  *Id*.  A publisher's advisory board, composed of current and former editors and senior executives from outside news organizations, advises the publisher on newsroom operations, from newsgathering to publication practices to business matters.  Dardarian Decl. ¶ 4; Declaration of William Church ¶ 19 (Church Decl.).

That independence has long shaped what Stripes covers.  Its journalists are authorized to report on the military and the federal government in full—including coverage unflattering to their officials.  *See* 32 C.F.R. pt. 246, App. D (2025); AR 0039 ("The Stars and Stripes news staffs are authorized to gather and report news, good and bad, on the Department of Defense and

its subordinate commands.").[1]   Their award-winning investigative work bears that out, from exposing the exploitation of Filipina women serving U.S. troops to revealing that the Pentagon had profiled journalists embedded with units in Afghanistan.  *See Stars and Stripes' Military Reporting Earns Two Awards*, Stars and Stripes (Oct. 15, 2010), https://perma.cc/EYY5-QGPK.  Time and again, Stripes has reported on matters of public controversy involving the U.S. government and military, including coverage critical of official conduct and policy.  Declaration of Brian S. Brooks ¶ 5 (Brooks Decl.); Declaration of Walter Baranger ¶ 12 (Baranger Decl.); Dardarian Decl. ¶ 26.

Central to Stripes' value is how it selects news for its readers.  Its editors pair the paper's own military-focused reporting with a curated selection of national and international news, opinion, comics, and editorial cartoons from commercial sources such as the Associated Press ("AP") and the Washington Post—a mix the regulations required rather than merely permitted.  32 C.F.R. § 246.4(f)(2) (2025) & pt. 246, App. D; AR 0033–34, 0039.  That requirement is tied to the paper's purpose: giving overseas servicemembers and their families the same range of news available to readers in the United States, so they may exercise the "responsibilities of citizenship."  32 C.F.R. pt. 246, App. A (2025); AR 0035.  The result is a single, editorially chosen product spanning both military affairs and the wider world—which, as the House Armed Services Committee observed in 1989, "serves two purposes": to provide both commercial news and opinion "available to newspapers throughout the United States," and "U.S. government, Department of Defense, command, and local news information."  AR 0002.

For Stripes' readers, that blend is not a convenience but a necessity.  Servicemembers and their families—particularly those deployed overseas or stationed at remote installations—often have no access to the range of independent news sources available to civilian readers back home, and in many parts of the world where American forces serve, Stripes may be the only independent news source readily available to them.  *See* 32 C.F.R. pt. 246, App. A (2025); AR

---

[1] Citations to "AR" are to the Bates-stamped pages, DOW-CAR-0001 through -0163, of the certified administrative record.

0035; Brooks Decl. ¶ 14. That marriage of original reporting and outside news is what makes the paper both comprehensive and trusted the world over. Its reach is global, with bureaus in Europe, the Pacific, and the Middle East and distribution of both print and digital content worldwide. *See* About Stars and Stripes, Stars and Stripes, https://perma.cc/9KFX-ZFJA. Stripes publishes print editions throughout the week, maintains an online platform, delivers papers to deployed servicemembers, and produces newsletters and social media content. *Id.* In 2024 alone, it reported distributing more than 6.2 million editions of its U.S. Weekly publication and more than 3.6 million special publications, and drawing approximately 26 million views to its website. *Id.*

## II. The Regulations That Protected Stripes' Editorial Independence

For more than three decades, that independence rested on more than tradition—it was written into federal regulations. From 1994 to 2026, Stripes operated under a regulatory framework that safeguarded the newspaper's editorial independence and barred command influence over its journalism. *See* 32 C.F.R. § Pt. 246 (2025); AR 0032–40.

Those protections grew out of documented abuses. Amid concerns in the late 1980s that commanders were interfering with Stripes' reporting, Congress directed the then-General Accounting Office ("GAO") to investigate allegations of military censorship. *See* National Defense Authorization Act for Fiscal Years 1988 and 1989, Pub. L. No. 100-180, § 321, 101 Stat. 1019, 1078 (1987). The GAO confirmed the problem. It found that commanders had "repeatedly attempted to influence the reporting of news" and that an "inherent cultural conflict" existed between military command priorities and the First Amendment mission of the civilian journalists at Stripes. *See* U.S. Gen. Acct. Off., GAO/NSIAD 89-60, *Stars and Stripes: Inherent Conflicts Lead to Allegations of Military Censorship* 3, 24 (1988) ("GAO Report"), https://perma.cc/EMZ7-WNLH. It further found that commanders had shaped editorial outcomes through informal mechanisms—delay, withheld information, and pressure on editorial decisions. *Id.* at 3, 24. And it found that advisory structures involving military public-affairs officials had contributed to that improper influence over newsroom decisions. *Id.* at 23–24.

5

The GAO's prescription was structural. To insulate Stripes from command influence, it recommended replacing military editors with civilian editors serving fixed terms and eliminating the advisory structures that had allowed operational influence over newsroom decisions. *Id.* at 50–52. Congress and DoD took up that charge. The House Armed Services Committee called for an independent ombudsman—reporting to both DoD and Congress—to help secure Stripes' independence and accountability. AR 0001–04. The commercial news and opinion Stripes carries, the committee explained, "must enjoy the full protection of the First Amendment, and military personnel on the frontiers of freedom must enjoy their First Amendment rights," even as its staff-generated reporting "must be free of interference from the chain of command." AR 0002. The ombudsman it envisioned "would report to the DoD and annually to the committee on the state of the free flow of information to the armed forces via the *Stars and Stripes*," and "aggressive and objective oversight by the ombudsman" would "provide adequate safeguards to ensure against censorship or news management." AR 0003.

Congress has reaffirmed that commitment in the decades since. In 2013, it required that Stripes remain physically separate from the other organizations under the DoD subcomponent Defense Media Activity, expressly in order "[t]o preserve the actual and perceived editorial and management independence." National Defense Authorization Act (NDAA) for FY 2013, Pub. L. No. 112-239, § 593, 126 Stat. 1632, 1770–71. And in 2020, when the first Trump administration moved to shutter Stripes outright, a bipartisan group of senators publicly urged the Secretary of Defense to maintain support for the paper; President Trump reversed course, calling Stripes "a wonderful source of information" for military personnel, and Congress preserved its funding in the following year's defense authorization. *Pentagon Rescinding Order to Shutter Stars and Stripes Newspaper*, CBS News (Sept. 11, 2020), https://perma.cc/2APP-K7DE; NDAA for FY 2021, Pub. L. No. 116-283, § 643, 134 Stat. 3388, 3684.

DoD wrote these principles into a formal regulatory regime in 1993 and 1994. *See* Stars and Stripes (S&S) Newspaper and Business Operations, 58 Fed. Reg. 41,671 (Aug. 5, 1993); 59

6

Fed. Reg. 19,137 (Apr. 22, 1994); AR 0032–40.[2] Codified at 32 C.F.R. § Pt. 246 (2025), the

regulations guaranteed a "free flow of news and information" to Stripes' readership "without

news management or censorship," 32 C.F.R. § 246.4(b) (2025); AR 0033, and required that news

from wire services and other news outlets run alongside staff-generated reporting, 32 C.F.R.

§ 246.4(f)(2) (2025); AR 0033–34.  Those regulations created an independent ombudsman to

advise both DoD leadership and Congress on issues affecting editorial independence, 32 C.F.R.

§ 246.3(d) (2025); AR 0033; required a civilian editor-in-chief, *id.* § 246.3(f) (2025); AR 0033;

and strictly limited military authority to prevent publication of information, 32 C.F.R.

§ 246.4(e)(1) (2025); AR 0033.  They further barred military command from participating in

editorial advisory boards, recognizing that such involvement would create "an unacceptable

conflict of interest" undermining the editorial integrity and credibility of Stripes.  32 C.F.R.

§ 246.5(e)(9) (2025); AR 0034.

DoD reinforced the regime with a parallel directive.  DoD Directive 5122.11 mirrored the

regulatory framework governing Stripes, *see* DoD Directive 5122.11, Stars and Stripes (S&S)

Newspapers and Business Operations, https://perma.cc/KYY5-AK4A; AR 0005–31, and DoD

kept it current through—and beyond—the change in administrations.  On March 7, 2025, DoD

issued "Change 3," an amendment it described as merely "administrative," AR 0012, that left the

core protections intact: the guarantee of "a free flow of news and information to [Stripes']

readership without news management or censorship," AR 0006, the strict limits on withholding

news from publication, AR 0007, and the ombudsman who "independently advises" DoD

leadership "and the Congress," AR 0015.

---

[2] The Stripes Regulations were issued pursuant to 10 U.S.C. § 136, which provides the Under
Secretary of Defense for Personnel and Readiness authority to "perform such duties and exercise
such powers as the Secretary of Defense may prescribe in the areas of military readiness, total
force management, military and civilian personnel requirements, military and civilian personnel
training, military and civilian family matters, exchange, commissary, and nonappropriated fund
activities, personnel requirements for weapons support, National Guard and reserve components,
and health affairs." 10 U.S.C. § 136(b)

7

The protection afforded by the Stripes Regulations was not merely theoretical.  During his tenure as Stripes' European editor, Mr. Brooks invoked the Stripes Regulations after a Navy captain in Sigonella, Sicily summoned one of his reporters—an enlisted sailor—over an article that displeased the captain, and "[t]he order was promptly withdrawn."  Brooks Decl. ¶ 5.

On April 23, 2024, DoD proposed a "rule revision" to the Stripes Regulations framework.  AR 0132; *see* Stars and Stripes Media Organization, 89 Fed. Reg. 30,296 (Apr. 23, 2024).  The Assistant to the Secretary of Defense for Public Affairs explained in an internal memorandum that the proposal "highlights areas of public interest regarding Stripes' editorial independence, but . . . removes internal procedures that do not have external burden or implications."  *Id.*; *see* AR 0131.  The proposed rule would have reaffirmed the core protections: Stripes' status as the only DoD-authorized organization providing "First Amendment-type reporting and editorially independent media products" to the military community; strict limits on the circumstances under which military officials may prevent Stripes from publishing; and the ombudsman's role in independently advising the publisher, DoD leadership, and Congress on Stripes matters, including "editorial interference, news management, or censorship."  89 Fed. Reg. at 30,297–98; AR 0146–49. It would also have established that the publisher must be a civilian.  *Id.*  The only provisions the proposal would have removed were limited internal-management details—staffing, advertising, retail pricing, and distribution logistics.  *See* 32 C.F.R. § Part 246, Apps. B–C, E (2025); AR 0033–40.  As discussed below, DoD ultimately withdrew the proposed rule as part of repealing the Stripes Regulations altogether.

### III.  DoD Repeals the Regulatory Framework and Restricts Stripes

On January 15, 2026, DoD changed course.  Defendant Sean Parnell, DoD's chief spokesperson and Assistant to the Secretary of Defense for Public Affairs, announced on the social-media platform X that DoD was "returning Stars & Stripes to its original mission" and would "refocus its content away from woke distractions that syphon morale."  Sean Parnell (@SeanParnellASW), X (Jan. 15, 2026), https://perma.cc/D2G2-W457.  Stripes, he said, would focus on "warfighting, weapons systems, fitness, lethality, survivability, and ALL THINGS

MILITARY," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints." *Id.*  The post came a day after the Washington Post reported that Stripes job applicants were being asked what they would do to support President Trump's policies.  *See* Liam Scott, *Stars and Stripes job applicants are asked if they back Trump policies*, Wash. Post (Jan. 14, 2026), https://perma.cc/86U2-ZKHF.  And, according to contemporaneous reporting, DoD signaled that it would generate half of Stripes' content itself, displacing the paper's professional journalists.  *See* David Bauder, *Defense Department says military newspaper Stars and Stripes must eliminate 'woke distractions'*, AP (Jan. 16, 2026), https://perma.cc/7Z8E-Y6YD.

The same day, DoD published a final rule repealing the Stripes Regulations.  *See* Stars and Stripes Media Organization, 91 Fed. Reg. 1,706 (Jan. 15, 2026) ("Repeal Rule"); AR 0167–68.  DoD pronounced the existing regulations "outdated" and asserted that notice-and-comment procedures were unnecessary because the regulations addressed internal agency policies and procedures and their removal would have "no impact on the public." 91 Fed. Reg. at 1,706; AR 0167–68.  At the same time, it withdrew the 2024 proposed rule that would have reaffirmed Stripes' editorial independence.  91 Fed. Reg. at 1,706; AR 0167.  The Repeal Rule acknowledged that 91 public comments had been received on the proposed rule, that "commenters were supportive of the Stripes program," and that some had "advocated for not changing the existing rule because of perceived concerns that changes would restrict Stripes in continuing its mission of providing editorially independent news and information." 91 Fed. Reg. at 1,706; AR 0167.

The administrative record, however, traces the decision to repeal even earlier—to the administration's deregulatory efforts in mid-2025.  Executive Order 14219 instructed agencies to identify regulations for rescission or modification under the administration's "Department of Government Efficiency" initiative.  Exec. Order No. 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025); AR 0150–52.  In response, DoD's public-affairs staff reported in April 2025 that "[n]one of" its regulations "fall specifically within the categories outlined in EO 14219," yet recommended acting anyway to repeal the Stripes regulations "to meet the intent" of the order.

9

AR 0153–54; *accord* AR 0157.  Parnell, however, struck through the staff's recommendation to "repeal" the rule and hand-wrote "modify" next to his initials.  AR 0154–56.  The record does not explain what happened next.  But by September 2025, Parnell had approved the decision to "remove the Stars and Stripes regulation," on the ground that it "does not have an impact or burden to the public."  AR 0158.

In March 2026, Deputy Secretary of Defense Stephen Feinberg issued a memorandum that DoD billed as a "modernization" of Stripes.  *See* Modernization of Stars and Stripes Operations ("DoD Mem."), AR 0172–79.  Although the memorandum disclaimed any intent to compromise editorial independence, it imposed significant new restrictions on Stripes' newsroom operations and content—and it took effect at once.  It directed Stripes to "immediately begin implementing the guidance in this memorandum and its attachment" and provided that DoD officials "will oversee Stripes' implementation of these changes and address any issues that may arise."  DoD Mem. at 1, AR 0172.  It further directed the Assistant to the Secretary of Defense for Public Affairs to revise DoD Directive 5122.11 to "incorporate the guidance in this memorandum . . . as expediently as possible."  *Id.*  The memorandum's provisions include, among others, the following.

**Strips the ombudsman of the role of independent advisor to Congress.**  The memorandum eliminates the ombudsman's role as an independent advisor to Congress, requiring instead that all congressional communications be routed through DoD leadership—coordinated with DoD officials who review and transmit materials to Congress, with no independent submission by the ombudsman.  *See* DoD Mem. § 4(c), AR 0177.

**Prohibits Stripes' aggregation and publication of purchased commercial news content.**  The memorandum bars Stripes from "purchasing or contracting for news stories, features, syndicated columns, comic strips, and editorial cartoons from commercial news media services or sources" absent an exception approved by senior DoD leadership—cutting a substantial share of the content the paper carried and its readers valued.  DoD Mem. § 2(a)(2)(c), AR 0175.  Comic strips and editorial cartoons alone had filled eight pages of Stripes' weekend

10

editions.  Dardarian Decl. ¶ 12.  That material was not mere supplement to Stripes' original reporting: it allowed the paper to offer a single, curated news product pairing military-focused journalism with broader national and international developments, opinion, and other content of interest to military communities—one place where readers could follow both military affairs and the wider events shaping their lives.

**Restricts the publication of large swaths of previously distributed content.**  The memorandum extends publication limits well beyond classified information.  It reaches material designated "controlled unclassified information" (CUI)—a broad framework that does not ordinarily apply to journalists covering the military and encompasses more than 100 categories—and any content deemed inconsistent with the "good order and discipline of the military," a term drawn from the Uniform Code of Military Justice for violations of military law that can carry criminal penalties.  DoD Mem. §§ 1(b), 2(a)(2)(e), AR 0174 & 0176.

**Mandates that the Stripes publisher appoint DoD personnel to a new advisory group.**  The memorandum requires the appointment of federal officers, DoD employees, or active-duty military personnel—selected with DoD's concurrence—to a new "Stars and Stripes Advisory Group."  DoD Mem. § 3(h)(1), AR 0177.

**Increases DoD control over Stripes' operations.**  The memorandum places Stripes under heightened oversight by the Secretary of Defense's public-affairs apparatus.  It requires the paper to operate as a "fiscally sound and efficient business enterprise, fully accountable to [Department of Defense] leadership for its budget, performance, and strategic modernization," DoD Mem. § 1(c)(1), AR 0174; directs the publisher to report to the Director of the Department of War Information Activity, DoD Mem. § 3(b), AR 0176–77; and provides that "Stripes briefings or reports to and non-newsgathering engagements with Congress must be coordinated beforehand with the Office of the Assistant Secretary of War for Legislative Affairs," DoD Mem. § 1(f), AR 0175.

DoD issued the memorandum without notice-and-comment rulemaking and without consulting Stripes' publisher.  Rose L. Thayer, *Pentagon Plan Expands Oversight of Stars and*

*Stripes, Limits Content*, Stars and Stripes (Mar. 13, 2026), https://perma.cc/B6L2-S2YT.

The Department's actions drew alarm from military-family organizations, journalists, press-freedom advocates, and members of Congress alike. *See, e.g.*, Corey Dickstein, *Military Families Advocacy Group Urges Pentagon to Reconsider Stars and Stripes Overhaul*, Stars and Stripes (Jan. 29, 2026), https://perma.cc/FCN5-CFWE; Suzanne Trimel, *Alarm Over Pentagon Move to Impose Restrictions on Stars and Stripes' Editorial Independence*, PEN America (Mar. 13, 2026), https://perma.cc/QNQ9-3QHA; Press Release, *Warren, Blumenthal, Gallego, Duckworth, Hirono, Kelly Slam Pentagon's Restrictions on Editorial Independence of Stars and Stripes* (Apr. 9, 2026), https://perma.cc/6VXW-UHMM. Thirty-nine members of the U.S. House of Representatives wrote separately to DoD leadership to voice "great alarm about recent reports of political interference with the editorial independence of Stars and Stripes," warning that "[a]ny effort to censor, influence, control, or suppress the paper's reporting raises profound constitutional and institutional problems." Press Release, Raskin, Colleagues to Hegseth: Keep Stars and Stripes, Pentagon Press Corps Free and Independent (Apr. 15, 2026), https://perma.cc/PHS5-FZHT.

In the months that followed, DoD abruptly terminated Stripes' ombudsman, Jacqueline Smith, after she publicly raised concerns that the new policies threatened the paper's editorial independence. *See* Erik Wemple, *Pentagon Fires Stars and Stripes' Advocate for Independence*, N.Y. Times (Apr. 23, 2026), https://perma.cc/9QX8-DXSQ. DoD gave no reason for the dismissal and told Smith it was "not grievable." *Id.* Smith had criticized the changes as inconsistent with Stripes' historical mission and warned that they threatened the newspaper's ability to operate independently. *See* Jacqueline Smith, *Pentagon Wants a "Refocus," but Stripes Hasn't Wavered From Its True Mission*, Stars and Stripes (Jan. 20, 2026), https://perma.cc/CV8A-4FTV; Jacqueline Smith, *Ombudsman Column: Readers React to Pentagon Plans for Stripes*, Stars and Stripes (Feb. 3, 2026), https://perma.cc/23SZ-WUGK. In a final column, she wrote: "Apparently the Pentagon also doesn't want you to hear from me anymore about threats to the editorial independence of Stars and Stripes." *See* Jacqueline Smith,

12

*Ombudsman column: The Pentagon is trying to silence me*, Stars and Stripes (Apr. 23, 2026),

https://perma.cc/W8UE-M4DV.  She had, she noted, "told House and Senate Armed Services

committees in recent months of [her] great and growing concern about attempted control of the

newspaper by the Pentagon," adding: "No one should be surprised that they're kicking out the

one person charged by Congress with protecting Stars and Stripes' editorial independence."  *Id.*

Most recently, in July 2026, DoD ordered a naval public-affairs officer to report to Stripes as a

"military deputy" to its civilian publisher—without any job description or prior discussion with

the publisher—further inserting the military chain of command into the newsroom's leadership.

Dardarian Decl. ¶ 32.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A fact is 'material' if it is capable of affecting the substantive outcome of the

litigation," and "[a] dispute is 'genuine' if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *CREW v. SEC*, 916 F. Supp. 2d 141, 144 (D.D.C.

2013) (citations omitted).  "In a case involving review of a final agency action under the APA,

however," the court's role is "to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did."  *Id.* at 144–45 (quotation

marks and citations omitted).  "Summary judgment thus serves as the mechanism for deciding, as

a matter of law, whether the agency action is supported by the administrative record and

otherwise consistent with the APA standard of review."  *Id.* at 145.

## ARGUMENT

### I. Plaintiffs Have Standing

Plaintiffs have standing on either of two independent bases: the Repeal Rule and DoD

Memorandum have cost them money, and have impaired their First Amendment right to receive

information and ideas.  "To establish constitutional standing, a petitioner must show an actual or

imminent injury in fact, fairly traceable to the challenged agency action, that will likely be

redressed by a favorable decision." *New York Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 586 (D.C. Cir. 2011) (citation omitted). "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992)). Only one Plaintiff need establish standing for the Court to proceed to the merits. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Both injuries are concrete, particularized, and fairly traceable to Defendants' actions. The Repeal Rule stripped away the decades-old framework that required Stripes to carry handpicked news and opinion from wire services and other news outlets, and that shielded its editorial independence from military command; the DoD Memorandum then imposed the very content restrictions and editorial controls that have devalued Plaintiffs' subscriptions and curtailed the information they receive. Vacatur of the DoD Memorandum would lift the content prohibitions and structural changes that proximately caused the harm, while vacatur of the Repeal Rule would restore the framework that had barred those restrictions. Nor does it matter that Plaintiffs' injuries reach them through Stripes' compliance with Defendants' directives: the directives command the very changes that caused the harm, so the causal chain is direct, not speculative.

For Plaintiffs' notice-and-comment claims, the standing inquiry is slightly modified. A plaintiff asserting a procedural injury need show only (1) a concrete interest affected by the deprivation of the procedure, and (2) a causal connection between the procedural violation and "some reasonably increased risk of injury" to that interest. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996); *see Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 37–38 (D.D.C. 2020). When those showings are made, the requirements of imminence and redressability are relaxed, and the plaintiff has standing if there is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

14

### A.  Economic harm

Defendants' actions have inflicted a straightforward pocketbook injury: Plaintiffs paid full price for a subscription now worth markedly less, and several now pay out of pocket to recover the coverage Stripes lost.  A plaintiff suffers a "cognizable overpayment injury" when she can show a "difference between what [plaintiff] contracted for and what she actually received." *Austin-Spearman v. AARP & AARP Servs. Inc.*, 119 F. Supp. 3d 1, 8 (D.D.C. 2015) (alteration in original and citation omitted); *see also In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010) ("[C]ourts have long held that a plaintiff is injured … when he receives less than what he was promised.").  And "a loss of even a small amount of money is ordinarily an 'injury'" for Article III purposes. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).  Plaintiffs need not establish both: a single Plaintiff's overpayment or out-of-pocket payment is sufficient.

Start with the overpayment.  Plaintiffs paid full price for a newspaper the Repeal Rule and DoD Memorandum stripped of much of its value.  When each Plaintiff bought an annual subscription for $49.99, Stripes' editorial independence and its selected mix of news and opinion from other sources were not incidental perks—they were the reason for the purchase.  Church Decl. ¶ 11 (subscribing because he "value[s] [Stripes'] editorial judgment" and its selection of news "from a broad range of sources, including … [the] [Associated Press] and Washington Post"); Dardarian Decl. ¶ 6 (same); Baranger Decl. ¶¶ 9, 12 (relying on "Stripes' editorial selection of AP and Washington Post stories" and confidence that Stripes "would be straight with its readership … even if that reporting looked bad for DoD"); Brooks Decl. ¶ 11 (explaining that he "received the bulk of [his] international and national news from Stripes, and [he] relied on Stripes' selection of AP stories to ensure the broadest coverage that is relevant to the military community").  Since Stripes implemented the DoD Memorandum, those features—AP news, Washington Post news and opinion, comics, and editorial cartoons, content that "frequently … made up … more than 50%" of an issue—have largely disappeared, along with the editorial discretion over content selection and presentation that defines an independent newspaper.

15

Church Decl. ¶¶ 22–23; Dardarian Decl. ¶¶ 18–19, 28; *see* Jacqueline Smith, *Stars and Stripes readers insist: Bring back our color comics!*, Stars and Stripes (Apr. 8, 2026), https://perma.cc/E24Y-NAG2.  That loss was no small piece of the newspaper.  The AP content Stripes carried drew from "over 250 bureaus across more than 100 countries," supplying national and international news that Stripes "lacks the staff or resources to gather on its own."  Dardarian Decl. ¶ 18.  The loss is concrete and personal: Mr. Church, who is "not a Washington Post subscriber," had relied on Stripes to "fill … that news gap" with Post coverage of the military and the federal government, and explains that Stripes "was a one-stop shop then, but it isn't now."  Church Decl. ¶¶ 10–11.  The upshot is a textbook overpayment—Plaintiffs pay the same $49.99 for a publication worth substantially less than the one they bargained for, Dardarian Decl. ¶ 8; Church Decl. ¶ 12; Baranger Decl. ¶¶ 16–17; Brooks Decl. ¶ 18, and Mr. Church and Mr. Baranger each attest they would not have paid that price for the Stripes that exists today, *see* Church Decl. ¶ 13; Baranger Decl. ¶ 16.

That Plaintiffs must now recreate Stripes' editorial selection themselves shows how much the subscription has lost.  Because no single outlet replicates it—and Plaintiffs cannot review the hundreds of AP and Washington Post articles published each day—they must now search multiple sources to try to assemble comparable coverage they once received in one place.  Church Decl. ¶ 23; Dardarian Decl. ¶¶ 20, 24; Baranger Decl. ¶ 17; Brooks Decl. ¶ 19.  For example, Mr. Baranger, who relied on Stripes to stay up to date for his volunteer position with the Coast Guard Auxiliary and as an informed citizen, now spends about two more hours each week reading the AP and New York Times websites to find coverage comparable to what he previously received through Stripes alone.  Baranger Decl. ¶ 17.  Even with Mr. Baranger's additional time and effort, the coverage he assembles for himself is not equivalent to what Stripes provided, because no other single publication selects and contextualizes the news specifically for the military community.  *Id.*  The same is true of Mr. Brooks, who spends an additional hour each day to try to locate stories that Stripes would have provided elsewhere.  Brooks Decl. ¶ 19.  As Ms. Dardarian, a career editor, puts it, "the value of my subscription was

that Stripes performed that selection and aggregation of the news most relevant to its readers"; without it, she "now spend[s] additional time and effort consulting multiple sources to piece together comparable coverage." Dardarian Decl. ¶ 24. Mr. Church describes the same burden: having to "find national/international stories elsewhere"—including the time and energy to track down coverage of the war in Iran that Stripes once carried from the AP—is "laborious" and "makes Stripes not a complete news experience." Church Decl. ¶¶ 10, 23.

Several Plaintiffs have also paid out of pocket to replace what Stripes eliminated. Ms. Dardarian, who renewed her annual Stripes subscription on May 2, 2026, now pays a $5.99 monthly fee for a separate Washington Post subscription to recover the federal- and defense-focused coverage Stripes dropped, and she will continue to pay it so long as DoD bars Stripes from purchasing AP and Washington Post content. Dardarian Decl. ¶¶ 4, 15–17. She renewed expecting that Stripes would obtain an exemption to resume publishing AP content—a request its publisher made to DoD leadership in May that remains unanswered. *Id.* ¶ 7. Mr. Brooks likewise bought a New York Times subscription to replace the national and international coverage he had received through Stripes' AP and Washington Post selection. Brooks Decl. ¶ 19.

Beyond the content already lost, the Repeal Rule and DoD Memorandum have begun to erode the quality of Stripes' journalism itself—and threaten to erode it further. For example, Mr. Baranger—a veteran editor and journalism lecturer—attests that he "can no longer be confident that stories are not being withheld" because the newspaper he "long valued for its independence now operates under improper military command interference." Baranger Decl. ¶ 15. And Mr. Brooks, a former Stripes editor, current president of the Board of Directors of the Stripes' museum, and a career journalism professor, has observed "that the content and quality of Stripes have diminished." Brooks Decl. ¶ 18. That degradation is likely to deepen. DoD's ongoing editorial interference threatens Stripes' ability to recruit journalists, cultivate sources, and produce the reporting Plaintiffs paid for—including the coverage critical of the military and its leadership that Plaintiffs prize. Dardarian Decl. ¶ 26 ("They shine a light on the failings of the

17

military or its members—as well as the accomplishments."); Church Decl. ¶¶ 25, 27–28.  As Mr. Church, a career editor, puts it, "there is now a real risk [Stripes] can no longer sustain [the] hard-hitting reporting" for which it was known.  Church Decl. ¶ 27.  This already-diminished quality is itself a present reduction in the value of Plaintiffs' subscriptions, and it confirms the reasonably increased risk of further decline.  That risk is already being borne out: as recently as July 2026, DoD ordered a naval public-affairs officer to report to Stripes as a "military deputy" to its civilian publisher—without any job description or prior discussion with the publisher— confirming that DoD's interference with the newsroom is not abating but expanding.  Dardarian Decl. ¶ 32.  These concrete economic injuries satisfy the ordinary standing requirements for Plaintiffs' substantive APA claims; and for their notice-and-comment claims, the reasonably increased risk of further diminishment independently satisfies the relaxed procedural-injury standard.  *See Fla. Audubon Soc'y,* 94 F.3d at 664.

### B.  Deprivation of right to receive information

Defendants' actions also harm Plaintiffs' First Amendment right to "receive information and ideas," a right the Supreme Court has long recognized.  *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (collecting cases).  That right gives rise to a cognizable injury "where the listener has a concrete, specific connection to [a] speaker" whose message is curtailed by government action.  *Murthy v. Missouri*, 603 U.S. 43, 75 (2024).  Plaintiffs satisfy both requirements.

First, Plaintiffs have a "concrete, specific connection" to Stripes.  *Id*.  All four are subscribers who have read and relied on Stripes for years.  Mr. Church, a member of Stripes' publisher's advisory board—now executive editor of the Santa Fe New Mexican, a former Pulitzer juror, and a past president of the AP Media Editors group—has read Stripes since he was about twelve, growing up as a military dependent in Japan, Church Decl. ¶¶ 2–5, and Ms. Dardarian, also a member of Stripes' publisher's advisory board—a retired career editor at the Seattle Times and Minnesota Star Tribune and the National Press Foundation's 2025 Editor of the Year, and likewise a past board president of the AP Media Editors group—reads it almost

18

daily, Dardarian Decl. ¶¶ 2–5.  Mr. Baranger and Mr. Brooks are themselves military veterans and career journalists—and therefore part of the very military community that the Stripes Regulations demand the newspaper serve.  Mr. Baranger is a former New York Times senior editor who served in the U.S. Coast Guard and covered the wars in Afghanistan and Iraq for the Times.  Baranger Decl. ¶¶ 3, 6–7.  Mr. Brooks is a Vietnam veteran and Bronze Star recipient who edited Stripes' European edition, received the Department of Defense's Civilian Distinguished Service Medal for that service, and now serves as president of the Board of Directors of the Stars and Stripes National Museum and Library; his family read Stripes across three generations of military service.  Brooks Decl. ¶¶ 2, 4, 7–8.  That is precisely the concrete, identified speaker-listener relationship whose absence defeated standing in *Murthy.  See* 603 U.S. at 73–75.  And it is far more concrete than the connections the Supreme Court has already deemed sufficient: non-subscriber mail recipients challenging government interference with their right to receive communist political propaganda, *see Lamont v. Postmaster General*, 381 U.S. 301 (1965), prescription-drug consumers challenging a Virginia statute that prohibited the advertisement of prescription drug prices, *see Virginia State Bd. of Pharmacy*, 425 U.S. at 757, and professors challenging a visa denial for a specific speaker they had invited to a conference, *see Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972).

Second, DoD has curtailed the Stripes content Plaintiffs seek to receive in at least three independent ways, each a cognizable First Amendment injury.  Most directly, the challenged actions have stripped from Plaintiffs' subscriptions content they relied on: the AP and Washington Post news and opinion, and the comics and editorial cartoons, that Stripes once carried, along with any reporting DoD now deems "controlled unclassified information" or inconsistent with the military's "good order and discipline."  Church Decl. ¶ 25; Dardarian Decl. ¶¶ 19, 27–28; Baranger Decl. ¶ 15; Brooks Decl. ¶ 19.  Ms. Dardarian, for example, no longer receives through her subscription the Washington Post's coverage of the White House, federal agencies, and the military that she had read in Stripes, or the AP's on-the-ground reporting from journalists embedded with military units.  Dardarian Decl. ¶¶ 15, 20.  And Mr. Church, who does

19

not subscribe to the Post, has lost the Post coverage of the military and the federal government that Stripes alone had supplied him.  Church Decl. ¶ 11.  Mr. Baranger and Mr. Brooks both relied on Stripes' selection of AP stories for national and international news that included broad coverage relevant to the military community, and cannot otherwise obtain the same content because "they do not—and realistically could not—review the hundreds or thousands of articles that the AP and other outlets publish each day" and Stripes had performed that selection and assembly for them.  Brooks Decl. ¶ 19; Baranger Decl. ¶ 9.  Depriving Plaintiffs of content the paper previously delivered is itself a cognizable injury: in *Lamont*, even a procedural barrier to receiving information violated the First Amendment, and the barrier here is absolute.  *Lamont*, 381 U.S. at 301 (requiring the addressee to return a reply card to receive his mail).

DoD has also deprived Plaintiffs of Stripes' editorial product as a whole—its curated selection of the news and opinion most relevant to the military community.  The Supreme Court has long recognized that a newspaper's selection and presentation of content is protected editorial judgment.  *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("the choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper … constitute the exercise of editorial control and judgment."); *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (analogizing a parade organizer's control over its message to a newspaper editor's, and holding that a private speaker's choice of what content to include or exclude is constitutionally protected).  That judgment belongs to Stripes as an independent newspaper.  *See* 32 C.F.R. pt. 246, App. D (2025) ("the contents of the Stars and Stripes . . . are not to be considered as the official views of, or endorsed by, the U.S. Government, including the Department of Defense").  Plaintiffs did not subscribe for unfiltered access to wire copy; they subscribed for Stripes' judgment about what matters most to military readers.  Church Decl. ¶ 11; Dardarian Decl. ¶ 6; Baranger Decl. ¶ 9; Brooks Decl. ¶ 10.  As Ms. Dardarian, a career editor, explains, Stripes "truly knows its audience" and selects "a diversity of perspectives on issues of keen importance to [its] readers."  Dardarian Decl. ¶ 5.  By dictating Stripes' content choices, DoD has suppressed

20

that editorial judgment—an injury distinct from the loss of any single article. *See* Church Decl. ¶¶ 10, 24, 26; Dardarian Decl. ¶¶ 30–32; Baranger Decl. ¶¶ 9, 12; Brooks Decl. ¶ 10.

Finally, the same CUI and "good order and discipline" standards chill the original reporting Plaintiffs would otherwise receive. The latter is drawn from the Uniform Code of Military Justice and carries the threat of criminal sanction; vague, punitive standards like these "predictably lead reporters to self-censor," Church Decl. ¶ 25, and have already had "a chilling effect on Stripes staff, particularly military staff," as well as on sources, Dardarian Decl. ¶¶ 27–28; *see* Baranger Decl. ¶ 17. The predictable result is that reporting Plaintiffs would otherwise receive is never written—and as DoD's interference makes it harder for Stripes to keep journalists and cultivate sources, Plaintiffs stand to lose still more of the coverage they subscribed for. Church Decl. ¶¶ 27–28; Dardarian Decl. ¶¶ 27–28; Brooks Decl. ¶ 18.

For the same reasons discussed above, these First Amendment injuries satisfy both the ordinary standing requirements for Plaintiffs' substantive APA claims and the relaxed procedural-injury standard for the notice-and-comment claims.

## II. The Repeal Rule Is Unlawful

The APA supplies two independent grounds for setting aside the Repeal Rule. First, DoD repealed the Stripes Regulations without the notice-and-comment rulemaking that both the APA and DoD's own procedures require. Second, even absent that requirement, the repeal was arbitrary and capricious. Either defect requires vacatur. 5 U.S.C. § 706(2).

The Repeal Rule is a final agency action. It "mark[ed] the 'consummation' of [DoD's] decisionmaking process" and is one "from which 'legal consequences … flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). The Repeal Rule was effective on publication, removed 32 C.F.R. part 246 from the Code of Federal Regulations (CFR), and eliminated the binding protections that had governed Stripes for three decades—including the guarantee of a "free flow of news and information . . . without news management or censorship," the strict limits on withholding information from publication, and the ombudsman's independent reporting role. 32 C.F.R. § 246.4(b) (2025).

21

### A. The Repeal Rule violates notice-and-comment requirements

DoD rescinded the long-standing Stripes Regulations without notice or comment, in violation of both the APA and its own rules. Those regulations were legislative rules, adopted through notice-and-comment rulemaking and codified in the CFR, and thus § 553 permitted DoD to repeal them only through the same process. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance"). DoD's own internal procedures independently required notice and comment before a rule could be pulled from the CFR, and having bound itself to those procedures, DoD was obligated to follow them. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954); *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 34 n.3 (D.D.C. 1998) (citing *Accardi* and stating that "government agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions"); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) ("'an agency pronouncement is transformed into a binding norm if so intended by the agency,' a determination that takes into account the substance and intent of the agency action, as well as whether it confers individual protections or privileges") (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)). Either way, DoD was required to proceed through notice and comment. Instead, it withdrew its 2024 proposed rule and issued the Repeal Rule as a separate final rule on the stated ground that notice and comment was "unnecessary." 91 Fed. Reg. at 1,706; AR 0167–68.

The APA generally requires an agency to publish notice of a proposed rule and to consider public comments. 5 U.S.C. § 553. Those requirements apply to "legislative rules." *California Communities Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019). Legislative rules have the "force and effect of law," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215 (2016), and typically effect "a substantive change in existing law or policy," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). A rule is legislative where "it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive

22

change in existing law or policy." *Id.* The question is whether the rule has binding legal effect, constraining future agency action or regulating conduct as law. *Id.*

The APA "provides only limited exceptions to [its notice and comment] requirements." *Batterton v. Marshall*, 648 F.2d 694, 700–01 (D.C. Cir. 1980). An exception applies to "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). That exception is narrow and "must be narrowly construed," *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011) (citation omitted), because it is limited to "internal house-keeping measures organizing agency activities," *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (quoting *Batterton*, 648 F.2d at 702). Procedural rules are those "primarily directed toward improving the efficient and effective operations of an agency," *Mendoza*, 754 F.3d at 1023, and their "critical feature" is that they govern internal processes without "alter[ing] the rights or interests of parties." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (quotation marks omitted). A rule is not procedural, however, where it imposes "substantive burden[s]," *Bowen*, 834 F.2d at 1052, "encodes a substantive value judgment," *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (quotation marks omitted), "trenches on substantial private rights [or] interests," *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 707), or otherwise "alter[s] the rights or interests of parties," *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (citation omitted); *see also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. NLRB*, 57 F.4th 1023, 1034–35 (D.C. Cir. 2023).

The Stripes Regulations were legislative rules, so DoD could rescind them only through the same notice-and-comment process by which it adopted them. They were issued through notice-and-comment rulemaking, codified at 32 C.F.R. part 246 (2025), and treated by DoD as binding for three decades, constraining how the agency administered the newspaper. The regulations required a "free flow of news and information to [Stripes'] readership without news management or censorship," 32 C.F.R. § 246.4(b) (2025); required Stripes to carry commercial news and opinion alongside its staff-generated content, *id.* § 246.4(f)(2) (2025) & Appendix D (2025); strictly limited when military officials could stop Stripes from publishing, *id.*

23

§ 246.4(e)(1) (2025); barred military officials from any advisory board, *id.* § 246.5(e)(9) (2025); and created an ombudsman reporting directly to Congress and DoD leadership to enforce Stripes' independence, *id.* § 246.3(d) (2025).  A rule that binds the agency this way—constraining its discretion until amended or repealed—is no internal procedural device; it carries the force and effect of law and is legislative. *See Nat'l Min. Ass'n*, 758 F.3d at 251–52.  DoD could therefore rescind the Stripes Regulations only as it enacted them: through notice and comment. *See Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (it is "black-letter administrative law" that "ordinarily an agency that promulgates a rule under § 553's auspices must use the same procedure to revoke that rule"); *Perez*, 575 U.S. at 105 (regulations "codified in the Code of Federal Regulations" were "legislative rules, issued through the notice-and-comment process") (citation omitted); *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) ("an amendment to a legislative rule must itself be legislative." (quotation marks omitted)).

Section 553(b)(A)'s exception for procedural rules does not save the repeal.  The Stripes Regulations are substantive on two independent grounds: they encode a considered value judgment, and they alter the interests of parties outside the agency.  First, the regulations did not prescribe a process; they resolved a substantive conflict.  After a congressionally mandated GAO investigation found "an inherent cultural conflict" between command priorities and Stripes' First Amendment mission, and that military officials had "repeatedly attempted to influence the reporting of news," GAO Report at 3, 24, the Stripes Regulations settled that conflict in favor of editorial independence—precisely the "substantive value judgment" a procedural rule does not make. *Pub. Citizen*, 276 F.3d at 640.  Congress made the same choice, requiring Stripes' physical separation from other organizations housed under the DoD subcomponent Defense Media Activity, rather than consolidated at Fort Meade, "to preserve the actual and perceived editorial and management independence" of the newspaper.  NDAA for FY 2013 § 593, 126 Stat. at 1770–71.  Second, they alter the interests of parties outside the agency—precisely what a procedural rule does not do.  A procedural rule's "critical feature" is that it governs internal

24

process without "alter[ing] the rights or interests of parties." *Hurson*, 229 F.3d at 280. The Stripes Regulations guaranteed readers a "free flow of news and information . . . without news management or censorship," 32 C.F.R. § 246.4(b) (2025), and news and opinion from wire services and other news outlets alongside Stripes' own reporting, *id.* § 246.4(f)(2) (2025). The Repeal Rule stripped those guarantees away, leaving readers with less content and no assurance that what remains is uncensored. Church Decl. ¶¶ 22, 28. A rule that changes what the public receives, not how the agency runs itself, alters private interests—and is substantive, not procedural. *Nat'l Min. Ass'n*, 758 F.3d at 250; *Mendoza*, 754 F.3d at 1023.

The Stripes Regulations are also nothing like the "internal house-keeping measures organizing agency activities" to which the procedural-rule exception is limited. *Bowen*, 834 F.2d at 1045. Housekeeping rules govern how an agency runs its own operations, *id.*; the Stripes Regulations instead constrain DoD's authority over an editorially independent newspaper— down to an ombudsman with an "independent duty to inform Congress," a reporting line to a coordinate branch rather than a feature of internal administration. AR 0156. Nor does Stripes' government ownership change matters. What matters is what a rule does, not who owns the entity it governs; these regulations do not primarily organize DoD's operations but forbid it from censoring a newspaper that, even in government hands, enjoys the full protection of the First Amendment. *See Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 55–59 (D.D.C. 2003).

DoD has conceded as much itself. When DoD proposed to amend the Stripes Regulations in 2024—through notice and comment rulemaking—it described the rule as one that "highlights areas of public interest regarding Stripes' editorial independence, but . . . removes internal procedures that do not have external burden or implications." 89 Fed. Reg. at 30,298; AR 0132. The procedures it treated as removable were genuine housekeeping rules—related to advertising, retail pricing, and distribution logistics. 32 C.F.R. § Pt. 246, Apps. B–C, E (2025); AR 0036–0040. The editorial-independence provisions it left in place were the "public interest" core—the mission to "provide editorially independent media products to the U.S. military community." AR 0154. And yet the Repeal Rule eliminated the Stripes Regulations wholesale,

25

and pronounced them entirely "internal" with "no impact on the public." 91 Fed. Reg. at 1,706; AR 0167. And having defended forgoing notice and comment on that ground alone, DoD cannot now invoke some other exemption it never stated. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

DoD's own rulemaking directives reinforce that conclusion. DoD's Federal Register instruction provides that a DoD issuance "shall be published in the [Federal Register] for public comment" when, among other triggers, it "[i]s presently in the CFR" or "has a direct or substantial impact on any significant portion of the public." Dep't of Defense, *Office of the Secretary of Defense (OSD) Federal Register (FR) System*, (Sept. 24, 2020), https://perma.cc/7A8G-G537. DoD's Issuances Program instruction likewise directs that policies "affecting the public" may not be issued through internal issuances at all; they "must be removed from the issuance" and published "as a rule in the CFR." Dep't of Defense, *DoW Instruction 5025.01, DoD Issuances Program*, § 7.5 (Jan. 20, 2026), https://perma.cc/3W8Q-5FXX. The Stripes Regulations both affect the public and were "presently in the CFR"; under DoD's own procedures, their repeal required publication for public comment. Having bound itself to those procedures, DoD was obligated to follow them. *United States ex rel. Accardi*, 347 U.S. at 266–67; *Rodway v. USDA*, 514 F.2d 809, 814 (D.C. Cir. 1975) (agency's self-imposed notice-and-comment obligations are binding).

### B. The Repeal Rule is arbitrary and capricious

In any event, the Repeal Rule fails arbitrary-and-capricious review. An agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). At minimum, an agency must provide a "satisfactory explanation for its action including a rational connection between the facts found and the choice made," and may not "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). And when an agency departs from past policy, more is required: the agency "must at a minimum acknowledge

26

the change and offer a reasoned explanation for it," *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017), to ensure that "prior policies and standards are being deliberately changed, not casually ignored," *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (citation omitted).  The agency must also "consider the alternatives that are within the ambit of the existing policy," *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation marks omitted), and where it "disregard[s] facts and circumstances that underlay or were engendered by the prior policy," it must offer a "more detailed justification," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).  The Repeal Rule fails at every step—and most starkly at the threshold, because the very official who approved it had personally rejected repeal in favor of modification, and the record nowhere explains the reversal.

The most telling evidence comes from DoD's own administrative record.  In April 2025, DoD's deregulation review recommended repealing the Stripes Regulations on the theory that they imposed "no requirements of the public."  AR 0154.  But Defendant Parnell—the same official who later approved the Repeal Rule, AR 0160–61—rejected that recommendation: he struck through the word "repeal" and hand-wrote "modify."  AR 0154.  Modification was thus not an alternative DoD failed to imagine; it was the alternative the decisionmaker himself chose, squarely "within the ambit of the existing policy." *Regents*, 591 U.S. at 30 (citation modified).  It was also the course DoD had charted once before, having proposed a limited revision— modernizing the regulations while preserving their substantive protections—less than two years earlier. *See* 89 Fed. Reg. at 30,297.  Yet five months after Parnell wrote "modify," DoD decided to "remove the Stars and Stripes regulation" outright.  AR 0158.  No document in the record acknowledges that reversal, identifies what changed, or explains why wholesale repeal displaced the modification the decisionmaker had previously chosen.  An agency may not abandon its own reasoned choice, or decline the obvious alternative within its existing policy *sub silentio*. *Fox Television*, 556 U.S. at 515; *Regents*, 591 U.S. at 30.  That failure alone renders the Repeal Rule arbitrary and capricious.

27

DoD compounded the error by never acknowledging that it was changing position at all. The Repeal Rule nowhere recognizes that it dismantled a framework DoD had maintained as binding for three decades and had proposed to reaffirm, through notice-and-comment rulemaking, less than two years earlier.  *See* 89 Fed. Reg. 30,296 (Apr. 23, 2024); AR 0146–49. It does not even acknowledge that DoD had adopted the Stripes Regulations through notice-and-comment, *see* 58 Fed. Reg. 41,671 (Aug. 5, 1993), before declaring such proceedings "unnecessary" to repeal them "because the underlying rule addresses internal agency policies and procedures and its removal has no impact on the public."  91 Fed. Reg. at 1,706; *accord* AR 0158–59; AR 0167–68.  That rationale is not just conclusory, *see Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("The agency's statement must be one of reasoning; it must not be just a conclusion." (quotation marks omitted)); it is contradicted by the administrative record. The same April 2025 review concluded that the regulations fit no EO 14219 category warranting deregulatory action, AR 0153, 0157, and acknowledged that the regulations contained "elements of public interest, including [Stripes'] mission as the only DoD-authorized organization to provide editorially independent media products to the U.S. military community," AR 0154. Where an agency "disregard[s] facts . . . that underlay or were engendered by the prior policy," it owes a "more detailed justification," *Fox Television*, 556 U.S. at 515–16.  But DoD offered none.

Nor does the one reason DoD did provide have a rational connection to wholesale repeal. Commenters on the 2024 proposal urged DoD not to alter the regulations, warning that changes "would restrict Stripes in continuing its mission of providing editorially independent news and information."  91 Fed. Reg. at 1,706.  DoD's only response—and its only stated reason for repeal—was that the regulations "only referenc[e] Stripes as a hardcopy/print publication and not the multi-platform (including web-based) publication it has become."  *Id.*  But protections against censorship do not become "outdated" because Stripes now publishes online as well as in print; they are just as necessary for a web-based publication as for a print one.  Nor were the regulations "outdated" in any sense that necessitates repeal in full.  By independent measures,

28

"Stripes was not broken": third-party analysis has "recognized its credibility as a neutral, nonpartisan newspaper," Church Decl. ¶ 26, and places Stripes "at or near the top" for "accuracy and balance," Brooks Decl. ¶ 10.  That Stripes now publishes online in addition to in print is no reason to strip it of protection against military censorship.  *State Farm*, 463 U.S. at 43.

DoD also entirely failed to consider the reliance interests that three decades of codified editorial-independence protections engendered.  *Encino Motorcars*, 579 U.S. at 221–22; *Regents*, 591 U.S. at 30, 33.  Stripes' readers (servicemembers and their families stationed worldwide, many with no other readily available independent news source) relied on the regulations' guarantee of news "without news management or censorship."  *See supra* Background I–II. Those reliance interests appear in DoD's own record.  DoD acknowledged in April 2025 that the rule "has been used to affirm the editorial independence of Stars and Stripes and the Ombudsman position and purpose" and that the ombudsman "has an independent duty to inform Congress about matters regarding the state of the free flow of information to the U.S. military via Stripes." AR 0156; AR 0157.  And it recounted that Stripes itself had "non-concurred" with a 2022 proposal to strip its governance from the CFR precisely because portions of its mission are "of distinct public and Congressional interest."  AR 0157.  The Repeal Rule contains no discussion of reliance at all.

DoD likewise failed even to acknowledge the constitutional interests its action implicated.  The Stripes Regulations were designed to safeguard the free flow of news to Stripes' readership and to prevent military official censorship, and their repeal cleared the way for the content restrictions DoD imposed two months later.  *See infra* Part III.  The constitutional dimension of stripping anti-censorship protections from a newspaper read by millions of servicemembers was, at minimum, an "important aspect of the problem" DoD had to consider. *State Farm*, 463 U.S. at 43.  The Repeal Rule says nothing about it.

These silences are not accidental: the record shows that the Repeal Rule's stated rationale was not the real one—which is why the reversal went unexplained.  The same day the Repeal Rule was published, DoD's chief spokesperson announced that DoD would "refocus its content

away from woke distractions that syphon morale"—with "[n]o more repurposed DC gossip columns; no more Associated Press reprints."  Sean Parnell (@SeanParnellASW), X (Jan. 15, 2026), https://perma.cc/D2G2-W457; *see supra* Background III.  That contemporaneous, content- and viewpoint-driven explanation bears no resemblance to the neutral, technological rationale offered in the Federal Register.  Agency action cannot stand on an explanation "that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).  The administrative record confirms the incongruence.  The repeal did not originate in any finding that the Stripes Regulations had become "outdated"; it originated in a cross-agency deregulatory review under EO 14219—an order that DoD's own staff conceded the regulations did not fit, AR 0153, 0157—and it issued over DoD's acknowledgments that the rule addresses "areas of public interest regarding Stripes' editorial independence," AR 0132, and safeguards the ombudsman's "independent duty to inform Congress," AR 0156.  And when DoD certified the final rule for publication, it invoked a different order altogether—Executive Order 14192—while determining that the repeal "is not an Executive Order 14192 regulatory action because this rule is not significant under Executive Order 12866."  AR 0160.

Because DoD abandoned its own decisionmaker's contrary choice *sub silentio*, ignored the obvious alternative of modification, disregarded the findings and reliance interests underlying the Stripes Regulations, failed to consider the constitutional stakes, and offered a rationale at odds with its actual objectives, the Repeal Rule was arbitrary and capricious and must be set aside.  5 U.S.C. § 706(2)(A).

## III.  The DoD Memorandum Is Unlawful

The DoD Memorandum fares no better than the Repeal Rule, and indeed falls for many of the same reasons.  Although it disclaims any intent to compromise Stripes' editorial independence, it imposes a suite of unprecedented restrictions that do exactly that—censoring broad categories of unclassified content, barring the purchase of news, opinion, and cartoons from wire services and other news outlets that Stripes had carried for decades, stripping the

30

ombudsman of its independent line to Congress, and placing the newspaper under DoD's public-affairs apparatus.  The DoD Memorandum is reviewable final agency action: it took effect immediately, ordered Stripes to "immediately begin implementing" its terms, and supersedes DoD Directive 5122.11 in any conflict.  *Bennett*, 520 U.S. at 177–78; DoD Mem. at 1, AR 0172.

The APA supplies three independent grounds to set the DoD Memorandum aside.  First, it amends the still-binding Stripes Regulations without notice and comment, and in any event, is a legislative rule that is not exempt from § 553.  Second, it is arbitrary and capricious: DoD reversed thirty years of editorial-independence protections without acknowledging the change, ignored the censorship findings that produced those protections, and contradicted itself—promising independence while imposing censorship.  Third, it violates the First Amendment because it imposes content- and viewpoint-based restrictions on Stripes and thereby denies the right to information and ideas to its readers.  Any one defect requires vacatur.  5 U.S.C. § 706(2).

## A. The DoD Memorandum violates notice-and-comment requirements

The DoD Memorandum was issued without the notice and comment the APA requires, and it must be set aside for that reason alone.  5 U.S.C. § 706(2)(D).  An agency "is itself bound by [a legislative] rule until that rule is amended or revoked," and may not "alter [it] without notice and comment."  *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (citation modified).  Because DoD's rescission of the Stripes Regulations was itself unlawful, those regulations remain binding, *see supra* Part II—yet the DoD Memorandum overrides them anyway, amending one provision after another without any process at all.  And even if the Repeal Rule were valid, the DoD Memorandum would independently require notice and comment as a substantive rule in its own right.

The DoD Memorandum conflicts with—and thus impermissibly amends—the Stripes Regulations provision after provision:

**32 C.F.R. § 246.3(d) (2025): Independent Ombudsman Advising Congress.**  The Stripes Regulations created an ombudsman to "independently advise[]" DoD leadership, Stripes leadership, and Congress on "matters of readership interest in the Stars and Stripes"—a reporting

31

line deliberately routed around ordinary command channels to ensure accountability to Congress and readers, not to DoD alone.  32 C.F.R. § 246.3(d) (2025); *see* GAO Report at 3 (finding an "inherent cultural conflict between civilian journalists who must execute the First Amendment mission and commanders who must execute the military mission").  The DoD Memorandum eliminates that independence: the ombudsman now "[a]dvises" only "the Stripes Publisher and DoW leadership"—not Congress—on "matters relating to Stripes audience interests or concerns and journalistic and editorial practices," DoD Mem. § 4(b), AR 0177, and any report to Congress must be "coordinat[ed]" with DoD leadership and routed through it "for transmittal to Congress," DoD Mem. § 4(c), AR 0177–78.  What Congress designed as an independent line becomes a channel controlled by the military chain of command.

　　　**32 C.F.R. § 246.4(e)(1) (2025): Narrow Grounds to Prevent Publication.**  The Stripes Regulations provide that "[t]he only circumstances under which news or information that is not in the public domain may be directed to be withheld from publication" are where: publication "(i) involves disclosure of classified national security information"; "(ii) would adversely affect national security"; or "(iii) clearly endangers the lives of U.S. personnel."  32 C.F.R. § 246.4(e)(1) (2025).  Those grounds, moreover, "may not be construed to permit the calculated withholding of news unfavorable to the Department of Defense, the Military Services, or the U.S. Government."  *Id.* § 246.4(e)(2) (2025).  The DoD Memorandum discards both limits, barring publication of the many categories of "controlled unclassified information"—at least 113, *see* CUI Categories and Abbreviations, DOD CUI Program, https://perma.cc/JHF8-3GQE— and of any content DoD deems inconsistent with "good order and discipline of the military," a standard drawn from the Uniform Code of Military Justice that carries the threat of criminal prosecution, as discussed above.  *See* 10 U.S.C. § 934; DoD Mem. §§ 1(b), 2(a)(2)(e), AR 0176.  The "good order and discipline" catch-all is precisely the calculated withholding of unfavorable news that § 246.4(e)(2) (2025) forbids—reporting critical of military leadership being the content most likely to be deemed inconsistent with discipline.  Where the Stripes Regulations confined withholding to a fixed set of national-security and safety grounds, the DoD

32

Memorandum claims open-ended authority to suppress unclassified news.

**32 C.F.R. § 246.4(f)(2) (2025) & Appendix D: Commercially Sourced Content Required.**  The Stripes Regulations define Stripes as an "abstracted collection of commercial news and opinion available to commercial newspapers in the United States," together with "editorial staff-generated DoD, command, and local news."  32 C.F.R. § 246.4(f)(2) (2025). Appendix D makes that commercial sourcing mandatory, directing that Stripes "purchase (or contract for) and carry news stories, features, syndicated columns, comic strips, and editorial cartoons from commercial services or sources."  32 C.F.R. pt. 246, App. D (2025).  The regulations also specifically mandate that Stripes publish opinion and editorial cartoons from other news outlets, and in a balanced manner: "Since the Stars and Stripes may not take an independent editorial position, a balanced selection of syndicated opinion columns shall be published over a reasonable time period" and "[t]he presentation of syndicated editorial cartoons should reflect the full spectrum of topical editorial cartoons being published throughout the United States."  *Id*.  The DoD Memorandum does the opposite: it "prohibit[s]" Stripes from "purchasing or contracting for news stories, features, syndicated columns, comic strips, and editorial cartoons from commercial news media services or sources," confining the paper to staff-generated content.  DoD Mem. § 2(a)(2)(c), AR 0175.  The Stripes Regulations required the very commercial content the DoD Memorandum now forbids.

**32 C.F.R. § 246.4(b) (2025): Free Flow of News and Information.**  The Stripes Regulations commit DoD to "a free flow of news and information to [Stripes'] readership without news management or censorship," and specifically prohibit "[t]he calculated withholding of unfavorable news."  32 C.F.R. § 246.4(b) (2025).  The DoD Memorandum imposes exactly the news management the Stripes Regulations prohibited: it bars commercial news and opinion, DoD Mem. § 2(a)(2)(c), AR 0175; prevents publication of controlled unclassified information, DoD Mem. § 1(b), AR 0174; and requires all content to be "consistent with good order and discipline of the military," DoD Mem. § 2(a)(2)(e), AR 0176.  Each is an affirmative limit on what Stripes may publish—the antithesis of a "free flow… without news management or

censorship." 32 C.F.R. § 246.4(b) (2025).

**32 C.F.R. §§ 246.3 & 246.5 (2025): Insulation from Command Control.** The Stripes Regulations deliberately insulate the newsroom from the military chain of command. Meetings between Stripes leadership and military officials "may not serve as editorial advisory boards," because any such "involvement or appearance of involvement . . . in the Stars and Stripes editorial policy creates an unacceptable conflict of interest damaging to the editorial integrity and credibility of the Stars and Stripes." 32 C.F.R. § 246.5(e)(9) (2025). The regulations further vest Stripes leadership in a civilian editor. *Id.* § 246.3(f) (2025). The DoD Memorandum breaches that boundary. It installs a DoD-approved advisory group that must include federal officers, federal employees, or active-duty military, DoD Mem. § 3(h)(1), AR 0177—raising the very "conflict of interest" that § 246.5(e)(9) (2025) sought to prevent. It requires the publisher to report to the Director of the Department of War Information Activity, DoD Mem. § 3(b), AR 0176, inserting DoD's public-affairs apparatus into the newsroom's chain of command. It makes Stripes "fully accountable to [DoD] leadership" for its "performance" and "strategic modernization," DoD Mem. § 1(c)(1), AR 0174—terms that impermissibly reach editorial output. And it requires Stripes' non-newsgathering engagements with Congress to be pre-coordinated with DoD's legislative-affairs office, DoD Mem. § 1(f), AR 0175, stripping the newsroom of the direct line to Congress that the Stripes Regulations preserved through the ombudsman, 32 C.F.R. § 246.3(d) (2025).

Independently, the DoD Memorandum is itself a legislative rule that required notice and comment, and it must be set aside for that reason even if the Repeal Rule were valid. As explained above, *see supra* Part II.A, a rule is substantive rather than procedural when it encodes a value judgment or alters the rights or interests of parties outside the agency, and the § 553(b)(A) exception reaches only internal housekeeping. That conclusion holds even more forcefully here, because the DoD Memorandum does not merely strip protections away—it affirmatively imposes binding restrictions, commanding that Stripes is "prohibited" from purchasing or publishing commercial content, DoD Mem. § 2(a)(2)(c), AR 0175, barring whole

categories of information from publication, DoD Mem. §§ 1(b), 2(a)(2)(e), AR 0174 & 0176, and dictating the reporting structure the publisher must adopt, DoD Mem. § 3(b), AR 0176. Mandatory commands of that kind carry the force of law and dictate what a newspaper "much the same as any other commercial newspaper" may print—the antithesis of an internal housekeeping measure.  *Tripp*, 284 F. Supp. 2d at 58; *see Nat'l Min. Ass'n*, 758 F.3d at 250–52.

**B.  The DoD Memorandum is arbitrary and capricious**

The DoD Memorandum is arbitrary and capricious in four independent ways: it reverses more than thirty years of settled policy without acknowledgment or justification; it rests on no reasoned decisionmaking and ignores the aspects of the problem that matter most; it commands things that contradict one another on its own face; and it offers a "modernization" rationale the record shows to be pretextual.  Any one defect is independently fatal.

First, DoD reversed a decades-long anti-censorship policy without confronting the change, the record that produced it, or the reliance it engendered.  For more than thirty years, the Stripes Regulations guaranteed "a free flow of news and information to [Stripes'] readership without news management or censorship," expressly provided that "[t]he calculated withholding of unfavorable news is prohibited," and permitted withholding only in "[t]he only circumstances" of three narrow national-security and safety grounds.  32 C.F.R. §§ 246.4(b), 246.4(e)(1) (2025).  DoD adopted those limits in direct response to GAO findings that military commanders "repeatedly attempted to influence the reporting of news" and that public affairs officers "caused stories to be withheld."  GAO Report at 3–5; *see* 58 Fed. Reg. at 41,671.  And as recently as 2024—less than two years before the DoD Memorandum—DoD's own proposed rule reaffirmed that editorial independence and preserved an ombudsman who would "independently advise[] . . . oversight authorities" and report "annually to the House Armed Services Committee on the state of the free flow of information."  AR 0142, 0156; *see* 89 Fed. Reg. 30,296, 30,297–98 (Apr. 23, 2024).  The DoD Memorandum sweeps all of it aside *sub silentio*.  It drops both the "only circumstances" limitation and the bar on calculated withholding; it adds "controlled unclassified information"—a sweeping and elastic category—to what Stripes

35

may not disclose, DoD Mem. § 1(b), AR 0174; it imposes a new, open-ended command that all "content must be consistent with good order and discipline of the military," DoD Mem. § 2(a)(2)(e), AR 0176; *see* 10 U.S.C. § 934; and it eliminates the ombudsman's independent line to Congress, permitting reports only "in coordination with" DoD leadership and routed "to OASW(LA) for transmittal to Congress," DoD Mem. § 4(c), AR 0177–78. Nowhere does the DoD Memorandum confront the GAO findings, the editorial-independence rationale, or DoD's own contrary position from two years earlier. Where an agency "disregard[s] facts . . . that underlay or were engendered by the prior policy," it owes "a more detailed justification" than would suffice on a blank slate. *Fox Television*, 556 U.S. at 515–16. Reliance interests of this magnitude only compound that obligation. *Encino Motorcars*, 579 U.S. at 222. DoD offered none.

Second, DoD "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. As a threshold matter, the DoD Memorandum issued without any consultation of Stripes' publisher and on no administrative record—by itself an absence of reasoned decisionmaking. *See supra* Background III. The DoD Memorandum says nothing about the First Amendment interests plainly at stake, though GAO framed the very findings that produced the Stripes Regulations in terms of Stripes' "First Amendment mission." GAO Report at 3; *see infra* Part III.C. It says nothing about the impact on readers, many of whom lack reliable digital access to the alternatives DoD invokes, face paywalls DoD now passes on to them, and cannot replicate Stripes' editorial selection of news relevant to its readers' interests without added cost and effort. Dardarian Decl. ¶¶ 23–24; Church Decl. ¶¶ 23–24; Baranger Decl. ¶¶ 17–19; Brooks Decl. ¶ 19. DoD's stated justification for the commercial-news ban— that such content is available "due to the[] digital availability . . . globally," DoD Mem. § 2(a)(2)(c), AR 0175—is not just uninformed but affirmatively contradicted by DoD's own restrictions on servicemember internet access. Deployed servicemembers in combat zones "are often not allowed to have computers and mobile phones" for operational-security reasons, which renders digital news access alone "not a viable alternative"; and even at established posts in

36

Japan and Germany, the military controls the local broadcast stations while other English-language outlets "seldom if ever cover U.S. military news." Brooks Decl. ¶¶ 14–15; *see* Dardarian Decl. ¶ 23. And the DoD Memorandum says nothing about the chill its CUI and "good order and discipline" standards would impose on Stripes' journalists and their sources—a chill the record already confirms. Dardarian Decl. ¶¶ 27–28; *see* Baranger Decl. ¶ 15. The consequences have already materialized: readers have lost the commercial news they relied on, Church Decl. ¶¶ 23–24; Dardarian Decl. ¶¶ 18–19; Baranger Decl. ¶ 17; Brooks Decl. ¶ 19, and the quality of Stripes' post-Memo reporting is "diminished." Brooks Decl. ¶ 18.

Third, the DoD Memorandum contradicts itself on its face. It declares in one clause that Stripes' "editorial operations are independent of the military chain of command . . . and without censorship or propaganda," then commands in the same sentence that they "must comply with the [instructions] in Section 2 [of the DoD Memorandum] and the policies and procedures that prevent the disclosure of . . . controlled unclassified information." DoD Mem. § 1(b), AR 0174. That is not independence. And it directs Stripes to provide "comprehensive coverage . . . of issues relevant to DoW personnel," DoD Mem. § 2(a)(2)(a), AR 0175, while two subsections later "prohibit[s]" Stripes from purchasing the commercial news content that would make such coverage possible, DoD Mem. § 2(a)(2)(c), AR 0175—content Stripes lacks the staff and resources to replicate in-house compared to AP's "over 250 bureaus across more than 100 countries." Dardarian Decl. ¶ 18. That kind of internally inconsistent decisionmaking is neither "reasonable" nor "reasonably explained," *Ohio*, 603 U.S. at 293, and is by definition arbitrary and capricious, *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025).

Fourth, the DoD Memorandum's stated justification of modernization bears no resemblance to the content- and viewpoint-driven purpose DoD announced when it foreshadowed the memorandum. *See infra* Part III.C; *see also supra* Part II.B (same contemporaneous evidence exposing the Repeal Rule's rationale as pretextual). Two months before the memorandum issued, DoD's chief spokesperson publicly declared that DoD would

37

"refocus [Stripes'] content away from woke distractions" and end "repurposed DC gossip columns" and "Associated Press reprints." *Supra* Background III.  The DoD Memorandum delivered exactly that: it bans commercial news and opinion, DoD Mem. § 2(a)(2)(c), AR 0175; imposes content standards keyed to "good order and discipline," DoD Mem. § 2(a)(2)(e), AR 0176; and installs DoD oversight of Stripes' operations, DoD Mem. § 3(b), (h)(1), AR 0176–77.  DoD confirmed the point after issuance by firing Stripes' ombudsman days after she publicly criticized the changes.  *See supra* Background III.  As above, agency action cannot stand on an explanation "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce*, 588 U.S. at 785.

### C.  The DoD Memorandum violates the First Amendment

The DoD Memorandum dictates what the military's independent newspaper may print and what its readers may receive.  The First Amendment protects the freedom of the press, *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 548 (1976) ("Our liberty depends on the freedom of the press, and that cannot be limited without being lost" (quoting 9 Papers of Thomas Jefferson 239 (J. Boyd ed., 1954))), as well as the public's right to "receive information and ideas," *Va. State Bd. of Pharmacy*, 425 U.S. at 756–57.  The DoD Memorandum violates both: it imposes content- and viewpoint-based restrictions on what Stripes may publish and Plaintiffs may receive.  Those restrictions are presumptively unconstitutional, and DoD's asserted "modernization" rationale cannot carry the heavy burden the First Amendment imposes.

The First Amendment protects Plaintiffs' right to "receive information and ideas": "[w]here a speaker exists," "the protection afforded is to the communication, to its source and to its recipients both." *Id.*; *see supra* Part I.B.  Here, the DoD Memorandum denies Plaintiffs the wire-service news and opinion they relied on, strips them of Stripes' curated editorial product, and imposes CUI and "good order and discipline" standards that chill the reporting they would otherwise receive.  *See supra* Part I.B.  Each is an unlawful "limitation on the unfettered exercise of the [recipients'] First Amendment rights." *Lamont*, 381 U.S. at 305.

38

As a threshold matter, Stripes' journalism is fully protected First Amendment speech.  A judge of this District has so held: Stripes "is much the same as any other commercial newspaper," and "both DoD and Congress intend for the Stars and Stripes to operate like other commercial newspapers, and enjoy First Amendment protections and prohibitions." *Tripp*, 284 F. Supp. 2d at 58.  That remains true today.  The DoD Memorandum itself declares that Stripes is to be editorially independent and free of censorship.  DoD Mem. § 1, AR 0174–75.  Congress has "expressly stated" that articles in Stripes "should 'enjoy the full protection of the First Amendment,'" and intended Stripes' reporting "to be free of interference from the DOD chain of command." *Tripp*, 284 F. Supp. 2d at 56 (citing H.R. Rep. No. 101-121 (1989)).  Congress has legislated on that understanding ever since, mandating preservation of Stripes' "actual and perceived editorial and management independence."  NDAA for FY 2013 § 593, 126 Stat. at 1770–71.

DoD cannot recast Stripes' journalism as the government's own speech.  The government-speech doctrine lets government control messages it delivers in its own voice; it does not reach speech the government has deliberately established as independent.  *See Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); *Shurtleff v. City of Boston*, 596 U.S. 243 (2022).  Government speech turns on whether the public reasonably attributes the message to the government and whether the government exercised editorial control—factors that all cut against DoD here.  As explained above, a century of history has established Stripes as an independent source of news useful to the military community, as is well known to its readers.  *See supra* Background I–II.  For more than three decades, DoD's own regulations, its Directive 5122.11, and acts of Congress defined Stripes as editorially independent, insulated it from the chain of command, and forbade "news management or censorship."  32 C.F.R. § 246.4(b) (2025); NDAA for FY 2013 § 593.  Moreover, although part of Stripes' funding comes from the government, much of it comes from subscription and advertising.  *See supra* Background I.  Stripes is not like an agency publication or website where the government expresses its own viewpoint; it reflects a broad array of

39

perspectives and sources of content and is in many ways indistinguishable from any other newspaper. As explained above, DoD explicitly disclaims that Stripes expresses DoD's official viewpoint. *Supra*, at 20. Based on that context, the court in *Tripp* unsurprisingly concluded that Stripes was indistinguishable from a commercial newspaper for First Amendment purposes. *Tripp*, 284 F. Supp. 2d at 58. Having spent decades disclaiming editorial control precisely so that readers would not attribute Stripes' content to the Pentagon, DoD cannot now assert that control to escape the First Amendment. DoD is now asserting exactly that control in practice: since the DoD Memorandum, it has installed a uniformed public-affairs officer as a "military deputy" to Stripes' civilian publisher. Dardarian Decl. ¶ 32.

That Stripes is published and partially financed by DoD does not change this outcome. The editorial and journalistic functions of government-employed journalists are protected by the First Amendment. *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 364 & n.25 (D.D.C. 2020) (distinguishing Stripes, whose articles Congress directed "should 'enjoy the full protection of the First Amendment'" (citations omitted)).

The DoD Memorandum imposes both content- and viewpoint-based restrictions and therefore denies Stripes' readers access to information and ideas. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Content-based restrictions are "presumptively unconstitutional" and survive only if "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination—an "egregious form of content discrimination" *Rosenberger*, 515 U.S. at 829—is "prohibited" outright, *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018), and a facially neutral rule qualifies if adopted "because of disagreement with the message [the speech] conveys." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation modified). The DoD Memorandum is both.

The DoD Memorandum's restrictions are content-based on their face. They single out speech "based on its communicative content," *Reed*, 576 U.S. at 163, banning whole categories

40

of expression: the commercial news, opinion, comic strips, and editorial cartoons Stripes had carried for decades, DoD Mem. § 2(a)(2)(c), AR 0175; more than 100 categories of "controlled unclassified information," DoD Mem. §§ 1(b), 2(a)(2)(e), AR 0174 & 0176; and any content DoD deems inconsistent with the "good order and discipline of the military," DoD Mem. § 2(a)(2)(e), AR 0176. Each targets speech by its content and is therefore "presumptively unconstitutional." *Reed*, 576 U.S. at 163. In dictating what Stripes may publish, the DoD Memorandum also commandeers the editorial judgment the First Amendment protects: "the choice of material" and the "decisions made as to . . . [the] content of the paper . . . constitute the exercise of editorial control and judgment" the government may not displace. *Miami Herald Pub. Co.*, 418 U.S. at 258; *see Hurley*, 515 U.S. at 573–75. That interference with a willing speaker is precisely what denies Plaintiffs access to the content they seek.

The DoD Memorandum's restrictions are also viewpoint discriminatory. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Both the purpose and effect of the memorandum are to eliminate content, and chill speech, that DoD perceives as unfavorable or biased. Dardarian Decl. ¶¶ 32–33. DoD has made that motive plain. As discussed above, two months before the memorandum issued, its chief spokesperson vowed that DoD would "refocus [Stripes'] content away from woke distractions," end "repurposed DC gossip columns"—an apparent reference to the Washington Post—and end "Associated Press reprints"; the memorandum delivered exactly that. Parnell (@SeanParnellASW), X (Jan. 15, 2026), https://perma.cc/D2G2-W457. The point is underscored by what the DoD Memorandum cut: the syndicated comics DoD eliminated had themselves included "satirical comics that criticized the current administration." Dardarian Decl. ¶ 22. And months earlier, the White House barred the AP from the press pool for refusing the President's "Gulf of America" terminology—conduct a court of this District held to be unconstitutional viewpoint discrimination. *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 39 (D.D.C. 2025) (the Government "cannot . . . shut [its] doors to other journalists because of their viewpoints"). A

41

restriction adopted "because of disagreement with the message [the speech] conveys" is viewpoint discriminatory however neutrally packaged, *Sorrell*, 564 U.S. at 566 (citation modified), and DoD's "modernization" label bears no resemblance to the viewpoint-driven purpose it announced. *Dep't of Commerce*, 588 U.S. at 785.

The DoD Memorandum also chills the reporting it does not preemptively excise. The command that content stay "consistent with good order and discipline of the military," DoD Mem. § 2(a)(2)(e), AR 0176—a UCMJ standard carrying the threat of criminal prosecution, *see supra* Background III—gives commanders open-ended authority over coverage, with reporting critical of military leadership the likeliest casualty. These vague, punitive standards predictably make speakers "steer far wider of the unlawful zone . . . than if the boundaries . . . were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citation omitted). That effect has followed: the memorandum "predictably lead[s] reporters to self-censor," Church Decl. ¶ 25, and has chilled Stripes' staff and sources, Dardarian Decl. ¶¶ 27–28; Church Decl. ¶¶ 25, 28; Baranger Decl. ¶ 17; Brooks Decl. ¶ 17. DoD confirmed the point by firing Stripes' ombudsman days after she criticized the changes. *See supra* Background III.

These content bans are also prior restraints—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. By barring the categories above before any of it appears, the DoD Memorandum keeps lawful speech from ever reaching the public and so bears "a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (citation omitted). DoD has not made—and cannot make—the extraordinary showing a prior restraint demands.

These restrictions cannot survive the strict scrutiny they trigger. *Reed*, 576 U.S. at 163–64. DoD bears the burden of proving a compelling interest and narrow tailoring, and offers neither. "Modernization" is not a compelling interest but an administrative preference, which cannot justify suppressing protected speech. DoD Mem. at 1–2, AR 0172–73. And even if it could, the DoD Memorandum is not tailored to it: DoD never explains why "modernizing" a newspaper requires banning commercial news and cartoons, embargoing 100-plus categories of

42

unclassified information, or conditioning publication on "good order and discipline."  DoD Mem. § 2(a)(2)(e), AR 0176.  A restriction sweeping in vast quantities of lawful speech is the antithesis of narrow tailoring—and its viewpoint discrimination is fatal regardless of the level of scrutiny.

## IV.  Vacatur Is the Proper Remedy

Vacatur is "the normal remedy" when agency action is unlawful.  *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *see* 5 U.S.C. § 706(2) (a reviewing court "shall . . . hold unlawful and set aside" unlawful agency action).  Whether to depart from that norm depends on "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed."  *Allied-Signal*, 988 F.2d at 150–51 (citation omitted).  Both factors compel vacatur here.  The deficiencies are fundamental: DoD bypassed notice and comment entirely—a "fundamental flaw" that "normally" requires vacatur, *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citation omitted)—and the Repeal Rule and DoD Memorandum are arbitrary, capricious, and unconstitutional in ways that no explanation on remand could cure.

Nor would vacatur be disruptive; it would restore the status quo that governed for three decades.  Vacatur of the Repeal Rule revives the Stripes Regulations*, see Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam) (vacating a rescission "reinstate[s] the rules previously in force"), and vacatur of the DoD Memorandum lifts restrictions that took effect only months ago.  The Court should vacate both actions and order that the Stripes Regulations remain in effect unless and until lawfully amended.

## CONCLUSION

For the above reasons, Plaintiffs' motion should be granted.

July 29, 2026                                         Respectfully submitted,

                                                     */s/ Allyson R. Scher*
                                                     Allyson Scher (D.C. Bar 1616379)
                                                     Paul R.Q. Wolfson (D.C. Bar 414759)
                                                     Elena Goldstein (D.C. Bar 90034087)

Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ascher@democracyforward.org
pwolfson@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*