**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Susan Dardarian *et al.*,

*Plaintiffs*,

v.

Case No. 1:26-cv-1965

U.S. Department of Defense *et al.*,

*Defendants*.

**DECLARATION OF SUSAN DARDARIAN**

I, Susan ("Suki") Dardarian, declare as follows:

1.      I am over eighteen years old and have personal knowledge of the facts and information in this declaration. I respectfully provide this declaration to detail the ways in which I have been harmed by changes to Stars and Stripes ("Stripes") as a result of the rescission ("Repeal Rule") of U.S. Department of Defense ("DoD") regulations governing Stripes' newspaper and operations ("Stripes Regulations"), and the issuance of DoD's March 9, 2026, memorandum ("DoD Memorandum") in its place. The policies put in place through the DoD Memorandum impose: (1) affirmative content restrictions on Stripes and its journalists; (2) unduly broad and vague standards, chilling the publication of large swaths of information; and (3) layers of oversight by military leadership, in direct contradiction of congressional intent.

2.      I am a retired journalist and editor. Early in my career, I spent 12 years at the News Tribune in Tacoma, Washington, serving as a reporter, editor, and senior editor and was a finalist for the Pulitzer Prize in explanatory reporting. I then spent more than fourteen years at the Seattle Times in news leadership, including as managing editor. In 2014, I joined the Minnesota Star

1

Tribune as managing editor and vice president before assuming the role of editor and senior vice president in March 2022. I also served as an advisor to the Associated Press ("AP") in my role as an active member (serving at one point as board president) of the industry leadership group Associated Press Managing Editors, which evolved into the News Leaders Association, from 1996 to 2024.

3.      Over the course of my career, I have overseen numerous Pulitzer Prize-winning projects and was the 2025 recipient of the National Press Foundation's Benjamin Bradlee Editor of the Year Award. *See* https://nationalpress.org/award-story/suki-dardarian-of-the-minnesota-star-tribune-wins-editor-of-the-year-award/. As a staunch advocate for open government and the First Amendment, I have been a plaintiff and provided declarations in multiple lawsuits seeking media access, including efforts that resulted in the live-streaming of the trials for the murder of George Floyd. I hold a Bachelor of Arts degree in Communications and Political Science from the University of Washington.

4.      In 2025, I was recruited to serve as a subject matter expert on Stripes' Publisher's Advisory Board ("Board"). In my role as a Board member, I advise Stripes' Publisher (currently Max D. Lederer, Jr.) on the management of a newspaper committed to First Amendment principles. Following my appointment to the Board, I purchased an annual Stripes digital subscription for $49.99 on May 2, 2025. On May 2, 2026, I renewed my annual subscription for $49.99. Since mid-February, I have been reading Stripes almost daily for both national and international news, and sometimes for news local to my area, and I rely on the expertise of Stripes' staff to choose the most important news and information specific to my needs and those of its readership.

5.      What I appreciate about Stripes' coverage is not just the quality reporting, editing, design, and writing, but also Stripes' staff's deep understanding of and passion for its readers, both

2

in the subjects and stories it chooses to cover and in its packaging of news, features, and opinion pieces. In an industry striving to retain readers, this publication truly knows its audience. Through my reading of Stripes' news coverage, I've been able to better understand the military world, culture, and protocols and develop a deeper appreciation for the experiences and challenges facing those who serve or have served, and their families. And the opinion pieces they have curated give a diversity of perspectives on issues of keen importance to their readers.

6.      From reading the publication, reviewing its standards and practices, and meeting with some staff members, I have come to trust the publication as one that is committed to accurate and fair coverage and that operates professionally. I purchased a subscription to Stripes to support my advisory role, and I read it because I value and appreciate its editorial judgment. I relied on Stripes to select news and information from a broad range of sources, including the AP and Washington Post, that will be relevant to its readers, including me. I also agreed to serve on the Board and subscribe to Stripes because I ascribe value to the newspaper as an editorially independent entity that is free from military command influence.

7.      I re-purchased my annual subscription in May 2026, because I continue to support Stripes—despite DoD's rescission of the Stripes Regulations and the issuance of the DoD Memorandum and their impact on Stripes' content and threat to its independence. I also supported the Publisher's request to DoD leadership for an exemption to continue to re-publish syndicated news and features content, and I understand that DoD leadership has not responded to the request.

8.      The Stripes product I pay for is worth less to me because of the Repeal Rule and the DoD Memorandum. For the same price, subscribers now receive less content and less breadth of coverage. The lack of an ombudsman erodes an element of trust and credibility. And we no longer benefit as greatly from Stripes' unique editorial curation—its selection and compilation of

3

news from other sources. Moreover, the editorial independence that has long distinguished the paper is being eroded—further degrading the value of what I and others pay for.

9. While countless Stripes' readers are loyal to the publication, I know some chose to cancel subscriptions to protest the cuts to content and the threat to its independence. Were I not on the Board, I might have made the same decision. I also know some readers have kept their subscriptions or re-subscribed to express support for Stripes journalism and in opposition to the changes.

**Harm from the Repeal Rule and DoD Memorandum**

10. In January 2026, DoD repealed the Stripes Regulations without notice or an opportunity for comment, and in March 2026, it issued the DoD Memorandum in their place—again without notice or comment—to govern Stripes' newspaper and operations. The new policies are directly at odds with Stripes' editorial independence. Although the DoD Memorandum invokes Stripes' editorial independence, it imposes direct, affirmative limits on what Stripes may report and publish. The cumulative impact of the content restrictions imposed by the DoD Memorandum is a severe degradation of journalist discretion and editorial independence. If Stripes is to provide accurate, relevant, comprehensive, and contextual information to their audience, then Stripes must be able to identify what content is appropriate to fulfill its mission for readers and whether that content is more efficiently or appropriately delivered by an alternative source. Prohibiting that violates Stripes' pledge of editorial independence.

11. <u>Failure to Provide Notice and Opportunity to Comment.</u> If DoD had provided notice of and the opportunity to comment on the Repeal Rule and DoD Memorandum, I would have provided comments raising my concerns, as illustrated in detail below.

12. <u>Prohibition on Commercial Content</u>. The DoD Memorandum specifies what news content is and is not acceptable—a clear infringement on editorial decision-making. Prior to the

4

Repeal Rule and DoD Memorandum, Stripes relied heavily on AP and Washington Post news and opinion content. For example, an issue of Stripes may contain dozens of AP articles and a dozen Washington Post articles, including several opinion pieces. Stripes also contained syndicated comics and editorial cartoons, including eight pages of comics in weekend editions.

13. The DoD Memorandum prohibits Stripes from purchasing or contracting for news stories, features, syndicated columns, comic strips, and editorial cartoons from commercial news media, without justifying purchase of that content to superiors, namely the Assistant to the Secretary of War for Public Affairs ("ATSW(PA)"). As a result, since late March, Stripes has not published content from the Washington Post; news and feature stories from the AP; or any comic strips and editorial cartoons. These forced omissions significantly undermine the breadth and quality of Stripes' coverage and its ability to get relevant information to its readers on a timely basis.

14. While I am an avid reader of newspapers, I have spent and continue to spend more time reviewing the AP and Washington Post and other websites to identify content that is relevant to my interests because I know that content is no longer included in Stripes.

15. Washington Post content is particularly salient for me and other Stripes readers because the Post is uniquely positioned to report, and provide commentary, on the White House, federal agencies—including specifically DoD—and the federal workforce, due to its longstanding presence in the Nation's capital and relationships with federal officials. It is also a strong source of general and breaking news in the DC area. As a result of the Repeal Rule and DoD Memorandum, I no longer have access to this reporting on the federal government, defense matters, and issues specific to Washington, DC through my Stripes subscription.

16. In addition, under both the Stripes Regulations and the DoD Memorandum, Stripes is prohibited from presenting its own editorial position. To nevertheless provide its readers with

content comparable to U.S. commercial daily newspapers, the Stripes Regulations provided that Stripes would present a wide range of news and views, including a balanced selection of syndicated opinion columns. Again, because of the Post's unique vantage point and federally focused coverage, that selection often included opinion columns from the Post. I no longer have access to those columns via my Stripes subscription.

17. To obtain this missing coverage, Stripes' subscribers must now pay for an additional Washington Post subscription. Indeed, I paid a monthly promotional fee of $5.99 to re-subscribe to the Washington Post in May 2026, when my previous subscription lapsed, because a selection of Washington Post content is no longer available to me through my Stripes subscription, and I wanted to get a more fulsome report on political and military coverage that I was previously able to receive through Stripes. I will continue to pay for a Washington Post subscription if DoD continues to prohibit Stripes from purchasing commercial news.

18. The restrictions on AP content are equally damaging. In addition to sharing content from more than 1,000 AP-member news organizations, the AP operates in over 250 bureaus across more than 100 countries, producing content that daily reaches more than half the global population. Like many newsrooms, Stripes relied on the AP to republish timely national and international news that it lacks the staff or resources to gather on its own. Stripes simply does not have the capacity to cover all the stories the AP covers around the globe that are relevant to Stripes' readership. Stripes also regularly published opinion columns via the AP.

19. By prohibiting Stripes from buying AP content, the DoD Memorandum severely limits readers' ability to obtain timely and relevant information. When war broke out in Iran in February 2026, for example, DoD's public affairs office did not respond for hours, but Stripes was able to republish an AP report immediately and update it with its own reporting to keep readers informed. It can no longer do so. Staff must now scramble and expend scarce resources to cover

6

essential breaking news of key relevance to their readers that has already been fully reported by the AP.

20.    Reporting by journalists embedded with military units is also distributed through the AP. Without AP access, I and other readers lose that on-the-ground reporting unless we separately subscribe to (and pay for) each reporter's home newspaper.

21.    In sum, without AP content, Stripes' readership, including myself and members of the U.S. military and their families, are being and will continue to be deprived of access to comprehensive and oftentimes the timeliest national and international news that they previously obtained through their Stripes subscriptions.

22.    Since the Repeal Rule and DoD Memorandum, Stripes has also dropped its daily comics and the eight pages of Sunday color comics, prompting an outcry among readers. *See* https://www.stripes.com/opinion/2026-04-08/stripes-ombudsman-bring-back-color-comics-21317857.html.   In addition to providing levity, it is well-documented that comics are a longstanding and powerful tool for criticizing political leadership and challenging authority. Prior to the Repeal Rule and DoD Memorandum, Stripes had indeed included satirical comics that criticized the current administration. I occasionally read and enjoyed those comics, and losing them has diminished my enjoyment of the paper. Many readers complained about the loss. (Cutting comics has traditionally been one of the most unpopular decisions a newspaper can make.).

23.    DoD's justification for its prohibition on commercial content is that the content is digitally available elsewhere.   However, the presumption of wide-open access to news is inaccurate. Digital access to information—particularly news that is comprehensive and accurate—requires technology, internet access, and, in most cases, a subscription.   We know that many servicemembers and their families do not have reliable internet access and, in some cases, do not

have internet access at all.  Stationed all over the world, such access may be non-existent, restricted by the host country, or restricted by our own military policies.  Even then, many reliable sources require additional access fees.  While many news organizations have cut back on print distribution, most successful operations continue to produce print products to serve those who prefer or can access the products only in that format.  A print copy of Stripes can then be shared with families and in barracks and chow halls and consumed regardless of internet access.  DoD's presumption of universal access is thus wrong and runs contrary to Stripes' longstanding mission to provide servicemembers and their families with a comprehensive source of news comparable to U.S. commercial daily newspapers, including to those in remote and isolated locations where access to such news is lacking, prohibited, or otherwise difficult to access.

24.    Even those of us who can find the missing content elsewhere pay a price for it. Because that content is no longer bundled into Stripes, my subscription is worth less, and I have had to pay for other sources to replace what Stripes used to provide.  I have also lost the benefit I valued most: Stripes' editorial curation.  I do not—and could not—review the hundreds of articles that the AP and Washington Post publish each day, and the value of my subscription was that Stripes performed that selection and aggregation of the news most relevant to its readers.  Without it, I now spend additional time and effort consulting multiple sources to piece together comparable coverage.

25.    Stripes' previous ability to supplement their coverage with syndicated content meant they could spend more resources on stories for their unique readership that no other news outlets were reporting.  And they could package that content together, cohesively.  Today, that's not possible; in addition, because they must cover at least some of the news they used to rely on the wires for, they have less capacity to pursue the breadth of unique enterprise coverage they once did.

8

26.    I take great pride in supporting, reading, and subscribing to Stripes. It covers news across the military community—from joyful celebrations to military operations. In particular, I have been impressed with their coverage of issues important to families impacted by housing and education challenges and the disruptions of war and deployments. They cover basic issues on personal safety, pay, and benefits, as well as controversial policies about who can serve in the military or be promoted. They speak directly with those who serve. They shine a light on the failings of the military or its members—as well as the accomplishments. They are committed to supporting military families' assimilation to the service or to a new country. The staff is clearly committed to freely and independently sharing important news and information with military communities. I want to continue to subscribe to support Stripes' foundation and ideals, but I will be unable to continue to subscribe to and read Stripes if DoD continues to interfere with the newspaper and its editorial judgments.

27.    Prohibition on Publishing "Controlled Unclassified Information." The DoD Memorandum also requires Stripes to comply with restrictions on "controlled unclassified information." By expanding DoD's ability to prevent the disclosure of CUI, the DoD Memorandum further curtails the content Stripes can publish and readers can receive. Already the application of CUI has been vague and unclear, with multiple standards for labeling information. This has a chilling effect on Stripes staff, particularly military staff, as well as on sources who are unclear on the standards. Even on a routine article, some staff worry they will run afoul of the broad CUI restriction. This further undermines Stripes' editorial independence and the breadth and quality of its content. It can also stifle sources from talking with Stripes staff.

28.    Requirement that All Content Be Consistent with "Good Order and Discipline." The Memorandum further requires that Stripes' content be consistent with the "good order and discipline of the military"—a standard drawn from the Uniform Code of Military Justice,

9

violations of which can carry criminal penalties.  Applying it to Stripes' content likewise threatens to further chill reporting and publishing, undermining Stripes' editorial independence and the breadth and quality of its content.  In addition, the establishment of these standards further sends a message to Stripes' readers that the publication is being muzzled—further undermining the credibility Stripes has built up over decades.

29.    Rejection of Well-Accepted Ethics Standards.    The DoD Memorandum also removed the requirement that Stripes adhere to the standards of the highest-quality U.S. daily newspapers and dropped any reference to the Society of Professional Journalists' Code of Ethics, which serve to further undermine the credibility of the newspaper.  These tenets are the foundation of journalism; they are rooted in the First Amendment, which our military forces defend every day of their lives.  The act of excising these standards implies that they are disposable.  They are not.

30.    Restrictions on the Ombudsman's Independence and Influence.    The Stripes Regulations created an ombudsman to advise DoD, Stripes' leadership, and Congress independently.  The DoD Memorandum removes the ombudsman's direct line to Congress and routes it through DoD.  In any event, there is no ombudsman today: DoD fired the most recent ombudsman after she protested these very changes—exactly the job she was asked to do. *See* https://www.washingtonpost.com/business/2026/04/23/stars-stripes-ombudsman-fired-pentagon/. This role was created to provide independent oversight of the institution, to ensure the regulations were being followed, and to broaden perspectives and navigate challenges from any of the parties, or from readers.  Times like these are when we need an ombudsman most.  Her firing likewise sent a chilling message to Stripes' staff—a message heard by both Congress and service men and women.

31.    Increased DoD Control Over Stripes' Operations.  The DoD Memorandum places Stripes under heightened oversight by DoD's public-affairs apparatus—requiring, among other

10

things, that the publisher report to the Director of the Department of War Information Activity and that Stripes coordinate its reports to Congress with the Office of the Assistant Secretary of War for Legislative Affairs. These changes are exactly what the parties sought to avoid in implementing the Stripes Regulations. The memorandum asserts DoD's direct control over Stripes journalism and impedes the free flow of information to Congress, a direct assault on independence, fairness, and credibility.

32. On July 23, 2026, the members of Stripes' Publisher's Advisory Board, including me, learned that DoD has ordered a naval officer whose career has been in DoD public affairs to report to Stripes as a "military deputy" to the publisher. DoD has provided the Board with no job description or other explanation of the position. Based on my experience on the Board, the appointment appears consistent with the DoD Memorandum's broader effort to place Stripes under closer DoD oversight rather than to preserve the newspaper's independence. It is inconsistent, however, with the long-standing practice of a civilian publisher—a practice adopted to protect Stripes' independence from the military chain of command. Like the other changes described above, this step was taken without any prior discussion with the publisher. In my view, it is yet another incursion on Stripes' editorial independence, and it reflects a continuing effort to override congressional protections and erode the newspaper's independence in covering DoD and the military community.

\* \* \*

33. Taken together, these changes—affirmative content restrictions, vague and sweeping publication limits, the loss of recognized ethics standards and an independent ombudsman, and increased DoD control—undermine Stripes' ability to produce the best product possible and have made it harder to recruit journalists and cultivate sources. Not only is Stripes' content diminished, but the breadth and depth of its daily reporting will continue to suffer as long

as the current policies are in place. If DoD's actions persist, they will further erode the value of my subscription, and threaten to cause lasting damage to the newspaper's reputation, credibility, and independence. Ultimately, this would be a tragic and unmistakable loss to those who serve this country and defend our Constitution at home and around the world.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of July 2026, in Tacoma, Washington.

Suki Dardarian

12