**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Susan Dardarian *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. Department of Defense *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-1965 |

**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. Stripes' Mission and Editorial Independence ........ 3

II. The Regulations That Protected Stripes' Editorial Independence ........ 6

III. DoD Repeals the Regulatory Framework and Restricts Stripes ........ 9

LEGAL STANDARD ........ 13

ARGUMENT ........ 13

I. Plaintiffs Have Standing ........ 13

A. Economic harm ........ 15

B. Deprivation of right to receive information ........ 18

II. The Repeal Rule is Unlawful ........ 22

A. The Repeal Rule violates notice-and-comment requirements ........ 23

B. The Repeal Rule is arbitrary and capricious ........ 28

III. The Parnell Directive Is Unlawful ........ 32

A. The Parnell Directive violates notice-and-comment requirements ........ 32

B. The Parnell Directive is arbitrary and capricious ........ 37

C. The Parnell Directive violates the First Amendment ........ 39

IV. Vacatur Is the Proper Remedy ........ 44

CONCLUSION ........ 45

## INTRODUCTION

Stars and Stripes ("Stripes") has been the military's independent newspaper since the Civil War. In the last year, however, the Department of Defense ("DoD") has moved to limit, and perhaps eliminate, Stripes' editorial independence from DoD's political leaders and command. On January 15, 2026, DoD rescinded its own regulations (the "Stripes Regulations")—in place for more than three decades—guaranteeing that Stripes would operate "without news management or censorship." It did so through a final rule (the "Repeal Rule") issued with no notice, no opportunity for comment, and no reasonable explanation. Defendant Sean Parnell, Assistant to the Secretary of Defense for Public Affairs, announced the real objective the same day: to "refocus [Stripes'] content away from woke distractions," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints."

Over the next several months, DoD made good on that promise. It first issued an interim policy (the "DoD Memorandum") in March, and then, on August 21, 2026, completely revised DoD Directive 5122.11, which previously had guaranteed Stripes' editorial independence but now, post-amendment, radically constrains it. The amended Directive ("Parnell Directive") filled the vacuum DoD had created with a framework that constrains Stripes' editorial independence. It overhauls Stripes on four fronts as relevant here. *First*, it prohibits Stripes from purchasing news, opinion, and editorial cartoons from wire services and other news sources its readers have relied on for generations. *Second*, it bars publication of more than 100 categories of unclassified information, plus any content that may "negative[ly] impact military readiness and safety." *Third*, it strips the Stripes ombudsman of her congressionally endorsed role as an independent voice. *Fourth*, it places the newsroom under the direct oversight of DoD's public-affairs apparatus. For servicemembers and families stationed at remote posts

around the world—often with no other independent news source within reach—the Pentagon now decides what they may read.

The Stripes Regulations' protections were not abstract. DoD adopted them, through notice-and-comment rulemaking, precisely because military officials had interfered before. A congressionally mandated investigation found in 1988 that military officials had "repeatedly attempted to influence the reporting of news" at Stripes. DoD responded by committing itself, by regulation, to a "free flow of news and information" to Stripes' readership "without news management or censorship." The Repeal Rule and Parnell Directive resurrect the very interference those rules were written to end.

Each of Defendants' actions is independently unlawful. The Repeal Rule rescinded binding legislative rules without the notice and comment the APA requires—on the untenable premise that regulations shielding journalists and readers from censorship are internal "procedures" with "no impact on the public." It is also arbitrary and capricious. DoD never acknowledged the reversal. It never weighed the obvious alternative—modification instead of wholesale repeal—or the reliance three decades of protection had built. And the rationale it offered bears no resemblance to the objectives it announced the same day. The Parnell Directive repeats every one of those failures and adds a constitutional one: it was issued without notice and comment, is arbitrary and capricious, and abridges Plaintiffs' First Amendment right to receive the news and information Stripes has long delivered.

Plaintiffs Susan Dardarian, William Church, Walter Baranger, and Brian Brooks are longtime Stripes subscribers and career journalists. Ms. Dardarian and Mr. Church are civilian editors serving on Stripes' publisher's advisory board; Mr. Baranger and Mr. Brooks are military veterans—the readership Stripes was founded to serve—and Mr. Brooks, a former Stripes editor,

is the board president of the Stars and Stripes National Museum. Plaintiffs ask the Court to grant summary judgment and vacate the Repeal Rule, DoD Memorandum, and Parnell Directive.[1]

## BACKGROUND

### I. Stripes' Mission and Editorial Independence

Stars and Stripes has informed the American military community for generations. Union soldiers founded Stripes during the Civil War, and it has published continuously since World War II. About Stars and Stripes, Stars and Stripes, https://perma.cc/9KFX-ZFJA. It serves active-duty servicemembers, civilian employees, contractors, veterans, and their families. 32 C.F.R. pt. 246, App. A (2025).[2] Throughout, its mission has never changed: independent journalism for the military community, free from the chain of command. 32 C.F.R. § 246.4(b) (2025). During World War II, then-General Dwight D. Eisenhower repeatedly ordered military commanders not to interfere with Stripes, and rebuked a general who threatened to ban the paper from his command over an editorial cartoon. Cindy Elmore, *A unique American newspaper's historical struggle against military interference and control*, Media History, Vol. 16, No. 3, 305 (Aug. 2010), https://perma.cc/QKC4-9PTF.

[1] Plaintiffs challenge both the DoD Memorandum and the Parnell Directive. The Directive "incorporates and cancels" the Memorandum, Parnell Directive at 1, carrying forward the challenged restrictions largely verbatim. Unless otherwise noted, it therefore cites the Directive as the currently operative instrument. Plaintiffs do not brief each argument twice, because the provisions are materially identical: every argument that a provision of the Directive is unlawful should be understood as directed equally at the Memorandum provision the Directive incorporates, and Plaintiffs seek vacatur of both. Where the two texts differ materially, that difference is noted. The Directive's issuance does not moot the challenge to the Memorandum, which governed Stripes from March 9 to August 21, 2026. *See Slash Creek Waterworks, Inc. v. Lutnick*, No. 25-5042, 2026 WL 2482550, at *4-5 (D.C. Cir. Aug. 25, 2026).

[2] Citations to "AR" are to the Bates-stamped pages, DOW-CAR-0001 through -1633, of the certified administrative record.

Stripes' structure has reflected that tradition of editorial independence—until now. A civilian publisher and a civilian editor-in-chief have long led the paper; the Stripes Regulations required the latter. *See* ECF No. 18-3, Declaration of Susan Dardarian ¶ 32 (Dardarian Decl.); 32 C.F.R. § 246.3(f) (2025). Its newsroom pairs civilian journalists with active-duty servicemembers on rotating assignments, mentored by civilian staff. About Stars and Stripes, Stars and Stripes, https://perma.cc/9KFX-ZFJA. While DoD funds roughly half of Stripes' budget—money used to print and distribute the newspaper to troops scattered across the globe, including in warzones—traditional revenue streams, such as subscriptions and advertising, supply the rest. *Id.* And a publisher's advisory board, comprised of current and former editors and senior executives from outside news organizations, advises the publisher on newsroom operations, such as newsgathering, publication practices, and business matters. Dardarian Decl. ¶ 4; ECF No. 18-6, Declaration of William Church ¶ 19 (Church Decl.).

That independence has long shaped what Stripes covers. The Stripes Regulations authorize its journalists to report on the military and the federal government in full—including coverage unflattering to their officials. *See* 32 C.F.R. pt. 246, App. D (2025) ("The Stars and Stripes news staffs are authorized to gather and report news, good and bad, on the Department of Defense and its subordinate commands."). Their award-winning investigative work bears that out, from exposing the exploitation of Filipina women serving U.S. troops to revealing that the Pentagon had profiled journalists embedded with units in Afghanistan. *See Stars and Stripes' Military Reporting Earns Two Awards*, Stars and Stripes (Oct. 15, 2010), https://perma.cc/EYY5-QGPK. Time and again, Stripes has reported on matters of public controversy involving the U.S. government and military, including coverage critical of official conduct and policy. ECF No. 18-4, Declaration of Brian S. Brooks ¶ 5 (Brooks Decl.); ECF No. 18-5, Declaration of Walter Baranger ¶ 12 (Baranger Decl.); Dardarian Decl. ¶ 26.

Stripes' value turns on how it selects news for its readers. Its editors pair the paper's own military-focused reporting with a curated selection of national and international news, opinion, comics, and editorial cartoons from commercial sources—a mix the regulations required rather than merely permitted. 32 C.F.R. § 246.4(f)(2) (2025) & pt. 246, App. D. These sources were principally the Associated Press ("AP") and the Washington Post. Church Decl. ¶ 22. That requirement is tied to the paper's purpose: giving overseas servicemembers and their families the same range of news available to readers in the United States, so they may exercise the "responsibilities of citizenship." 32 C.F.R. pt. 246, App. A (2025). The result is a single, editorially chosen product spanning both military affairs and the wider world. As the House Armed Services Committee observed in 1989, that product "serves two purposes": providing both commercial news and opinion "available to newspapers throughout the United States" and "U.S. government, Department of Defense, command, and local news information." AR 0002.

For Stripes' readers, that blend is not a convenience but a necessity. Servicemembers and their families—particularly those deployed overseas or stationed at remote installations—often have no access to the range of independent news sources available to civilian readers back home. *See* 32 C.F.R. pt. 246, App. A (2025). In many parts of the world where American forces serve, Stripes may be the only independent news source readily available to them. Brooks Decl. ¶ 14. Its reach is global, with bureaus in Europe, the Pacific, and the Middle East and distribution of both print and digital content worldwide. *See* About Stars and Stripes, Stars and Stripes, https://perma.cc/9KFX-ZFJA. In 2024 alone, it reported distributing more than 6.2 million editions of its U.S. Weekly publication and more than 3.6 million special publications, and drawing approximately 26 million views to its website. *Id.*

**II. The Regulations That Protected Stripes' Editorial Independence**

For more than three decades, Stripes' independence rested on more than tradition. From 1994 to 2026, federal regulations safeguarded the paper's editorial independence and barred command influence over its journalism. *See* 32 C.F.R. § Pt. 246 (2025).

Those protections grew out of documented abuses. Amid concerns in the late 1980s that military commanders were interfering with Stripes' reporting, Congress directed the then-General Accounting Office ("GAO") to investigate allegations of military censorship. *See* National Defense Authorization Act for Fiscal Years 1988 and 1989, Pub. L. No. 100-180, § 321, 101 Stat. 1019, 1078 (1987). The GAO confirmed the problem. It found that commanders had "repeatedly attempted to influence the reporting of news" and that an "inherent cultural conflict" existed between military command priorities and the First Amendment mission of the civilian journalists at Stripes. *See* U.S. Gen. Acct. Off., GAO/NSIAD 89-60, *Stars and Stripes: Inherent Conflicts Lead to Allegations of Military Censorship* 3, 24 (1988) ("GAO Report") https://perma.cc/EMZ7-WNLH. It further found that commanders had shaped editorial outcomes through informal mechanisms—delay, withheld information, and pressure on editorial decisions. *Id.* at 3, 24. And it found that advisory structures involving military public-affairs officials had contributed to that improper influence over newsroom decisions. *Id.* at 23-24.

The GAO's prescription was structural. To insulate Stripes from command influence, it recommended replacing military editors with civilian editors serving fixed terms and eliminating the advisory structures that had allowed operational influence over newsroom decisions. *Id.* at 50-52. Congress and DoD took up that charge. The House Armed Services Committee called for an independent ombudsman—reporting to both DoD and Congress—to help secure Stripes' independence and accountability. AR0001-04. The commercial news and opinion Stripes carries, the committee explained, "must enjoy the full protection of the First Amendment, and

military personnel on the frontiers of freedom must enjoy their First Amendment rights," even as its staff-generated reporting "must be free of interference from the chain of command." AR0002. The ombudsman it envisioned "would report to the DoD and annually to the committee on the state of the free flow of information to the armed forces via the Stars and Stripes," and "aggressive and objective oversight by the ombudsman" would "provide adequate safeguards to ensure against censorship or news management." AR0003.[3]

DoD wrote these principles into a formal regulatory regime in 1993 and 1994. *See* Stars and Stripes (S&S) Newspaper and Business Operations, 58 Fed. Reg. 41,671 (Aug. 5, 1993); 59 Fed. Reg. 19,137 (Apr. 22, 1994). Codified at 32 C.F.R. Pt. 246 (2025), the regulations guaranteed a "free flow of news and information" to Stripes' readership "without news management or censorship." 32 C.F.R. § 246.4(b) (2025). They also required that news from wire services and other news outlets run alongside staff-generated reporting, 32 C.F.R. § 246.4(f)(2) (2025). Those regulations created an independent ombudsman to advise both DoD leadership and Congress on issues affecting editorial independence, 32 C.F.R. § 246.3(d) (2025); required a civilian editor-in-chief, *id.* § 246.3(f) (2025); and strictly limited military authority to prevent publication of information, 32 C.F.R. § 246.4(e)(1) (2025). They further barred military command from participating in editorial advisory boards, recognizing that such involvement would create "an unacceptable conflict of interest" undermining the editorial integrity and credibility of Stripes. 32 C.F.R. § 246.5(e)(9) (2025). Stripes' editors relied on them. A Navy captain in Sigonella, Sicily once summoned one of Mr. Brooks's reporters—an enlisted sailor—

[3] Congress has reaffirmed that commitment in the decades since. In 2013, it required that Stripes remain physically separate from the other organizations under the DoD subcomponent Defense Media Activity, expressly in order "[t]o preserve the actual and perceived editorial and management independence." National Defense Authorization Act (NDAA) for FY 2013, Pub. L. No. 112-239, § 593, 126 Stat. 1632, 1770-71.

over an article that displeased him. Brooks Decl. ¶ 5. Mr. Brooks, then Stripes' European editor, invoked the Stripes Regulations. "[T]he order was promptly withdrawn." *Id.*

DoD reinforced the regime with a parallel agency directive. DoD Directive 5122.11 mirrored the regulatory framework governing Stripes, *see* DoD Directive 5122.11, Stars and Stripes (S&S) Newspapers and Business Operations, https://perma.cc/KYY5-AK4A; AR0005-31. On March 7, 2025, DoD made administrative changes to the directive but left its core protections intact: the guarantee of "a free flow of news and information to [Stripes'] readership without news management or censorship," AR0006, the strict limits on withholding news from publication, AR0007, a civilian editor, AR0015, and the ombudsman who "independently advises" DoD leadership "and the Congress," AR0015.

On April 23, 2024, DoD proposed a "rule revision" to the Stripes Regulations framework. AR0132; *see* Stars and Stripes Media Organization, 89 Fed. Reg. 30,296 (Apr. 23, 2024). The Assistant to the Secretary of Defense for Public Affairs explained in an internal memorandum that the proposal "highlights areas of public interest regarding Stripes' editorial independence, but . . . removes internal procedures that do not have external burden or implications." *Id.*; *see* AR0131. The proposed rule would have reaffirmed the core protections. *First*, it would have preserved Stripes' status as the only DoD-authorized organization providing "First Amendment-type reporting and editorially independent media products" to the military community. 89 Fed. Reg. at 30,297. *Second*, it would have maintained strict limits on the circumstances under which military officials may prevent Stripes from publishing. *Id.* at 30,299. *Third*, it would have preserved the ombudsman's role in independently advising the publisher, DoD leadership, and Congress on Stripes matters, including "editorial interference, news management, or censorship." *Id.* It would also have established that the publisher must be a civilian. *Id.* at 30,298. The only provisions the proposal would have removed were limited internal-management details—such as

advertising, retail pricing, and distribution logistics. *See, e.g.*, 32 C.F.R. § Part 246, Apps. B- C, E (2025). DoD withdrew the proposed rule as part of repealing the Stripes Regulations altogether. *See infra* Background III.

**III. DoD Repeals the Regulatory Framework and Restricts Stripes**

On January 15, 2026, DoD changed course. Defendant Parnell announced on the social-media platform X that DoD was "returning Stars & Stripes to its original mission" and would "refocus its content away from woke distractions that syphon morale." Sean Parnell (@SeanParnellASW), X (Jan. 15, 2026), https://perma.cc/D2G2-W457. Stripes, he said, would focus on "warfighting, weapons systems, fitness, lethality, survivability, and ALL THINGS MILITARY," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints." *Id.* The post came a day after the Washington Post reported that Stripes job applicants were being asked what they would do to support President Trump's policies. *See* Liam Scott, *Stars and Stripes job applicants are asked if they back Trump policies*, Wash. Post (Jan. 14, 2026), https://perma.cc/86U2-ZKHF.

The same day, DoD published a final rule repealing the Stripes Regulations. *See* Stars and Stripes Media Organization, 91 Fed. Reg. 1,706 (Jan. 15, 2026) ("Repeal Rule"); AR0167-68. DoD pronounced the existing regulations "outdated" and asserted that notice-and-comment procedures were unnecessary because the regulations addressed internal agency policies and procedures and their removal would have "no impact on the public." 91 Fed. Reg. at 1,706; AR0167-68. At the same time, it withdrew the 2024 proposed rule that would have reaffirmed Stripes' editorial independence. 91 Fed. Reg. at 1,706; AR0167. The Repeal Rule acknowledged that DoD had received 91 public comments on the proposed rule, that "commenters were supportive of the Stripes program," and that some had "advocated for not changing the existing rule because of perceived concerns that changes would restrict Stripes in

continuing its mission of providing editorially independent news and information." 91 Fed. Reg. at 1,706; AR0167.

The administrative record, however, traces the decision to repeal even earlier—to the administration's deregulatory efforts in mid-2025. Executive Order 14219 instructed agencies to identify regulations for rescission or modification under the administration's "Department of Government Efficiency" initiative. Exec. Order No. 14,219, 90 Fed. Reg. 10,583 (Feb. 19, 2025); AR0150-52. In response, DoD's public-affairs staff reported in April 2025 that "[n]one of" its regulations "fall specifically within the categories outlined in EO 14219," yet recommended acting anyway to repeal the Stripes regulations "to meet the intent" of the order. AR0153-54; *accord* AR0157. Parnell, however, struck through the staff's recommendation to "repeal" the rule and hand-wrote "modify" next to his initials. AR0154-56. The record does not explain what happened next. But by September 2025, Parnell had approved the decision to "remove the Stars and Stripes regulation," on the ground that it "does not have an impact or burden to the public." AR0158.

In March 2026, Deputy Secretary of Defense Stephen Feinberg issued, without notice-and-comment, a memorandum that DoD billed as a "modernization" of Stripes. *See* Modernization of Stars and Stripes Operations ("DoD Mem."), AR0172-79. The memorandum disclaimed any intent to compromise editorial independence. It then imposed new restrictions on Stripes' newsroom operations and content. It directed Stripes to "immediately begin implementing the guidance in this memorandum and its attachment" and provided that DoD officials "will oversee Stripes' implementation of these changes and address any issues that may arise." DoD Mem. at 1, AR0172. It further directed the Assistant to the Secretary of Defense for Public Affairs to revise DoD Directive 5122.11 to "incorporate the guidance in this memorandum . . . as expediently as possible." *Id.* In August, DoD amended the directive to

"incorporate[] and cancel[]" the interim policies put forth by the DoD Memorandum—again without notice-and-comment. *See* Department of War Instruction 5122.11, Stars and Stripes Media Organization (Aug. 21, 2026) ("Parnell Directive"), AR0180-96. The Parnell Directive makes the following changes to Stripes, as relevant here:

| Change to Stripes | What the Parnell Directive Does | Citations |
|---|---|---|
| **Strips ombudsman of role of independent advisor to Congress** | Eliminates the ombudsman's role as an independent advisor to Congress; DoD officials must review and route all congressional communications, with no independent submission by the ombudsman. | Parnell Directive § 3.3(b), (c)(1), AR0190;<br>DoD Mem. § 4(b)-(c), AR0177 (similar) |
| **Prohibits Stripes' aggregation and publication of purchased commercial news content** | Bars Stripes from "purchasing or contracting for news stories, features, syndicated columns, and editorial cartoons from commercial news media services or sources" absent a senior-DoD-approved exception—cutting a substantial share of the content Stripes carried and readers valued. That material let Stripes pair military journalism with national/international news, opinion, and other content in one curated product. | Parnell Directive § 3.1(a)(2)(c), AR0186;<br>DoD Mem. § 2(a)(2)(c), AR0175 (similar, but included ban on comic strips) |
| **Restricts the publication of large swaths of previously distributed content** | Extends restrictions well beyond classified information into material designated "controlled unclassified information" (CUI)—a broad, 100-plus category framework not ordinarily applied to journalists covering the military. | Parnell Directive § 1.2(c), AR0182;<br>DoD Mem. § 1(b), AR0174 (similar) |
| | Mandates that, "[i]n support of good order and discipline of the military, Stripes content must not have a direct, material, and immediate negative impact on military readiness and safety, such as content that incites or produces imminent lawless action, or provides nonpublic operational details that could be foreseeably exploited by an adversary to compromise a mission's success or endanger personnel." | Parnell Directive § 3.1(a)(2)(e), AR0187<br>DoD Mem. DoD Mem. §§ 1(b), 2(a)(2)(e), AR0176 (broadly restricting content that is inconsistent with the "good order and discipline of the military") |

| Change to Stripes | What the Parnell Directive Does | Citations |
|---|---|---|
| **Increases DoD control over Stripes' editorial operations** | Establishes a new "Stars and Stripes Advisory Group" and requires the publisher, with the Assistant Secretary of Public Affairs' concurrence, to appoint federal officers, DoD employees, or active-duty military personnel. | Parnell Directive § 3.2(h), AR0189;<br>DoD Mem. § 3(h)(1), AR0177 (similar) |
| | Requires the paper to be "fully accountable to [Department of Defense] leadership for its budget, performance, and strategic modernization." | Parnell Directive § 3.1(d)(1), AR0188;<br>DoD Mem. § 1(c)(1), AR0174 (similar) |
| | Requires Stripes to "coordinate all of its congressional briefings, reports, and non-newsgathering engagements with the Office of the Assistant Secretary of War for Legislative Affairs . . . prior to the engagement." | Parnell Directive § 1.2(e), AR0182;<br>DoD Mem. § 1(f), AR0175 (similar) |
| | Publisher reports to the Director, Department of War Information Activity; role expands from operational/administrative to "manag[ing] the editorial content of Stripes in accordance" with the Directive's restrictions. | Parnell Directive § 3.2(b), (d), AR0188-89;<br>DoD Mem. §§ 3(b), (d), AR0176-77 (similar) |
| | Eliminates the civilian editor-in-chief position that previously headed Stripes' editorial staff. | *See generally* Parnell Directive; DoD Mem. |

Since DoD's implementation of these restrictive policies, the agency has moved to bring Stripes' newsroom under tighter control, embedding a military officer in its leadership and forcing out the ombudsman and journalists who objected. In July 2026, DoD ordered a naval public-affairs officer to report to Stripes as a "military deputy" to its civilian publisher—without any job description or prior discussion with the publisher. Dardarian Decl. ¶ 32. DoD also terminated Stripes' ombudsman, and issued termination notices to its publisher, editor-in-chief, and a reporter after each publicly raised concerns that the new policies threatened the paper's editorial independence. *See* Erik Wemple, *Pentagon Fires Stars and Stripes' Advocate for*

*Independence*, N.Y. Times (Apr. 23, 2026), https://perma.cc/9QX8-DXSQ; *see also Slavin v. Parnell*, No. 1:26-cv-3009 (D.D.C. filed Aug. 27, 2026), ECF No. 2-5, Decl. of Erik Slavin ("Slavin Decl.") ¶¶ 8-9, Ex. 1; *id.*, ECF No. 2-4, Decl. of Lara Korte ("Korte Decl.") ¶¶ 8-9, Ex. 1; *id.*, ECF No. 2-6, Decl. of Max Lederer ("Lederer Decl.") ¶¶ 19-20, Ex. 1. And before the publisher's termination, Defendant Parnell had criticized him for losing "institutional control over [his] senior leadership team who went into open rebellion against the new policy" by "participat[ing] in a network story they know was meant to criticize the DoW efforts with Stripes." Supplemental Declaration of Susan Dardarian ¶ 7 ("Dardarian Supp. Decl.").

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the APA, however," the court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *CREW v. SEC*, 916 F. Supp. 2d 141, 144-45 (D.D.C. 2013) (cleaned up). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 145.

## ARGUMENT

### I. Plaintiffs Have Standing

Plaintiffs have standing on two independent bases: the Repeal Rule and Parnell Directive have cost them money and have impaired their First Amendment right to receive information and ideas. "To establish constitutional standing, a petitioner must show an actual or imminent injury in fact, fairly traceable to the challenged agency action, that will likely be redressed by a favorable decision." *New York Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 586 (D.C. Cir.

2011) (citation omitted). "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Only one Plaintiff need establish standing for the Court to proceed to the merits. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Both injuries are concrete, particularized, and fairly traceable to Defendants' actions. The Repeal Rule stripped away the decades-old framework that required Stripes to carry selected news and opinion items from wire services and other news outlets, and that shielded its editorial independence from military command. The Parnell Directive then imposed the very content restrictions and editorial controls that have devalued Plaintiffs' subscriptions and curtailed the information they receive. Vacatur of the Parnell Directive would lift the content prohibitions and structural changes that proximately caused the harm, while vacatur of the Repeal Rule would restore the framework that had barred those restrictions.

For Plaintiffs' notice-and-comment claims, the inquiry is relaxed. A plaintiff asserting a procedural injury need show only (1) a concrete interest affected by the deprivation of the procedure, and (2) a causal connection between the procedural violation and "some reasonably increased risk of injury" to that interest. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996); *see Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 37-38 (D.D.C. 2020). When those showings are made, the requirements of imminence and redressability are relaxed, and the plaintiff has standing if there is "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

**A. Economic harm**

Defendants' actions have inflicted a straightforward pocketbook injury: Plaintiffs paid full price for a subscription now worth markedly less, and several now pay out of pocket to recover the coverage Stripes lost. A plaintiff suffers a "cognizable overpayment injury" when she can show a "difference between what [plaintiff] contracted for and what she actually received." *Austin-Spearman v. AARP & AARP Servs. Inc.*, 119 F. Supp. 3d 1, 8 (D.D.C. 2015) (alteration in original and citation omitted); *see also In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010) ("[C]ourts have long held that a plaintiff is injured … when he receives less than what he was promised."). And "a loss of even a small amount of money is ordinarily an 'injury'" for Article III purposes. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). Plaintiffs need not establish both: a single Plaintiff's overpayment or out-of-pocket payment is sufficient.

Start with the overpayment. Plaintiffs paid full price for a newspaper that the Repeal Rule and Parnell Directive stripped of much of its value. When each Plaintiff bought an annual subscription for $49.99, Stripes' editorial independence and its selected mix of news and opinion from other sources were not incidental perks—they were the reason for the purchase. Church Decl. ¶ 11 (subscribing because he "value[s] [Stripes'] editorial judgment" and its selection of news "from a broad range of sources, including … [the] [Associated Press] and Washington Post"); Dardarian Decl. ¶ 6 (same); Baranger Decl. ¶¶ 9, 12 (relying on "Stripes' editorial selection of AP and Washington Post stories" and confidence that Stripes "would be straight with its readership … even if that reporting looked bad for DoD"); Brooks Decl. ¶ 11 (explaining that he "received the bulk of [his] international and national news from Stripes, and [he] relied on Stripes' selection of AP stories to ensure the broadest coverage that is relevant to the military

community").[4] Since Stripes implemented the Parnell Directive, those features have largely disappeared: AP news, Washington Post news and opinion, and editorial cartoons—content that "frequently … made up . . . more than 50%" of an issue. Church Decl. ¶ 22; Dardarian Decl. ¶¶ 13, 16, 18-21. Gone with them is the editorial discretion over selection and presentation that defines an independent newspaper. Church Decl. ¶ 23; Dardarian Decl. ¶¶ 8, 18-19, 24-25. The AP content Stripes carried drew from "over 250 bureaus across more than 100 countries," supplying national and international news that Stripes "lacks the staff or resources to gather on its own." Dardarian Decl. ¶ 18. The loss is concrete: Mr. Church, who is "not a Washington Post subscriber," had relied on Stripes to "fill … that news gap" with Post coverage of the military and the federal government, and explains that Stripes "was a one-stop shop then, but it isn't now." Church Decl. ¶¶ 10-11. The upshot is a textbook overpayment: Plaintiffs pay the same $49.99 for a publication worth substantially less than the one they bargained for, Dardarian Decl. ¶ 8; Church Decl. ¶ 12; Baranger Decl. ¶¶ 16-17; Brooks Decl. ¶ 18, and Mr. Church attests he would not have paid that price for the Stripes that exists today, *see* Church Decl. ¶ 13.

Plaintiffs must now recreate Stripes' editorial selection themselves. Because no single outlet replicates it—and Plaintiffs cannot review the hundreds of AP and Washington Post articles published each day—they must now search multiple sources to try to assemble comparable coverage they once received in one place. Church Decl. ¶ 23; Dardarian Decl. ¶¶ 20, 24; Baranger Decl. ¶ 17; Brooks Decl. ¶ 19. Mr. Baranger relied on Stripes to stay current for

[4] The harms Plaintiffs describe in their original declarations continue unabated under the Parnell Directive. *See* Dardarian Supp. Decl. ¶ 3; Supplemental Declaration of William Church ¶ 3 ("Church Supp. Decl."); Supplemental Declaration of Brian Brooks ¶ 3 ("Brooks Supp. Decl."); Supplemental Declaration of Walter Baranger ¶ 3 ("Baranger Supp. Decl."). This brief accordingly does not separately cite Plaintiffs' supplemental declarations each time it relies on the original declarations.

his volunteer position with the Coast Guard Auxiliary and as an informed citizen. Baranger Decl. ¶ 17. He now spends about two more hours each week on the AP and New York Times websites to find comparable coverage. *Id.* Even with Mr. Baranger's additional time and effort, the coverage he assembles for himself is not equivalent to what Stripes provided, because no other single publication selects and contextualizes the news specifically for the military community. *Id.* The same is true of Mr. Brooks, who spends an additional hour each day to try to locate stories that Stripes would have provided elsewhere. Brooks Decl. ¶ 19. As Ms. Dardarian, a career editor, puts it, "the value of my subscription was that Stripes performed that selection and aggregation of the news most relevant to its readers"; without it, she "now spend[s] additional time and effort consulting multiple sources to piece together comparable coverage." Dardarian Decl. ¶ 24. Mr. Church describes the same burden: having to "find national/international stories elsewhere"—including the time and energy to track down coverage of the war in Iran that Stripes once carried from the AP—is "laborious" and "makes Stripes not a complete news experience." Church Decl. ¶¶ 10, 23.

Several Plaintiffs have also paid out of pocket to replace what Stripes eliminated. Ms. Dardarian, who renewed her annual Stripes subscription on May 2, 2026, now pays a $5.99 monthly fee for a separate Washington Post subscription to recover the federal- and defense-focused coverage Stripes dropped, and she will continue to pay it so long as DoD bars Stripes from purchasing AP and Washington Post content. Dardarian Decl. ¶¶ 4, 15-17. She renewed her Stripes subscription expecting that the newspaper would obtain an exemption to resume publishing AP content—a request its publisher made to DoD leadership in May that remains unanswered. *Id.* ¶ 7. Mr. Brooks likewise bought a New York Times subscription to replace the national and international coverage he had received through Stripes' AP and Washington Post selection. Brooks Decl. ¶ 19.

Beyond the content already lost, the Repeal Rule and Parnell Directive have begun to erode the quality of Stripes' journalism itself—and threaten to erode it further. For example, Mr. Baranger—a veteran editor and journalism lecturer—attests that he "can no longer be confident that stories are not being withheld" because the newspaper he "long valued for its independence now operates under improper military command interference." Baranger Decl. ¶ 15. And Mr. Brooks, a former Stripes editor, current president of the Board of Directors of Stripes' museum, and a career journalism professor, has observed "that the content and quality of Stripes have diminished." Brooks Decl. ¶ 18. That degradation is likely to deepen. DoD's ongoing editorial interference threatens Stripes' ability to recruit journalists, cultivate sources, and produce the reporting Plaintiffs paid for—including the coverage critical of the military and its leadership that Plaintiffs prize. Dardarian Decl. ¶ 26 ("They shine a light on the failings of the military or its members—as well as the accomplishments."); Church Decl. ¶¶ 25, 27-28. As Mr. Church, a career editor, puts it, "there is now a real risk [Stripes] can no longer sustain [the] hard-hitting reporting" for which it was known. Church Decl. ¶ 27. This already-diminished quality is itself a present reduction in the value of Plaintiffs' subscriptions, and it confirms the reasonably increased risk of further decline. These concrete economic injuries satisfy the ordinary standing requirements for Plaintiffs' substantive APA claims; and for their notice-and-comment claims, the reasonably increased risk of further diminishment independently satisfies the relaxed procedural-injury standard. *See Fla. Audubon Soc'y*, 94 F.3d at 664.

**B. Deprivation of right to receive information**

Defendants' actions also harm Plaintiffs' First Amendment right to "receive information and ideas," a right the Supreme Court has long recognized. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (collecting cases). That right gives rise to a cognizable injury "where the listener has a concrete, specific connection to

[a] speaker" whose message is curtailed by government action. *Murthy v. Missouri*, 603 U.S. 43, 75 (2024). Plaintiffs satisfy both requirements.

*First*, Plaintiffs have a "concrete, specific connection" to Stripes. *Id.* All four are subscribers who have read and relied on Stripes for years. Mr. Church, a career editor and member of Stripes' publisher's advisory board, has read Stripes since he was about twelve, growing up as a military dependent in Japan. Church Decl. ¶¶ 2-5. Ms. Dardarian, a career editor who also sits on that board, reads it almost daily. Dardarian Decl. ¶¶ 2-5. Mr. Baranger and Mr. Brooks are themselves military veterans and career journalists—and therefore part of the very military community that the Stripes Regulations instruct the newspaper serve. Mr. Baranger is a former New York Times senior editor who served in the U.S. Coast Guard and covered the wars in Afghanistan and Iraq for the Times. Baranger Decl. ¶¶ 3, 6-7. Mr. Brooks is a Vietnam veteran who edited Stripes' European edition and now serves as president of the Board of Directors of the Stars and Stripes National Museum and Library. Brooks Decl. ¶¶ 2, 4. His family read Stripes across three generations of military service. *Id.* ¶¶ 7-8. That is precisely the concrete, identified speaker-listener relationship whose absence defeated standing in *Murthy*. *See* 603 U.S. at 73-75. And it is far more concrete than the connections the Supreme Court has already deemed sufficient: non-subscriber mail recipients challenging government interference with their right to receive communist political propaganda, *see Lamont v. Postmaster General*, 381 U.S. 301 (1965), prescription-drug consumers challenging a Virginia statute that prohibited the advertisement of prescription drug prices, *see Virginia State Bd. of Pharmacy*, 425 U.S. at 757, and professors challenging a visa denial for a specific speaker they had invited to a conference, *see Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972).

*Second*, DoD has curtailed the Stripes content Plaintiffs seek to receive in at least three independent ways, each a cognizable First Amendment injury. Most directly, the challenged

actions have stripped from Plaintiffs' subscriptions content they relied on: the AP and Washington Post news, opinion, and editorial cartoons that Stripes once carried, along with any reporting DoD now deems "controlled unclassified information" or having a "direct, material, and immediate negative impact on military readiness and safety." Church Decl. ¶ 25; Church Supp. Decl. ¶ 4; Dardarian Decl. ¶¶ 19, 27-28; Dardarian Supp. Decl. ¶ 4; Baranger Decl. ¶ 15; Baranger Supp. Decl. ¶ 4; Brooks Decl. ¶ 19; Brooks Supp. Decl. ¶ 4. Ms. Dardarian, for example, no longer receives through her subscription the Washington Post's coverage of the White House, federal agencies, and the military that she had read in Stripes, or the AP's on-the-ground reporting from journalists embedded with military units. Dardarian Decl. ¶¶ 15, 20. And Mr. Church, who does not subscribe to the Post, has lost the Post coverage of the military and the federal government that Stripes alone had supplied him. Church Decl. ¶ 11. Mr. Baranger and Mr. Brooks both relied on Stripes' selection of AP stories for national and international news that included broad coverage relevant to the military community, and cannot otherwise obtain the same content because "they do not—and realistically could not—review the hundreds or thousands of articles that the AP and other outlets publish each day" and Stripes had performed that selection and assembly for them. Brooks Decl. ¶ 19; Baranger Decl. ¶ 9. Depriving Plaintiffs of content the paper previously delivered is itself a cognizable injury: in *Lamont*, even a procedural barrier to receiving information violated the First Amendment, and the barrier here is absolute. *Lamont*, 381 U.S. at 301 (requiring addressee to return a reply card to receive mail).

Further, by interfering with Stripes' judgments about what to publish, DoD has also deprived Plaintiffs of Stripes' editorial product as a whole—its trusted selection of the news and opinion most relevant to the military community. The Supreme Court has long recognized that a newspaper's selection and presentation of content is protected editorial judgment. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("the choice of material to go into a

newspaper, and the decisions made as to limitations on the size and content of the paper … constitute the exercise of editorial control and judgment.”). That judgment belongs to Stripes as an independent newspaper. *See* 32 C.F.R. pt. 246, App. D (2025) (“the contents of the Stars and Stripes . . . are not to be considered as the official views of, or endorsed by, the U.S. Government, including the Department of Defense”).

And as subscribers to Stripes, Plaintiffs are harmed when that independence is constrained—just as readers of any other newspaper would be harmed if the government attempted to dictate what it could or could not publish. Plaintiffs did not subscribe for unfiltered access to wire copy, but for Stripes’ judgment about what matters most to military readers. Church Decl. ¶ 11; Dardarian Decl. ¶ 6; Baranger Decl. ¶ 9; Brooks Decl. ¶ 10. As Ms. Dardarian, a career editor, explains, Stripes “truly knows its audience” and selects “a diversity of perspectives on issues of keen importance to [its] readers.” Dardarian Decl. ¶ 5. By dictating Stripes’ content choices, DoD has suppressed that editorial judgment—an injury distinct from the loss of any single article. *See* Church Decl. ¶¶ 10, 24, 26; Dardarian Decl. ¶¶ 30-32; Baranger Decl. ¶¶ 9, 12; Brooks Decl. ¶ 10.

Finally, Plaintiffs are deprived of still more of what they subscribed for because the Parnell Directive’s CUI prohibition and “military readiness and safety” standard chill the very reporting Plaintiffs would otherwise receive. The Directive frames the latter restriction as imposed “in support of good order and discipline of the military”—a UCMJ-derived standard that carries criminal penalties, 10 U.S.C. § 934—and bars Stripes from publishing content with a “direct, material, and immediate negative impact on military readiness and safety,” while claiming this standard is “not intended to prevent . . . critical analysis of policy, [or] reporting on command climate issues.” Parnell Directive § 3.1(a)(2)(e), AR0187. DoD has shown reporters and editors exactly what happens if they test it. The day after Stripes published an investigation

into sailors' deteriorating mental health and living conditions aboard the U.S.S. Abraham Lincoln, DoD ordered Stripes' publisher to deliver termination notices to the editor-in-chief and a reporter. *Slavin*, No. 1:26-cv-3009, Lederer Decl. ¶¶ 5-6. And the same day DoD adopted the "military readiness and safety" standard, it terminated Stripes' publisher, editor-in-chief, and that reporter outright—for publicly affirming their commitment to Stripes' editorial independence, conduct Parnell himself described as "particip[ating] in a network story [DoD] kn[e]w was meant to criticize the [DoW]'s efforts with Stripes"—precisely the "critical analysis of policy" the Directive claims to leave untouched. *Slavin*, No. 1:26-cv-3009, Slavin Decl. ¶¶ 8-9, Ex. 1; *id.*, Korte Decl. ¶¶ 8-9, Ex. 1; *id.*, Lederer Decl. ¶¶ 19-20, Ex. 1; Dardarian Supp. Decl. ¶ 7. Vague, punitive standards like these "predictably lead reporters to self-censor," Church Decl. ¶ 26; Church Supp. Decl. ¶ 4—especially where adverse action has already been taken—and have already had "a chilling effect on Stripes staff, particularly military staff, as well as on sources." Dardarian Decl. ¶¶ 33-34; Dardarian Supp. Decl. ¶ 4; *see* Baranger Decl. ¶ 17; Baranger Supp. Decl. ¶ 4. The predictable result is that reporting Plaintiffs would otherwise receive is never written—and as DoD's interference makes it harder for Stripes to keep journalists and cultivate sources, Plaintiffs stand to lose still more of the coverage they subscribed for. Decl. ¶¶ 27-28; Dardarian Decl. ¶¶ 27-28; Brooks Decl. ¶ 18.

These First Amendment injuries independently satisfy both the ordinary standing requirements for Plaintiffs' substantive APA claims and the relaxed procedural-injury standard for the notice-and-comment claims.

## II. The Repeal Rule is Unlawful

The APA supplies two independent grounds for setting aside the Repeal Rule. First, DoD repealed the Stripes Regulations without the notice-and-comment rulemaking that both the APA

and DoD's own procedures require. Second, even absent that requirement, the repeal was arbitrary and capricious. Either defect requires vacatur. 5 U.S.C. § 706(2).

The Repeal Rule is final agency action. It "mark[ed] the 'consummation' of [DoD's] decisionmaking process" and is one "from which 'legal consequences … flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted). The Repeal Rule was effective on publication, removed 32 C.F.R. part 246 from the Code of Federal Regulations (CFR), and eliminated binding protections that had governed Stripes for three decades—including the guarantee of a "free flow of news and information . . . without news management or censorship," the strict limits on withholding information from publication, the ombudsman's independent reporting role, and the civilian editor requirement. 32 C.F.R. §§ 246.3(f), 246.4(b) (2025).

**A. The Repeal Rule violates notice-and-comment requirements**

DoD rescinded the long-standing Stripes Regulations without notice or comment, violating the APA and its own rules. Instead, it withdrew its 2024 proposed rule and issued the Repeal Rule as a separate final rule on the stated ground that notice and comment was "unnecessary." 91 Fed. Reg. at 1,706; AR0167-68. But the Stripes Regulations were legislative rules, adopted through notice-and-comment rulemaking and codified in the CFR; accordingly, § 553 requires that DoD repeal them the same way. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

The APA generally requires an agency to publish notice of a proposed rule and to consider public comments. 5 U.S.C. § 553. Those requirements apply to "legislative rules." *California Communities Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019). Legislative rules have the "force and effect of law," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215 (2016), and typically effect "a substantive change in existing law or policy," *Mendoza v. Perez*,

754 F.3d 1002, 1021 (D.C. Cir. 2014). A rule is legislative where "it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Id.* The question is whether the rule has binding legal effect, constraining future agency action or regulating conduct as law. *Id.*

The APA "provides only limited exceptions to [its notice and comment] requirements." *Batterton v. Marshall*, 648 F.2d 694, 700-01 (D.C. Cir. 1980). An exception applies to "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). That exception "must be narrowly construed," *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011) (citation omitted), because it is limited to "internal house-keeping measures organizing agency activities," *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (quoting *Batterton*, 648 F.2d at 702). Procedural rules are those "primarily directed toward improving the efficient and effective operations of an agency," *Mendoza*, 754 F.3d at 1023, and their "critical feature" is that they govern internal processes without "alter[ing] the rights or interests of parties." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (quotation marks omitted). A rule is not procedural, however, where it imposes "substantive burden[s]," *Bowen*, 834 F.2d at 1052, "encodes a substantive value judgment," *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (quotation marks omitted), "trenches on substantial private rights [or] interests," *Mendoza*, 754 F.3d at 1023 (citation omitted), or otherwise "alter[s] the rights or interests of parties," *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (citation omitted); *see also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. NLRB*, 57 F.4th 1023, 1034-35 (D.C. Cir. 2023).

The Stripes Regulations were legislative rules, so DoD could rescind them only through the same notice-and-comment process by which it adopted them. They were issued through notice-and-comment rulemaking, codified at 32 C.F.R. part 246 (2025), and DoD treated them as

binding for three decades, constraining how the agency administered the newspaper. The regulations did six things as relevant here. *First*, they required a "free flow of news and information to [Stripes'] readership without news management or censorship." 32 C.F.R. § 246.4(b) (2025). *Second*, they required Stripes to carry commercial news and opinion alongside its staff-generated content. *Id.* § 246.4(f)(2) (2025) & Appendix D (2025). *Third*, they required Stripes to employ a civilian senior editor. *Id.* § 246.3(f) (2025). *Fourth*, they strictly limited when military officials could stop Stripes from publishing. *Id.* § 246.4(e)(1) (2025). *Fifth*, they barred military officials from any advisory board. *Id.* § 246.5(e)(9) (2025). And *sixth*, they created an ombudsman reporting directly to Congress and DoD leadership to enforce Stripes' independence. *Id.* § 246.3(d) (2025). A rule that binds the agency in these ways—constraining its discretion until amended or repealed—is no internal procedural device; it carries the force and effect of law and is legislative. *See Nat'l Min. Ass'n*, 758 F.3d at 251-52. DoD could therefore rescind the Stripes Regulations only as it enacted them: through notice and comment. *See Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (it is "black-letter administrative law" that "ordinarily an agency that promulgates a rule under § 553's auspices must use the same procedure to revoke that rule"); *Perez*, 575 U.S. at 105 (regulations "codified in the Code of Federal Regulations" were "legislative rules, issued through the notice-and-comment process") (citation omitted); *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) ("an amendment to a legislative rule must itself be legislative" (quotation marks omitted)).

Section 553(b)(A)'s exception for procedural rules does not save the repeal. The Stripes Regulations are substantive on two independent grounds: they encode a considered value judgment, and they alter the interests of parties outside the agency. *First*, the regulations did not prescribe a process; they resolved a substantive conflict. After a congressionally mandated GAO investigation found "an inherent cultural conflict" between command priorities and Stripes' First

Amendment mission, and that military officials had "repeatedly attempted to influence the reporting of news," GAO Report at 3, 24, the Stripes Regulations settled that conflict in favor of editorial independence—precisely the "substantive value judgment" a procedural rule does not make. *Pub. Citizen*, 276 F.3d at 640. Congress made the same choice, requiring Stripes' physical separation from other organizations housed under the DoD subcomponent Defense Media Activity, rather than consolidated at Fort Meade, "to preserve the actual and perceived editorial and management independence" of the newspaper. NDAA for FY 2013 § 593, 126 Stat. at 1770-71. *Second*, they alter the interests of parties outside the agency. A procedural rule's "critical feature" is that it governs internal process without "alter[ing] the rights or interests of parties." *Hurson*, 229 F.3d at 280. The Stripes Regulations guaranteed readers a "free flow of news and information . . . without news management or censorship," 32 C.F.R. § 246.4(b) (2025), and news and opinion from wire services and other news outlets alongside Stripes' own reporting, *id.* § 246.4(f)(2) (2025). The Repeal Rule stripped those guarantees away, leaving readers with less content and no assurance that what remains is uncensored. Church Decl. ¶¶ 22, 28. A rule that changes what the public receives, not how the agency runs itself, alters private interests—and is substantive, not procedural. *Nat'l Min. Ass'n*, 758 F.3d at 250; *Mendoza*, 754 F.3d at 1023.

The Stripes Regulations are also nothing like the "internal house-keeping measures organizing agency activities" to which the procedural-rule exception is limited. *Bowen*, 834 F.2d at 1045. Housekeeping rules govern how an agency runs its own operations. *Id.* The Stripes Regulations instead constrain DoD's authority over an editorially independent newspaper—down to an ombudsman with an "independent duty to inform Congress," a reporting line to a coordinate branch rather than a feature of internal administration. AR0156. Nor does Stripes' government ownership change matters. What a rule does matters; who owns the entity it governs

does not. These regulations do not organize DoD's operations. They forbid DoD from censoring a newspaper that, even in government hands, enjoys the full protection of the First Amendment. *See Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 55-59 (D.D.C. 2003).

DoD has conceded as much. When DoD proposed to amend the Stripes Regulations in 2024 through notice-and-comment rulemaking, it described the rule as one that "highlights areas of public interest regarding Stripes' editorial independence" but "removes internal procedures that do not have external burden or implications." 89 Fed. Reg. at 30,298; AR0132. The procedures it treated as removable were genuine housekeeping rules—related to advertising, retail pricing, and distribution logistics. *See, e.g.*, 32 C.F.R. pt. 246, Apps. B-C, E (2025). The editorial-independence provisions it left in place were the "public interest" core: the mission to "provide editorially independent media products to the U.S. military community." AR0154. The Repeal Rule then eliminated the Stripes Regulations wholesale and pronounced them entirely "internal" with "no impact on the public." 91 Fed. Reg. at 1,706; AR0167. Having defended forgoing notice and comment on that ground alone, DoD cannot now invoke some other exemption it never stated. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

DoD's own policies reinforce that conclusion. DoD's Federal Register "Administrative Instruction" provides that issuances "shall be published in the [Federal Register] for public comment" when it "[i]s presently in the CFR" or "has a direct or substantial impact on any significant portion of the public." Dep't of Defense, *Office of the Secretary of Defense (OSD) Federal Register (FR) System*, (Sept. 24, 2020), https://perma.cc/7A8G-G537. DoD's "Instruction 5025.01" likewise directs that policies "affecting the public" may not be issued through internal issuances at all; they "must be removed from the issuance" and published "as a rule in the CFR." Dep't of Defense, *DoW Instruction 5025.01, DoD Issuances Program*, § 7.5 (Jan. 20, 2026), https://perma.cc/3W8Q-5FXX. The Stripes Regulations both affect the public

and were "presently in the CFR"; under DoD's own procedures, their repeal required publication for public comment. Having bound itself to those procedures, DoD had to follow them. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954); *Rodway v. USDA*, 514 F.2d 809, 814 (D.C. Cir. 1975) (agency's self-imposed notice-and-comment obligations are binding).

**B. The Repeal Rule is arbitrary and capricious**

The Repeal Rule fails arbitrary-and-capricious review in any event. An agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). At minimum, an agency must provide a "satisfactory explanation for its action including a rational connection between the facts found and the choice made," and may not "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). And when an agency departs from past policy, more is required: the agency "must at a minimum acknowledge the change and offer a reasoned explanation for it," *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017), to ensure that "prior policies and standards are being deliberately changed, not casually ignored," *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (citation omitted). The agency must also "consider the alternatives that are within the ambit of the existing policy," *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation marks omitted), and where it "disregard[s] facts and circumstances that underlay or were engendered by the prior policy," it must offer a "more detailed justification," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). The Repeal Rule fails at every step—indeed, at the threshold, because the very official who approved it had personally rejected repeal in favor of modification, and the record nowhere explains or justifies the reversal.

In April 2025, DoD's deregulation review recommended repealing the Stripes Regulations because they imposed "no requirements of the public." AR0154. But Parnell—who later approved the Repeal Rule, AR0160-61—struck through "repeal" and hand-wrote "modify." AR0154. Modification was not an alternative DoD failed to imagine; it was the alternative the decisionmaker himself chose, squarely "within the ambit of the existing policy." *Regents*, 591 U.S. at 30 (citation modified). It was also the course DoD had charted once before, having proposed a limited revision—modernizing the regulations while preserving their substantive protections—less than two years earlier. *See* 89 Fed. Reg. at 30,297. Yet five months after Parnell wrote "modify," DoD decided to "remove the Stars and Stripes regulation" outright. AR0158. No document in the record acknowledges that reversal or explains why wholesale repeal displaced modification. An agency may not abandon its own reasoned choice, or discard the obvious alternative sub silentio. *Fox Television*, 556 U.S. at 515; *Regents*, 591 U.S. at 30. That failure alone renders the Repeal Rule arbitrary and capricious.

DoD compounded the error. It never acknowledged that it was dismantling a framework it had maintained as binding for three decades and had proposed to reaffirm fewer than two years earlier—through notice-and-comment rulemaking. *See* 89 Fed. Reg. 30,296 (Apr. 23, 2024). Nor did DoD acknowledge that it had adopted the Stripes Regulations through notice-and-comment, *see* 58 Fed. Reg. 41,671 (Aug. 5, 1993), before declaring such proceedings "unnecessary" to repeal them "because the underlying rule addresses internal agency policies and procedures and its removal has no impact on the public." 91 Fed. Reg. at 1,706; *accord* AR0158-59; AR0167-68. That rationale is not just conclusory, *see Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("The agency's statement must be one of reasoning; it must not be just a conclusion." (quotation marks omitted)); it is contradicted by the administrative record. Even as the agency decided to repeal the Stripes Regulations, it recognized that they contained

"elements of public interest, including [Stripes'] mission as the only DoD-authorized organization to provide editorially independent media products to the U.S. military community," AR0154. DoD owed a "more detailed justification" for disregarding the facts underlying its prior policy, *Fox Television*, 556 U.S. at 515-16, yet offered none.

Nor does DoD's sole reason bear a rational connection to wholesale repeal. *See State Farm*, 463 U.S. at 43. Commenters on the 2024 proposal warned DoD that changing the regulations "would restrict Stripes in continuing its mission of providing editorially independent news and information," 91 Fed. Reg. at 1,706, but DoD dismissed that concern on the ground that the regulations "only referenc[e] Stripes as a hardcopy/print publication and not the multi-platform (including web-based) publication it has become." *Id.* That a newspaper publishes online, as well as in print, does not make its protections against censorship unnecessary—the need is the same regardless of medium. Nor, independently, was Stripes "broken" in any sense that justified repealing those protections wholesale: third-party analysis has "recognized its credibility as a neutral, nonpartisan newspaper," Church Decl. ¶ 26, ranking it "at or near the top" for "accuracy and balance," Brooks Decl. ¶ 10.

DoD also entirely failed to consider the reliance interests that three decades of codified editorial-independence protections engendered. *Encino Motorcars*, 579 U.S. at 221-22; *Regents*, 591 U.S. at 30, 33. Stripes' readers (servicemembers and families stationed worldwide, many with no other readily available independent news source) relied on the regulations' guarantee of news "without news management or censorship." *See supra* Background I-II. Those reliance interests appear in DoD's own record. DoD acknowledged in April 2025 that the rule "has been used to affirm the editorial independence of Stars and Stripes and the Ombudsman position and purpose" and that the ombudsman "has an independent duty to inform Congress about matters regarding the state of the free flow of information to the U.S. military via Stripes." AR0156;

AR0157. And it recounted that Stripes itself had "non-concurred" with a 2022 proposal to strip its governance from the CFR precisely because portions of its mission are "of distinct public and Congressional interest." AR0157. Indeed, on March 7, 2025, DoD amended DoD Directive 5122.11 and left those very protections in place. The Repeal Rule contains no discussion of reliance at all.

DoD failed to even acknowledge the constitutional interests its action implicated. The Stripes Regulations were designed to safeguard the free flow of news to Stripes' readership and to prevent military official censorship, and their repeal cleared the way for the content restrictions DoD imposed two months later. The constitutional dimension of stripping anti-censorship protections from a newspaper read by millions of servicemembers was, at minimum, an "important aspect of the problem" DoD had to consider. *State Farm*, 463 U.S. at 43. The Repeal Rule says nothing about it.

These silences are not accidental: the record shows that the Repeal Rule's stated rationale was not the real one—which is why the reversal went unexplained. The same day the Repeal Rule was published, Parnell announced that DoD would "refocus its content away from woke distractions that syphon morale"—with "[n]o more repurposed DC gossip columns; no more Associated Press reprints," *see supra* Background III. That contemporaneous, content- and viewpoint-driven explanation bears no resemblance to the neutral, technological rationale offered in the Federal Register. Agency action cannot stand on an explanation "that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). The administrative record confirms the incongruence. The repeal did not originate in any finding that the Stripes Regulations had become "outdated"; it originated in a cross-agency deregulatory review under EO 14219—an order that DoD's own staff conceded the regulations did not fit, AR0153, 0157—and it issued

over DoD's acknowledgments that the rule addresses "areas of public interest regarding Stripes' editorial independence," AR0132, and safeguards the ombudsman's "independent duty to inform Congress," AR0156. And when DoD certified the final rule for publication, it invoked a different order altogether. AR0160.

**III. The Parnell Directive Is Unlawful**

The Parnell Directive fares no better than the Repeal Rule, and for many of the same reasons. It disclaims any intent to compromise Stripes' editorial independence, then imposes a set of restrictions that do exactly that. The Parnell Directive is similarly final agency action. It "mark[ed] the 'consummation' of [DoD's] decisionmaking process" and is one "from which 'legal consequences … flow.'" *Bennett*, 520 U.S. at 177-78.[5]

The APA supplies three independent grounds to set the Parnell Directive aside. *First*, it amends the still-binding Stripes Regulations without notice and comment, and in any event, is a legislative rule that is not exempt from § 553. *Second*, it is arbitrary and capricious: DoD reversed thirty years of editorial-independence protections without acknowledging the change, ignored the censorship findings that produced those protections, and contradicted itself—promising independence while imposing censorship. *Third*, it violates the First Amendment because it imposes content- and viewpoint-based restrictions on Stripes and thereby denies the right to information and ideas to its readers. Any one defect requires vacatur. 5 U.S.C. § 706(2).

**A. The Parnell Directive violates notice-and-comment requirements**

DoD issued the Parnell Directive without the notice and comment the APA requires. That alone requires setting it aside. 5 U.S.C. § 706(2)(D). An agency "is itself bound by [a

---

[5] The DoD Memorandum was also final agency action: it took effect immediately, ordered Stripes to "immediately begin implementing" its terms, and superseded DoD Directive 5122.11 in any conflict. DoD Mem. at 1, AR 0172; *see also Bennett*, 520 U.S. at 177-78.

legislative] rule until that rule is amended or revoked," and may not "alter [it] without notice and comment." *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (citation modified). Because DoD's rescission of the Stripes Regulations was itself unlawful, those regulations remain binding, *see supra* Part II—yet the Directive overrides them anyway, amending one provision after another without any process at all. And even if the Repeal Rule were valid, the Directive would independently require notice and comment as a substantive rule in its own right.

The Parnell Directive conflicts with—and thus impermissibly amends—the Stripes Regulations provision after provision:

**32 C.F.R. § 246.3(d) (2025): Independent Ombudsman Advising Congress.** The Stripes Regulations created an ombudsman to "independently advise[]" Congress, as well as DoD and Stripes leadership, on "matters of readership interest in the Stars and Stripes"—a reporting line deliberately routed around ordinary command channels to ensure accountability to Congress and readers, not to DoD alone. 32 C.F.R. § 246.3(d) (2025); *see* GAO Report at 3 (finding an "inherent cultural conflict between civilian journalists who must execute the First Amendment mission and commanders who must execute the military mission"). The Parnell Directive eliminates that independence: the ombudsman now "[a]dvises" only "the Stripes Publisher and DoW leadership"—not Congress—on matters such as journalistic and editorial practices, and any report to Congress must be routed through DoD leadership. Parnell Directive § 3.3(b), (c), AR0190; DoD Mem. § 4(b)(c), AR0177-78. What Congress and DoD designed as an independent line becomes a channel controlled by the military chain of command. The Stripes Regulations forbade exactly this.

**32 C.F.R. § 246.4(e)(1) (2025): Narrow Grounds to Prevent Publication.** The Stripes Regulations provide that "[t]he only circumstances under which news or information that is not in the public domain may be directed to be withheld from publication" are where: publication

"(i) involves disclosure of classified national security information"; "(ii) would adversely affect national security"; or "(iii) clearly endangers the lives of U.S. personnel." 32 C.F.R. § 246.4(e)(1) (2025). Those grounds, moreover, "may not be construed to permit the calculated withholding of news unfavorable to the Department of Defense, the Military Services, or the U.S. Government." *Id.* § 246.4(e)(2) (2025). The Parnell Directive discards both limits. *First*, it bars publication of at least 113 categories of "controlled unclassified information." Parnell Directive § 1.2(c), AR0182; *see also* DoD Mem. § 1(b). *See* CUI Categories and Abbreviations, DOD CUI Program, https://perma.cc/JHF8-3GQE. The result is open-ended authority to suppress unclassified news—the opposite of a framework that confined withholding to classified information or threats to national security or servicemembers' lives. *Second*, it bans content that has a "negative impact on military readiness and safety" in support of "good order and discipline of the military." Parnell Directive § 3.1(a)(2)(e), AR0187.[6] Where the Stripes Regulations limited withholding by military officials to information that "adversely affect[s] national security" or "clearly endangers . . . lives," the Directive now prohibits publication of a broader and more ambiguous category of information. The Stripes Regulations forbade exactly this.

**32 C.F.R. § 246.4(f)(2) (2025) & Appendix D: Commercially Sourced Content Required.** The Stripes Regulations define Stripes as an "abstracted collection of commercial news and opinion available to commercial newspapers in the United States," together with "editorial staff-generated DoD, command, and local news." 32 C.F.R. § 246.4(f)(2) (2025). Appendix D makes that commercial sourcing mandatory, directing that Stripes "purchase (or contract for) and carry news stories, features, syndicated columns, comic strips, and editorial

[6] As noted above, the DoD Memorandum imposed a broader "good order and discipline" content restriction that similarly conflicts with the Stripes Regulations. DoD Mem. §§ 1(b), 2(a)(2)(e), AR0176.

cartoons from commercial services or sources." 32 C.F.R. pt. 246, App. D (2025). The regulations also specifically mandate that Stripes publish opinion and editorial cartoons from other news outlets, and in a balanced manner: "Since the Stars and Stripes may not take an independent editorial position, a balanced selection of syndicated opinion columns shall be published over a reasonable time period" and "[t]he presentation of syndicated editorial cartoons should reflect the full spectrum of topical editorial cartoons being published throughout the United States." *Id.* The Parnell Directive does the opposite: it "prohibit[s]" Stripes from "purchasing or contracting for news stories, features, syndicated columns, and editorial cartoons from commercial news media services or sources," confining the paper to staff-generated content. Parnell Directive § 3.1(a)(2)(c), AR0186; *see also* DoD Mem. § 2(a)(2)(c), AR0175 (similar). The Stripes Regulations forbade exactly this.[7]

**32 C.F.R. § 246.4(b) (2025): Free Flow of News and Information.** The Stripes Regulations commit DoD to "a free flow of news and information to [Stripes'] readership without news management or censorship," and specifically prohibit "[t]he calculated withholding of unfavorable news." 32 C.F.R. § 246.4(b) (2025). The Parnell Directive imposes exactly the news management the Stripes Regulations prohibited. *First*, it bars commercial news and opinion. Parnell Directive § 3.1(a)(2)(c), AR0182; *see also* DoD Mem. § 1(b), AR0174. *Second*, it prevents publication of controlled unclassified information. Parnell Directive § 1.2(c), AR0186; *see also* DoD Mem. § 2(a)(2)(c), AR0175. And *third*, it prohibits content with a "negative impact on military readiness and safety" in the name of "good order and discipline of the military." Parnell Directive § 3.1(a)(2)(e), AR0187; *see also* DoD Mem. § 2(a)(2), AR0176. The Stripes Regulations forbade exactly this.

[7] As noted above, the DoD Memorandum also bans "comic strips," contrary to the Stripes Regulations. DoD Mem. § 2(a)(2)(c), AR0175.

**32 C.F.R. §§ 246.3 & 246.5 (2025): Insulation from Command Control.** The Stripes Regulations deliberately insulate the newsroom from the military chain of command. Meetings between Stripes leadership and military officials "may not serve as editorial advisory boards," because any such "involvement or appearance of involvement . . . in the Stars and Stripes editorial policy creates an unacceptable conflict of interest damaging to the editorial integrity and credibility of the Stars and Stripes." 32 C.F.R. § 246.5(e)(9) (2025). The regulations further vest Stripes leadership in a civilian editor. *Id.* § 246.3(f) (2025). The Parnell Directive breaches those boundaries. *First*, it removes the requirement that the editor-in-chief be a civilian. *Second*, it requires the publisher—a "senior DoW official"—to report to the Director of the Department of War Information Activity. Parnell Directive § 3.2(a)-(b), AR0188; *see also* DoD Mem. § 3(b), AR0176. *Third*, it directs that senior DoD official to "manage[] the editorial content of Stripes in accordance" with the new content restrictions. Parnell Directive § 3.2(d), AR0189; *see also* DoD Mem. § 3(d) AR0176. *Fourth*, it makes Stripes "fully accountable to DoW leadership" for its "performance" and "strategic modernization"—terms that impermissibly reach editorial output. Parnell Directive § 3.1(d)(1), AR0188; *see also* DoD Mem. § 1(c)(1), AR0174. *Fifth*, it installs a DoD-approved advisory group that must include federal officers, federal employees, or active-duty military—raising the very "conflict of interest" that § 246.5(e)(9) sought to prevent. Parnell Directive § 3.2(h)(1), AR0189; *see also* DoD Mem. § 3(h)(1), AR0177. *Sixth*, it requires that Stripes' briefings to Congress be coordinated through DoD's legislative-affairs office—stripping the newsroom of the direct line to Congress that the Stripes Regulations preserved through the ombudsman. *Compare* 32 C.F.R. § 246.3(d) (2025), *with* Parnell Directive § 1.2(e), AR0182 *and* DoD Mem. § 1(f), AR0175. Collectively, these provisions give DoD direct oversight over the newsroom's editorial functions and operations. The Stripes Regulations forbade exactly this.

Even if the Repeal Rule were valid, the Parnell Directive is itself a legislative rule requiring notice and comment, and must be set aside on that independent ground. As explained above, *see supra* Part II.A, a rule is substantive, not procedural, when it encodes a value judgment or alters the rights or interests of parties outside the agency; section 553(b)(A)'s exception reaches only internal housekeeping. The Parnell Directive crosses that line. It does not merely strip away protections; it affirmatively imposes binding restrictions, commanding that Stripes is "prohibited" from purchasing or publishing commercial content, barring whole categories of information from publication, and dictating the reporting structure the publisher must adopt. *Supra* pp. 11-12. Because Stripes operates "much the same as any other commercial newspaper," *Tripp*, 284 F. Supp. 2d at 58, commands controlling what it may print alter the rights and interests of readers outside the agency—precisely what takes a rule outside the housekeeping exception, *see Nat'l Min. Ass'n*, 758 F.3d at 250-52.

**B. The Parnell Directive is arbitrary and capricious**

The Parnell Directive is arbitrary and capricious in four independent ways; any defect is fatal. *First*, it reverses the same considered protections, provision by provision, *see supra* Part III.A, without ever confronting the change, the GAO findings that produced those protections, or the reliance three decades of settled policy created, *see supra* Part II.B. Where an agency "disregard[s] facts . . . that underlay or were engendered by the prior policy," it owes "a more detailed justification." *Fox Television*, 556 U.S. at 515-16. Reliance interests of this magnitude only compound that obligation. *Encino Motorcars*, 579 U.S. at 222. DoD offered none.

*Second*, DoD "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. The Parnell Directive says nothing about the First Amendment interests plainly at stake, though GAO framed the very findings that produced the Stripes Regulations in terms of Stripes' "First Amendment mission." GAO Report at 3; *see infra* Part III.C. It says

nothing about the impact on readers, many of whom lack reliable digital access to the alternatives DoD invokes, face paywalls DoD now passes on to them, and cannot replicate Stripes' editorial selection of news relevant to its readers' interests without added cost and effort. Dardarian Decl. ¶¶ 23-24; Church Decl. ¶¶ 23-24; Baranger Decl. ¶¶ 17-19; Brooks Decl. ¶ 19. DoD's stated justification for the commercial-news ban—that such content is available "due to the[] digital availability . . . globally," DoD Mem. § 2(a)(2)(c), AR0175—is affirmatively contradicted by DoD's own restrictions on servicemember internet access.[8] Deployed servicemembers in combat zones "are often not allowed to have computers and mobile phones" for operational-security reasons, which renders digital news access alone "not a viable alternative"; and even at established posts in Japan and Germany, the military controls the local broadcast stations while other English language outlets "seldom if ever cover U.S. military news." Brooks Decl. ¶¶ 14-15; *see* Dardarian Decl. ¶ 23. And the Parnell Directive says nothing about the chill its CUI and "military readiness and safety" standards would impose on Stripes' journalists and their sources—a chill the record already confirms. *Supra* pp. 21-22. Instead, the Parnell Directive's administrative record spans 1,454 pages, the overwhelming majority of which consists of boilerplate policy documents—financial-management regulations, personnel casualty procedures, clothing-allowance rules—with no apparent connection to editorial independence, content restrictions, or the notice-and-comment issues actually challenged here.[9]

*Third*, the Parnell Directive contradicts itself on its face. It declares that Stripes' "editorial operations" are "independent of the military chain of command" and "free from censorship or propaganda," then commands in the same paragraph that Stripes must comply with

[8] This explanation appears in the DoD Memorandum. The Parnell Directive provides no explanation for the commercial news ban. Parnell Directive § 3.1(a)(2)(c), AR0186.

[9] DoD did not provide an administrative record for the DoD Memorandum.

the Policy's content restrictions on CUI and commercial news. Parnell Directive § 1.2(c), AR0182; *see also* DoD Mem. § 1(b), AR0174 (similar). That is not independence. And it directs Stripes to provide "comprehensive" coverage of "issues relevant to DoW personnel," while two subsections later "prohibit[s]" Stripes from purchasing the commercial news content that would make such coverage possible, Parnell Directive § 3.1(a)(2)(a), (c), AR0186; *see also* DoD Mem. § 2(a)(2)(a), (c), AR0175—content Stripes lacks the staff and resources to replicate in-house compared to AP's "over 250 bureaus across more than 100 countries." Dardarian Decl. ¶ 18. That kind of internally inconsistent decisionmaking is neither "reasonable" nor "reasonably explained," *Ohio*, 603 U.S. at 293, and is by definition arbitrary and capricious, *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025).

*Fourth*, DoD's two stated justifications—to modernize Stripes, DoD Mem. at 1, AR0172, and to "bolster" military "morale [and] readiness," Parnell Directive at 1, AR0180—bear no resemblance to the content- and viewpoint-driven purpose that Parnell himself had announced. *See infra* Part III.C; *see also supra* Part II.B (same contemporaneous evidence exposing the Repeal Rule's rationale as pretextual). The Parnell Directive delivered exactly that purpose: it bans commercial news and opinion; imposes content restrictions; and installs DoD oversight of Stripes' editorial operations. As above, agency action cannot stand on an explanation "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce*, 588 U.S. at 785.

**C. The Parnell Directive violates the First Amendment**

The First Amendment protects the freedom of the press, *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 548 (1976) ("Our liberty depends on the freedom of the press, and that cannot be limited without being lost" (quoting 9 Papers of Thomas Jefferson 239 (J. Boyd ed., 1954))), as well as the public's right to "receive information and ideas," *Va. State Bd. of Pharmacy*, 425

U.S. at 756-57. The Parnell Directive violates both: it imposes content- and viewpoint-based restrictions on what Stripes may publish and Plaintiffs may receive. Those restrictions are presumptively unconstitutional, and DoD's asserted "modernization" and "morale" rationales cannot carry the heavy burden the First Amendment imposes.

The First Amendment protects Plaintiffs' right to "receive information and ideas": "[w]here a speaker exists," "the protection afforded is to the communication, to its source and to its recipients both." *Id.* (citation omitted); *see supra* Part I.B. Here, the Parnell Directive denies Plaintiffs the wire-service news and opinion they relied on, strips them of Stripes' curated editorial product, and imposes CUI and "readiness and safety" standards that chill the reporting they would otherwise receive. *See supra* Part I.B. Each is an unlawful "limitation on the unfettered exercise of the [recipients'] First Amendment rights." *Lamont*, 381 U.S. at 305.

Stripes' journalism is fully protected First Amendment speech. A judge of this District has so held: Stripes "is much the same as any other commercial newspaper," and "both DoD and Congress intend for the Stars and Stripes to operate like other commercial newspapers, and enjoy First Amendment protections and prohibitions." *Tripp*, 284 F. Supp. 2d at 58. That remains true today. The Parnell Directive itself declares that Stripes is to be editorially independent and free of censorship. Parnell Directive § 1.2(c), AR0182; *see also* DoD Mem. § 1(b), AR 0174-75. Congress has "expressly stated" that articles in Stripes "should 'enjoy the full protection of the First Amendment,'" and intended Stripes' reporting "to be free of interference from the DOD chain of command." *Tripp*, 284 F. Supp. 2d at 56 (citation omitted). Congress has legislated on that understanding ever since, mandating preservation of Stripes' "actual and perceived editorial and management independence." NDAA for FY 2013 § 593, 126 Stat. at 1770-71.

DoD cannot recast Stripes' journalism as the government's own speech. The government-speech doctrine lets government control messages it delivers in its own voice; it

does not reach speech the government has deliberately established as independent. *See Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); *Shurtleff v. City of Boston*, 596 U.S. 243 (2022). Government speech turns on whether the public reasonably attributes the message to the government and whether the government exercised editorial control—and both factors cut against DoD. For decades, DoD structured Stripes as an independent news source and expressly disclaimed that its content reflects DoD's views, *supra* Background I-II; *supra* p. 21, precisely so that readers would not attribute Stripes' journalism to the Pentagon. The court in *Tripp* accordingly held Stripes indistinguishable from a commercial newspaper for First Amendment purposes. 284 F. Supp. 2d at 58. Having spent decades disclaiming editorial control for that very purpose, DoD cannot now assert that control to escape the First Amendment.

The Parnell Directive imposes content- and viewpoint-based restrictions and thus denies Stripes' readers access to information and ideas. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Content-based restrictions are "presumptively unconstitutional" and survive only if "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination—an "egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829—is "prohibited" outright, *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018), and a facially neutral rule qualifies if adopted "because of disagreement with the message [the speech] conveys." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation modified). The Parnell Directive is both.

*First*, the Parnell Directive's restrictions are content-based on their face. They single out speech "based on its communicative content," *Reed*, 576 U.S. at 163, banning whole categories of expression: the commercial news, opinion, and editorial cartoons Stripes had carried for

decades, more than 100 categories of "controlled unclassified information," and any content that has a "negative impact on military readiness and safety." Parnell Directive §§ 1.2(c), 3.1(a)(2)(c), (e) AR0182, 0186-87; *see also* DoD Mem. §§ 1(b), 2(a)(2)(c), (e), AR0174-76. Each targets speech by its content and is therefore "presumptively unconstitutional." *Reed*, 576 U.S. at 163. In dictating what Stripes may publish, the Parnell Directive also commandeers the editorial judgment the First Amendment protects: "the choice of material" and the "decisions made as to . . . [the] content of the paper . . . constitute the exercise of editorial control and judgment" the government may not displace. *Miami Herald Pub. Co.*, 418 U.S. at 258; *see Hurley*, 515 U.S. at 573-75. That interference with a willing speaker is precisely what denies Plaintiffs access to the content they seek.

*Second*, the Parnell Directive discriminates by viewpoint. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Two months earlier, Parnell announced that DoD would "refocus [Stripes'] content away from woke distractions" and end "repurposed DC gossip columns"—an apparent reference to the Washington Post—and "Associated Press reprints." *Supra* Background III. Parnell did not name the AP in a vacuum. The White House had already barred it from the press pool for declining the President's "Gulf of America" terminology—conduct a court of this District held to be unconstitutional viewpoint discrimination. *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 39 (D.D.C. 2025). The Directive delivered exactly what Parnell promised. One provision bars Stripes from purchasing news, opinion, and editorial cartoons from commercial sources, eliminating the two outlets Parnell named, which together supplied most of the outside content Stripes carried. Parnell Directive § 3.1(a)(2)(c), AR0186; *see supra* p. 5. The same provision exempts syndicated comic strips. Parnell Directive § 3.1(a)(2)(c)(1), AR0186. The editorial cartoons it removes include

the "satirical comics that criticized the current administration." Dardarian Decl. ¶ 22. What it excises is political content. A restriction adopted "because of disagreement with the message [the speech] conveys" is viewpoint discriminatory however neutrally packaged. *Sorrell*, 564 U.S. at 566 (citation modified). DoD's "modernization" and "morale" labels bear no resemblance to the purpose Parnell announced. *Dep't of Commerce*, 588 U.S. at 785.

The Parnell Directive also chills the reporting it does not preemptively excise. Stripes' content may not have "a direct, material, and immediate negative impact on military readiness and safety," in support of "good order and discipline of the military"—an undefined threshold backed by the threat of criminal prosecution under the UCMJ, *see supra* Background III, Part I.B. Parnell Directive § 3.1(a)(2)(e), AR0187. Tying that standard to the equally undefined concept of "military readiness," *id.*, predictably makes speakers "steer far wider of the unlawful zone . . . than if the boundaries . . . were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (citation omitted). And DoD has already punished Stripes' journalists for criticizing it—or for what it took as criticism. It moved to remove the editor-in-chief for saying he did not know what Parnell meant by "woke distractions" because "they didn't explain it." *Slavin*, No. 1:26-cv-3009, Slavin Decl. ¶ 12, Ex. 1. And it moved to remove a reporter for saying she worked for the newspaper, not the Pentagon. *Slavin*, No. 1:26-cv-3009, Korte Decl. ¶ 11, Ex. 1. That standard, so enforced, "predictably lead[s] reporters to self-censor," Church Decl. ¶ 25; Church Supp. Decl. ¶ 4, and has chilled Stripes' staff and sources, Church Decl. ¶ 28; Church Supp. Decl. ¶ 4; Dardarian Decl. ¶¶ 27-28; Dardarian Supp. Decl. ¶ 4; Baranger Decl. ¶ 17; Baranger Supp. Decl. ¶ 4; Brooks Decl. ¶ 17; Brooks Supp. Decl. ¶ 4. The chill is sharper still because DoD has set out to suppress criticism of the agency. Parnell faulted the publisher for letting staff join "a network story they know was meant to criticize the DoW efforts with Stripes." Dardarian Supp. Decl. ¶ 7.

These content bans are also prior restraints—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. By barring those categories before any of that speech appears, the Parnell Directive keeps lawful speech from ever reaching the public and so bears "a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (citation omitted). DoD has not made—and cannot make—the extraordinary showing a prior restraint demands.

These restrictions cannot survive the strict scrutiny they trigger. *Reed*, 576 U.S. at 163-64. DoD cannot meet its burden of proving a compelling interest and narrow tailoring. The DoD Memorandum's original rationale—"modernization"—is an administrative preference, not a compelling interest, and cannot justify suppressing protected speech. DoD Mem. at 1-2, AR 0172-73. Nor does the Parnell Directive's revised rationale of military "morale" and "readiness" establish a compelling interest, Parnell Directive at 1, AR0180, particularly where, as here, "defendants have not shown how these interests are in any way furthered by the restriction on the speech" in the Parnell Directive. *Rigdon v. Perry*, 962 F. Supp. 150, 162 (1997). DoD never explains why military readiness and morale—much less the modernization of the newspaper—require banning commercial news, editorial cartoons, 100-plus categories of unclassified information, or conditioning publication on whether there may be a "negative impact on military readiness and safety." Parnell Directive §§ 1.2(c), 3.1(a)(2)(c), (e), AR0182, 0186-87; *see also* DoD Mem. §§ 1(b), 2(a)(2)(c), (e), AR0174-76. A restriction sweeping in vast quantities of lawful speech is the antithesis of narrow tailoring—and its viewpoint discrimination is fatal regardless of the level of scrutiny.

**IV. Vacatur Is the Proper Remedy**

Vacatur is "the normal remedy" when agency action is unlawful. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *see* 5 U.S.C. § 706(2) (a

reviewing court "shall . . . hold unlawful and set aside" unlawful agency action). Whether to depart from that norm depends on "the seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150-51 (citation omitted). Both factors compel vacatur here. The deficiencies are fundamental: DoD bypassed notice and comment entirely—a "fundamental flaw" that "normally" requires vacatur, *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citation omitted)— and both actions are arbitrary and capricious, and the Parnell Directive unconstitutional, in ways that no explanation on remand could cure.

Nor would vacatur be unduly disruptive; it would simply restore the status quo that had governed for three decades. Vacatur of the Repeal Rule would revive the Stripes Regulations, *see Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam) (vacating a rescission "reinstate[s] the rules previously in force"), and vacatur of the Parnell Directive and DoD Memorandum would lift restrictions that took effect only months ago. The Court should vacate these actions and order that the Stripes Regulations remain in effect unless and until lawfully amended.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

September 16, 2026

Respectfully submitted,

*<u>/s/ Allyson R. Scher</u>*
Allyson R. Scher (D.C. Bar 1616379)
Paul R.Q. Wolfson (D.C. Bar 414759)
Elena Goldstein (D.C. Bar 90034087)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ascher@democracyforward.org

pwolfson@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*