**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Susan Dardarian *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. Department of Defense *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-1965 |

**OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. Plaintiffs Have Standing ........ 2

A. Plaintiffs have suffered economic harm ........ 2

B. Plaintiffs are deprived of their right to receive information ........ 5

II. The Repeal Rule Is Unlawful ........ 9

A. The Repeal Rule violates notice-and-comment requirements ........ 9

B. The Repeal Rule is arbitrary and capricious ........ 11

III. The Parnell Directive Is Unlawful ........ 17

A. The Parnell Directive violates notice-and-comment requirements ........ 17

B. The Parnell Directive is arbitrary and capricious ........ 18

C. The Parnell Directive violates the First Amendment ........ 19

IV. Vacatur Is the Proper Remedy ........ 23

CONCLUSION ........ 24

## INTRODUCTION

Defendants' opposition concedes more than it contests. The Stripes Regulations, 32 C.F.R. pt. 246 (2025), guaranteed readers news "without news management or censorship," a value judgment Defendants acknowledge and try to recast as agency procedure. The U.S. Department of Defense ("DoD") repealed them without notice and comment, insisting that repeal would have "no impact on the public," a premise Defendants no longer defend. 91 Fed. Reg. 1,706 (Jan. 15, 2026) ("Repeal Rule"). Defendant Sean Parnell, the Assistant to the Secretary of Defense for Public Affairs, made the reason plain. The same day that the Repeal Rule was issued, Parnell announced that Stripes would be refocused "away from woke distractions," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints." The Parnell Directive then made good on that promise. *See* Department of War Instruction 5122.11, Stars and Stripes Media Organization (Aug. 21, 2026), AR0180–96. It banned the content Parnell singled out, imposed new limits on what Stripes may publish, and overrode the Stripes Regulations provision by provision. Defendants do not dispute any one of those conflicts, and they do not try to show that the Directive survives strict scrutiny. Their defense rests instead on the claim that Stripes' journalism is the government's own speech.

Defendants' own words refute that claim. Their Directive declares that Stripes' products "do not reflect the official views or endorsement of the U.S. Government." Their brief calls Stripes "an independent source of news and information," defends the Directive's provisions protecting its "editorial independence," and, in the very section claiming Stripes' reporting as DoD's own, insists that reporting is "free from command influence." Defendants cannot claim as their own speech that they have disclaimed and placed outside the military chain of command.

Standing is just as clear. Plaintiffs paid for a newspaper DoD has since stripped of the content and editorial selection they purchased, and they now pay elsewhere to replace what they

can. Defendants contest only the law, and their own cases defeat them.

Defendants' remaining arguments recite tests without applying them and rely on cases that do not say what Defendants claim. The Court should grant Plaintiffs' motion for summary judgment and vacate the Repeal Rule, DoD Memorandum, and Parnell Directive.[1]

## ARGUMENT

### I. Plaintiffs Have Standing

Standing here is not a close question. DoD's actions cost Plaintiffs money, both in the value of their subscriptions and in what they now pay elsewhere, and cost them reporting they relied on Stripes to provide. Any one of these injuries suffices, and only one Plaintiff need show one. Pls.' Mot. for Summ. J. at 14, ECF No. 22-1 ("Pls.' MSJ"). Defendants' responses misstate the record and misread the cases, including their own. Defs.' Mot. for Summ. J. at 5–9, ECF No. 24-1 ("Defs.' MSJ").[2]

#### A. Plaintiffs have suffered economic harm

Mr. Church subscribed on October 16, 2025—three months before the Repeal Rule—for Stripes' editorial judgment and its selection of Associated Press ("AP") and Washington Post coverage, including Post reporting he does not otherwise receive. Decl. of William Church ¶¶ 6, 11, ECF No. 18-6. The same $49.99 now buys "less content, and content of lower quality," and he would not have paid that price for the paper DoD has left him. *Id.* ¶¶ 12–13. Mr. Brooks, who renewed before DoD's March 9, 2026 memorandum, AR0172–79 ("DoD Memorandum"),

[1] Plaintiffs challenge both the DoD Memorandum and the Parnell Directive. Because the Directive "incorporates and cancels" the DoD Memorandum, AR0180, Plaintiffs cite the Directive as the operative instrument unless otherwise noted. See Pls.' MSJ at 3 n.1.

[2] Plaintiffs' notice-and-comment claims require a concrete interest and a "reasonably increased risk of injury" to it. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc); Pls.' MSJ at 14, 22. That standard reaches the ongoing decline in Stripes' quality and the chill on its reporters and sources, both of which threaten to cost Plaintiffs still more of the coverage they paid for. Pls.' MSJ at 17, 22. Plaintiffs easily meet it.

issued, got "the bulk of [his] international and national news" from Stripes; he has since watched "the content and quality of Stripes" diminish. Decl. of Brian S. Brooks ¶¶ 9, 11, 18, ECF No. 18-4. Plaintiffs paid Stripes to select the news for them; now they must do it themselves, spending roughly two more hours a week (Mr. Baranger) or an extra hour a day (Mr. Brooks) on the effort. Decl. of Walter Baranger ¶ 17, ECF No. 18-5; Brooks Decl. ¶ 19; *see* Decl. of Susan Dardarian ¶ 24, ECF No. 18-3; Church Decl. ¶¶ 10, 23; Pls.' MSJ at 16–17. Even then, what they assemble "is not equivalent to what Stripes provided." Baranger Decl. ¶ 17. And the paper Plaintiffs still receive is getting worse. Mr. Baranger "can no longer be confident that stories are not being withheld," Baranger Decl. ¶ 15, and Mr. Church warns of "a real risk [Stripes] can no longer sustain [its] hard-hitting reporting," Church Decl. ¶ 27; *see* Pls.' MSJ at 18. Defendants dispute none of this.

That is monetary harm, the "most obvious" kind of concrete injury: "If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Defendants insist only that Plaintiffs must "establish that they have a contractual right to receive reprints [of stories from other news outlets] through their Stripes subscriptions." Defs.' MSJ at 8. But no case requires a subscriber to identify a contract term guaranteeing particular content. An overpayment injury turns on the "difference between what [plaintiff] contracted for and what she actually received." *Austin-Spearman v. AARP*, 119 F. Supp. 3d 1, 8 (D.D.C. 2015) (alteration in original and citation omitted). That is a cognizable interest, which need not be "affirmatively protected by positive law." *Tanner-Brown v. Haaland*, 105 F.4th 437, 446 (D.C. Cir. 2024); *see Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997). And Stripes' reservation of a "right to modify" its

product, Defs.' MSJ at 8, says nothing about whether Plaintiffs received what they paid for. They did not.[3]

*Austin-Spearman*, on which Defendants rely, Defs.' MSJ at 8, illustrates the point. The plaintiff there lacked standing when she sued over a website privacy policy that was never part of her AARP membership. *Austin-Spearman*, 119 F. Supp. 3d at 9–10. She read it only after joining, it applied to members and non-members alike, and it was not "objectively essential" to what she bought. *Id.* at 11–13. Here, by contrast, the content and editorial selection DoD eliminated were the very things Plaintiffs paid for. Pls.' MSJ at 15. Until the Repeal Rule, binding regulations required Stripes to carry "the same range of international, national, and regional news and opinion from commercial sources, as is provided by newspapers in the United States." 32 C.F.R. pt. 246, App. A ¶ B (2025). Defendants admit as much. Defs.' MSJ at 20 (regulations "requir[ed] Stripes to carry commercial news and opinion"). And that content was no incidental term: it "frequently" made up "more than 50%" of an issue. Church Decl. ¶ 22. Without it, Plaintiffs did not get "what the parties agreed [they] had purchased." *Austin-Spearman*, 119 F. Supp. 3d at 13.

Plaintiffs have also paid out-of-pocket expenses to replace what DoD eliminated—a second and independent economic injury. Mr. Brooks bought a New York Times subscription "[t]o make up for the lost coverage in Stripes," which had consisted of AP coverage that "Stripes simply does not have the capacity to replicate." Brooks Decl. ¶ 19. Ms. Dardarian pays $5.99 a month for the Washington Post because "a selection of Washington Post content is no longer

---

[3] Defendants' Tucker Act footnote, Defs.' MSJ at 8 n.2, only hurts them. Defendants concede that the alleged breach could support "a suit for money damages," *id.*, which presupposes the very economic injury they deny. In any event, Plaintiffs seek vacatur under the APA, not "an order compelling performance" of any contract term. *Id.*

available to [her] through [her] Stripes subscription," and she will keep paying as long as DoD bars Stripes from purchasing it. Dardarian Decl. ¶ 17.

Defendants' only answer is that Plaintiffs are "inflicting harm on themselves." Defs.' MSJ at 8 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)). That argument does not survive a reading of *Clapper*. The plaintiffs there spent money to guard against surveillance that was not "certainly impending," and the Court held those costs "self-inflicted." 568 U.S. at 416–18. But Plaintiffs did not pay to ward off a speculative harm. They paid to replace content DoD had already stripped from Stripes. Brooks Decl. ¶ 19; Dardarian Decl. ¶¶ 13, 17. Indeed, Defendants themselves point Plaintiffs to that remedy, arguing that they can get the content "from other sources." Defs.' MSJ at 6–7. Defendants cannot send Plaintiffs elsewhere and then call the cost of going there self-inflicted. And the rest of Defendants' theory—that the costs must avoid "an injury that would have established standing in its own right," *id.* at 8—appears nowhere in the opinion. The only line in *Clapper* that resembles it, its refusal to accept "a repackaged version of [the plaintiffs'] first failed theory of standing," addresses the same problem of costs "incurred in response to a speculative threat." 568 U.S. at 416.

**B. Plaintiffs are deprived of their right to receive information**

Defendants' challenges to Plaintiffs' listener injury rest on assertions they do not support. Defs.' MSJ at 5–7. First, Defendants' lead argument is that Plaintiffs have no listener rights because Stripes' journalism is "government speech." *Id.* at 5–6 (citing *id.* at 15–17). As a threshold matter, Defendants confuse the merits with jurisdiction. For standing purposes, courts "accept as valid the merits of [Plaintiffs'] legal claims." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022). And on the merits, the argument fails twice over. Defendants' own Directive declares that Stripes' products "are unofficial and do not reflect the official views or endorsement of the U.S. Government," Parnell Directive § 3.1(a)(2)(d), AR0186, and that its

editorial operations are "independent of the military chain of command," Parnell Directive § 1.2(c), AR0182. And every factor of the government-speech test, which Defendants never apply, cuts against them. *See infra* Part III.C.

Second, on *Murthy v. Missouri*, 603 U.S. 43 (2024), Defendants summarily conclude that Plaintiffs lack a "concrete, specific connection" to Stripes, reasoning only that if Plaintiffs had standing, "anyone who subscribes to a publication would." Defs.' MSJ at 6. But Plaintiffs are not just anyone who subscribes. Two sit on Stripes' publisher's advisory board. Pls.' MSJ at 19. The other two are military veterans with decades-long ties to the paper. Mr. Brooks read it "religiously" while serving abroad, including as a lieutenant in Germany and Vietnam, and later edited its European edition. Brooks Decl. ¶¶ 2, 4, 7–8. Mr. Baranger, a Coast Guard Reserve veteran, has read it since 1986. Baranger Decl. ¶¶ 6–7. All four are paying subscribers who read Stripes daily or several times a week. Dardarian Decl. ¶ 4; Brooks Decl. ¶ 9; Baranger Decl. ¶ 8; Church Decl. ¶ 6. That is the "concrete, specific connection" *Murthy* requires. 603 U.S. at 75.

The facts here look nothing like those found insufficient in *Murthy*. The plaintiffs there claimed an interest in the speech of "countless other social-media users" and identified no "specific instance of content moderation that caused them identifiable harm." *Id.* Plaintiffs here claim an interest in one newspaper to which they subscribe, and they identify exactly what has been eliminated from it. Since the DoD Memorandum, Mr. Baranger has seen AP and Washington Post reporting disappear from Stripes' newsletter, app, and website, Baranger Decl. ¶ 17, and Mr. Brooks has noticed "nearly every day" an AP story that Stripes, having lost its AP coverage, does not cover and "simply does not have the capacity to replicate," Brooks Decl. ¶ 19. They have also lost what they value most in Stripes: its editors' selection of the news. *See, e.g.*, Brooks Decl. ¶ 10 ("I rely on its editors to select the news most relevant to military readers like me from a broad range of sources."). If that is not a specific connection, it is hard to fathom what

is. And Defendants' claim that Plaintiffs have not identified "any specific speakers or topics," Defs.' MSJ at 6, is hard to take seriously—the speaker is Stripes, and the topics are what the Parnell Directive banned.

Defendants' claim that Plaintiffs can obtain the content "from other sources," Defs.' MSJ at 7, was rejected by *Virginia Pharmacy*: the Court was "aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976). *Kleindienst* was likewise "loath to hold on this record that existence of other alternatives extinguishes altogether any constitutional interest on the part of the appellees in this particular form of access." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). Defendants also invent a concession, asserting without citation that Plaintiffs "concede" the material is available elsewhere. Defs.' MSJ at 6. Plaintiffs said the opposite. Pls.' MSJ at 20 (Plaintiffs "cannot otherwise obtain the same content"); Baranger Decl. ¶¶ 9, 17 (coverage he assembles himself "is not equivalent to what Stripes provided" and he "could not[] review the many hundreds of articles that the AP, the Washington Post, and other outlets publish each day").[4]

Defendants' other distinctions misread what the cases actually held. *Lamont*'s "affirmative obligation" describes how the statute burdened the addressees' right, *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965), not why they had one. And if the *Lamont* addressees had a protected interest in mail they had not subscribed to, *id.* at 302 (statute did not reach mail "furnished pursuant to subscription"), then Plaintiffs, as paying subscribers, have one too. The *Kleindienst* passage Defendants cite does not limit who may claim a listener's interest; it holds

[4] Defendants' fallback, that Stripes might someday regain the content through an exception, Defs.' MSJ at 6–7, changes nothing. A ban that might be lifted is still a ban, and Plaintiffs are without the content now. Nor is that hope realistic. Stripes' publisher has already asked DoD for an exemption, and DoD has not responded. Dardarian Decl. ¶ 7.

only that, given Congress's "plenary" power over immigration, the Executive's waiver decision need not yield whenever Americans wish to hear an excludable noncitizen. 408 U.S. at 768–70. Read for what they held, these cases support Plaintiffs, not Defendants.

Third, Defendants concede most of the ways DoD has curtailed the information Plaintiffs would otherwise receive. *See* Pls.' MSJ at 19–22. They do not dispute that DoD stripped Stripes of the content Plaintiffs relied on, or that it took away the editorial selection Plaintiffs paid for. *Id.* They challenge only the chill of the "readiness and safety" standard, claiming Plaintiffs identify no "actual instances" of censorship. Defs.' MSJ at 7. But the pages Defendants cite identify them. *Id.* (citing Pls.' MSJ at 18–22). The day after Stripes reported on conditions aboard the U.S.S. Abraham Lincoln, DoD ordered Stripes' publisher to deliver termination notices to its editor-in-chief and a reporter. Pls.' MSJ at 21–22. DoD then fired both, along with the publisher, for publicly affirming their commitment to Stripes' editorial independence, which Parnell described as "particip[ating] in a network story [DoD] kn[e]w was meant to criticize the [DoW]'s efforts with Stripes." *Id.* at 21–22; *see* Supp. Decl. of Susan Dardarian ¶ 7, ECF No. 22-3 ("Dardarian Supp. Decl."). DoD also fired the ombudsman after she protested its changes, Dardarian Decl. ¶ 30, and installed public-affairs officials as Stripes' "military deputy" and acting publisher, *id.* ¶ 32; *see* Svetlana Shkolnikova, *Pentagon Public Affairs Official Named Acting Publisher of Stars and Stripes*, Stars & Stripes (Oct. 13, 2026), https://perma.cc/8BLF-ZXHA. Those are the "actual instances" Defendants say are missing, and Plaintiffs' declarations describe the chill they have caused. *See* Dardarian Decl. ¶¶ 27–28; Church Decl. ¶ 25; Dardarian Supp. Decl. ¶ 4.

**II. The Repeal Rule Is Unlawful**

**A. The Repeal Rule violates notice-and-comment requirements**

Plaintiffs' notice-and-comment claims alone resolve this case, yet Defendants relegate them to the end of their brief—with good reason. Defs.' MSJ at 18–21. The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). DoD issued the Stripes Regulations through notice and comment and codified them in the C.F.R., then repealed them without it. *See* Pls.' MSJ at 23–28. Defendants' only response is that notice and comment was never required because the regulations were procedural rules or policy statements. Defs.' MSJ at 19–21. They offer no explanation for either label, and the regulations fit neither.

Defendants concede that the Stripes Regulations reflect a value judgment about Stripes' editorial independence. *Id.* at 19. As Plaintiffs explained, the regulations resolved the conflict between command control and Stripes' journalism in favor of editorial independence. Pls.' MSJ at 25–26. Defendants argue only, and without explanation, that "[t]hat value judgment" concerns "agency organization, procedure, or practice." Defs.' MSJ at 19. It does not. Procedural rules are those "primarily directed toward improving the efficient and effective operations of an agency." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (citation omitted); *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). The exception "must be narrowly construed," *Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011) ("*EPIC*") (citation omitted), and reaches only "internal house-keeping measures organizing agency activities," *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (quoting *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980)). The judgments procedural rules embody concern "what mechanics and processes are most efficient." *JEM Broad. Co. v. FCC*, 22 F.3d 320, 328 (D.C. Cir. 1994). The provisions Plaintiffs identified, Pls.' MSJ at 25, reflect no judgment about efficiency. They reflect a

judgment that readers will receive news "without news management or censorship," 32 C.F.R. § 246.4(b) (2025), which concerns what the public reads, not how DoD processes its work. That is a "substantive value judgment." *AFL-CIO*, 57 F.4th at 1042 (citation modified) (rule encoding a judgment about what "best serve[s] the policy goals" of an agency program is substantive); *see* Pls.' MSJ at 24. Even the purpose clause Defendants quote says the regulations "[e]stablish[] policy," not merely "prescribe[] procedures." 32 C.F.R. § 246.1 (2025); *see* Defs.' MSJ at 19. Defendants do not cite *AFL-CIO*, *Mendoza*, or *American Hospital*, and they ignore *EPIC*'s narrow-construction rule.

Defendants quote the test for whether a rule alters private interests, Defs.' MSJ at 18–19 (quoting *Chamber of Com. v. DOL*, 174 F.3d 206, 211 (D.C. Cir. 1999)), but never apply it, and they do not address *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000), which makes that inquiry the "critical feature" of the procedural exception. Pls.' MSJ at 24–25. The Stripes Regulations guaranteed readers uncensored news and required Stripes to carry wire news and opinion. And Defendants' own cases cut against them. *Chamber of Commerce* held the directive there "a substantive rule." 174 F.3d at 212–13. *EPIC* held the same, notwithstanding the "substantial impact" language Defendants quote. 653 F.3d at 5–6. And *JEM* treated the FCC's rules as procedural because they "did not change the substantive standards by which the FCC evaluates license applications." 22 F.3d at 327. The Stripes Regulations *were* the substantive standards. That Defendants' best example of a "proper" legislative rule is a minimum size for Atlantic cod, Defs.' MSJ at 20, confirms that they have no workable line to offer.

Nor can Defendants recast the regulations as "general statement[s] of policy." Defs.' MSJ at 20. They offer no analysis, and they do not even say which of the challenged provisions are supposedly policy statements and which are procedural rules. *Id.* And by Defendants' own definition, a policy statement announces how an agency "proposes to exercise a discretionary

power." *Id.* (citation omitted). The Stripes Regulations eliminated discretion. For example, they specified "[t]he only circumstances" in which news could be withheld. 32 C.F.R. § 246.4(e)(1) (2025). A rule that binds the agency's discretion until it is amended or repealed is legislative, as Defendants' own authority recognizes. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014); *see* Defs.' MSJ at 18; Pls.' MSJ at 25–26. In any event, the Repeal Rule never invoked the policy-statement exception. It rested solely on the assertion that part 246 "addresse[d] internal agency policies and procedures and its removal has no impact on the public." 91 Fed. Reg. 1,706, 1,706 (Jan. 15, 2026). Defendants cannot supply a new rationale now. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); Pls.' MSJ at 27.

Defendants' fallback is that DoD did not need notice and comment in 1994 and so it need not use it now. Defs.' MSJ at 20–21. They cite no case, and Plaintiffs are aware of no circuit precedent, that lets an agency repeal a rule without the procedures it used to adopt it on that theory. Defendants' theory also assumes the regulations were not legislative, which is the very question in dispute. And DoD's own record refutes it. Just two years ago, DoD proposed to keep in the C.F.R. the provisions addressing "areas of public interest regarding Stripes' editorial independence," removing only "internal procedures that do not have external burden or implications." 89 Fed. Reg. 30,296, 30,298 (Apr. 23, 2024).

And even if the regulations were not legislative, DoD's own rules required notice and comment for this repeal, and DoD had to follow them. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954); Pls.' MSJ at 27–28. Defendants have no answer.

**B. The Repeal Rule is arbitrary and capricious**

Defendants say the Repeal Rule is both unreviewable and adequately explained. Defs.' MSJ at 9–13. It is neither. First, Defendants' claim that the Repeal Rule is "committed to agency discretion by law," *id.* at 9–10 (quoting 5 U.S.C. § 701(a)(2)), ignores the regulation the Repeal

Rule rescinded. There is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). The agency-discretion exception applies only in "those rare circumstances" where the relevant law "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). And that standard need not come from a statute. "[J]udicially manageable standards 'may be found in formal and informal policy statements and regulations as well as in statutes.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citation omitted); *Cap. Area Immigrants' Rts. Coal. v. U.S. Dep't of Just.*, 264 F. Supp. 2d 14, 23 (D.D.C. 2003) ("earlier regulations do provide some standards by which the Court may review the final regulation"). The Stripes Regulations, which governed Stripes for thirty years, supply those standards here. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (an agency "changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change"); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020). So does the Directive's own statement that Stripes will operate "free from censorship or propaganda." Parnell Directive § 1.2(c), AR0182. *Lincoln v. Vigil* is thus inapposite. Defs.' MSJ at 10. The program there was governed by no statute or regulation, and ending it reallocated "funds from a lump-sum appropriation," a decision "traditionally regarded as committed to agency discretion." 508 U.S. at 190, 192, 194. And that DoD need not publish Stripes at all is beside the point. Having protected Stripes' independence for three decades, DoD had to justify abandoning those protections. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Next, on the merits, Defendants do not meaningfully defend the reasonableness of their decisionmaking. The Repeal Rule fails to explain how its rationale justified repeal, contradicts DoD's own record on the public's stake in the regulations, ignores the obvious alternative of

modification, abandons DoD's longstanding position without acknowledgment, and disregards readers' reliance. Defendants do not dispute that the Repeal Rule ignored the First Amendment consequences of stripping away binding anti-censorship protections, or that its stated rationales were pretextual. And the Rule never explains how a regulation's reference to print publication justified stripping away its protections against censorship. That failure alone makes it arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Defendant Parnell's public statements explain Defendants' silence. The same day the Rule was published, Parnell announced that DoD would "refocus [Stripes'] content away from woke distractions," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints." Pls.' MSJ at 31–32. That is "incongruent" with the Rule's claim that it merely retired an "outdated" print-era regulation. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); 91 Fed. Reg. at 1,706. Defendants make no attempt to reconcile Parnell's announcement with the Rule's stated rationale. Pls.' MSJ at 31–32.

Defendants also effectively concede that DoD failed to consider an important aspect of the problem: the Repeal Rule's effect on the public. The Rule justified skipping notice and comment on the ground that removing part 246 "has no impact on the public." 91 Fed. Reg. at 1,706. DoD's own record said otherwise: even as it recommended repeal, DoD recognized that the regulations contained "elements of public interest, including [Stripes'] mission as the only DoD-authorized organization to provide editorially independent media products to the U.S. military community." AR0154. Defendants do not defend the Rule's finding that repeal would have no impact on the public. They argue instead that "[e]ven 'a rule with a "substantial impact" upon the persons subject to it' may be a procedural rule." Defs.' MSJ at 19–20 (citation omitted). An agency that wrongly concludes its action will not affect the public at all has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

And the arguments Defendants do make miss the point. They treat DoD's April 2025 action memo, AR0153–54, as the "position" Plaintiffs say DoD changed and argue it was not "formal" enough to be a change in position that lacks explanation. Defs.' MSJ at 11–12. But Plaintiffs rely on the memo for a different purpose.[5] The memo shows that modification was the obvious alternative "within the ambit of the existing [policy]," which DoD was required to consider. *Regents*, 591 U.S. at 30 (citation modified); *see* Pls.' MSJ at 29. And although Parnell initially set out to modify the Stripes Regulation, *see* Pls.' MSJ at 28–29, the Repeal Rule never mentions modification as an alternative, much less explains why it was rejected in favor of wholesale repeal. Defendants' new explanation, that repeal allows changes to "more efficiently take place" through internal documents, Defs.' MSJ at 12, appears nowhere in the Rule, and Defendants cannot supply it now. *See Chenery*, 332 U.S. at 196.

The position DoD abandoned was its three-decade policy of protecting Stripes' editorial independence through binding regulations. Pls.' MSJ at 29–30. Rescinding a regulation is a change in position. *Wages*, 604 U.S. at 570. And this position was a considered one. DoD adopted the protections through notice and comment in 1994 "to accommodate recommendations made by the General Accounting Office," 59 Fed. Reg. 19,137 (Apr. 22, 1994). As recently as 2024, it distinguished the codified policies governing Stripes' "editorially independent media products" from "internal management procedures" that "do not require rulemaking." 89 Fed. Reg. at 30,297. The Repeal Rule reversed course, relegating those protections to "internal policy and procedures" in DoD Directive 5122.11, 91 Fed. Reg. at 1,706, without addressing the GAO findings, the 1994 rulemaking, or the 2024 proposal. Pls.' MSJ at 29–30. That is exactly the

---

[5] Nor does *Wages* support Defendants' formality argument. Defs.' MSJ at 11–12. The Court "assume[d], without deciding," that the change-in-position doctrine reaches positions stated in nonbinding guidance. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 n.5 (2025)

unacknowledged change the doctrine forbids. *Wages*, 604 U.S. at 569–70. Defendants try to recast DoD's choice as a legal question about "whether notice-and-comment is required." Defs.' MSJ at 13. It was not. Whether to keep these protections in binding regulations was a policy choice about how to protect Stripes' editorial independence. Defendants' only case says just that whether a rule is legislative is reviewed *de novo*. *Id.* at 13–14 (citing *Nebraska Dep't of Health & Hum. Servs. v. HHS*, 340 F. Supp. 2d 1, 12 (D.D.C. 2004)). That does not alter the conclusion that DoD reversed its position without explanation.

Defendants' suggestion that DoD never treated the 1994 rule as legislative, because the same policies appeared in Directive 5122.11 on October 5, 1993, Defs.' MSJ at 14, gets the chronology backwards. DoD published the proposed rule on August 5, 1993, before it issued the Directive. 59 Fed. Reg. at 19,137. And the 2024 proposal confirms that DoD understood the provisions governing Stripes' editorial independence to require rulemaking. 89 Fed. Reg. at 30,297.

The Repeal Rule's stated rationale fares no better. It dismissed concerns about Stripes' "editorial independen[ce]" because the "existing rule is outdated" and "only referenc[ed] Stripes as a hardcopy/print publication." 91 Fed. Reg. at 1,706. Whether Stripes appears in print or online has nothing to do with whether its readers need protection from censorship. Pls.' MSJ at 30. Defendants do not defend that reasoning. They argue instead that the Parnell Directive reaffirms Stripes' independence. Defs.' MSJ at 13. But the Directive came months after the Rule, and arbitrary-and-capricious review looks only to the reasons the agency gave when it acted. *See Chenery*, 332 U.S. at 196. In any event, the Directive proves Plaintiffs' point. It invokes Stripes' independence while banning commercial news and barring content that would undermine "readiness and safety." Parnell Directive §§ 3.1(a), 3.1(a)(2)(e), AR0186–87. And whatever it

promises, DoD can rewrite at will. Binding regulations are not interchangeable with an internal policy that already contradicts itself.

Finally, DoD never considered readers' reliance on the Stripes Regulations. Defendants' answer is that no one raised it. Defs.' MSJ at 14 (quoting *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 722 (D.C. Cir. 2016)). That is the product of DoD's own violation. *Mingo Logan* ties the duty to address reliance to "the thoroughness of public comments," 829 F.3d at 722 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 227 (2016) (Ginsburg, J., concurring)), and DoD denied the public any chance to comment. *Supra* Part II.A. Without comments, an agency is "unable to 'assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns,'" and acting anyway is arbitrary and capricious. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 131 (D.D.C. 2026) (quoting *Regents*, 591 U.S. at 33), *stay granted*, No. 26A308 (U.S. Sept. 25, 2026).

In any event, DoD's own record demonstrates the reliance interests. The GAO investigation behind the regulations recounted military officials' statement that Stripes' "popularity among our people is based on their confidence that the publication offers an unbiased view of world and regional events." U.S. Gen. Acct. Off., GAO/NSIAD-89-60, *Stars and Stripes: Inherent Conflicts Lead to Allegations of Military Censorship* 20 (1988), https://perma.cc/EMZ7-WNLH ("GAO Report"). DoD itself said in 2025 that part 246 "has been used to affirm the editorial independence" of Stripes. AR0156. And Stripes opposed removing the Stripes Regulations from the C.F.R. because its mission is "of distinct public and Congressional interest." AR0157; *see* Pls.' MSJ at 30–31. The Repeal Rule says nothing about any of it. These are not the "unidentified and unproven" interests of *Solenex LLC v. Bernhardt*,

962 F.3d 520, 529 (D.C. Cir. 2020). They are readers' interest in an uncensored newspaper, documented by DoD itself.

**III. The Parnell Directive Is Unlawful**

**A. The Parnell Directive violates notice-and-comment requirements**

The Parnell Directive required notice and comment for two independent reasons, and Defendants do not meaningfully engage with either. First, because the Repeal Rule is invalid, the Stripes Regulations still bind DoD, which may not "alter [them] without notice and comment." *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (citation modified). Plaintiffs showed, provision by provision, that the Directive contradicts those regulations. Pls.' MSJ at 32–36. Defendants do not dispute a single conflict, or even mention one. *See Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) ("an amendment to a legislative rule must itself be legislative" (citation modified)). Second, the Directive is legislative in its own right. Pls.' MSJ at 36–37.

On the second ground, Defendants' only answer is to call the Directive procedural, Defs.' MSJ at 18–20, or a matter "relating to agency management or personnel," *id.* at 21 (quoting 5 U.S.C. § 553(a)(2)). As with the Repeal Rule, they do not explain how either exemption fits. *See supra* Part II.A. They cite cases about DOJ's drug testing of its own employees, a federal pay scale, and the Library of Congress's internal management, Defs.' MSJ at 21, but each concerned an agency's management of its own personnel or operations, not commands about what an editorially independent newspaper may publish to its readers. And Defendants ignore Plaintiffs' showing that the Directive affirmatively imposes binding restrictions: it prohibits Stripes from purchasing or publishing commercial content, bars whole categories of information, and dictates the publisher's reporting structure. Pls.' MSJ at 36–37. Those commands are not procedural, *supra* Part II.A, and they are not personnel management.

**B. The Parnell Directive is arbitrary and capricious**

The Directive is reviewable for the same reasons as the Repeal Rule, *supra* Part II.B, and it fails review. Nothing in the record shows that the Parnell Directive serves its stated goals of "modernization" and "morale." Defs.' MSJ at 11–12. The Directive never explains how banning AP and Washington Post content, or barring content that negatively affects military readiness, advances either one. That alone makes it arbitrary and capricious. *State Farm*, 463 U.S. at 43.

The Directive is arbitrary and capricious for four further reasons, and Defendants address only the last. First, the Directive ignored the First Amendment interests at stake and the effect on Stripes' readers. Pls.' MSJ at 37–38. DoD justified the commercial-news ban by that content's "digital availability . . . globally," DoD Memorandum § 2(a)(2)(c), AR0175, without considering its own limits on servicemembers' internet access, Pls.' MSJ at 38. Second, the Directive's stated rationales of "modernization" and "morale" bear no relation to the purpose Defendant Parnell announced. *Id.* at 39. Third, the Directive contradicts itself by declaring Stripes "free from censorship" while imposing content restrictions. *Id.* at 38–39. Defendants' list of the Directive's independence provisions, Defs.' MSJ at 13, only underscores that contradiction.

Finally, the Directive reversed DoD's substantive anti-censorship protections without acknowledging the change, the GAO findings behind those protections, or readers' reliance on them. Pls.' MSJ at 33–37 (citing *Fox*, 556 U.S. at 515–16). That change is distinct from the Repeal Rule's, which concerned the form of the protections, *supra* Part II.B; the Directive eliminated their substance. Defendants offer only DoD's explanation that "Stripes must modernize to remain relevant," Defs.' MSJ at 12, which does not acknowledge the change at all, much less explain why modernizing Stripes required restricting what it may publish.

**C. The Parnell Directive violates the First Amendment**

The Parnell Directive imposes content- and viewpoint-based restrictions on a newspaper. Defendants' defense rests almost entirely on recasting Stripes' journalism as government speech. Defendants' own Directive forecloses that argument. It declares that Stripes' "products are unofficial and do not reflect the official views or endorsement of the U.S. Government, the DoW, or command authorities." Parnell Directive § 3.1(a)(2)(d), AR0186. It calls Stripes "an independent source of news and information," *id.* at 1, AR0180, whose "editorial operations" must be "independent of the military chain of command, . . . free from censorship or propaganda," *id.* § 1.2(c), AR0182. DoD has said the same for more than thirty years. DoD Directive 5122.11, Stars and Stripes (S&S) Newspapers and Business Operations § 4.6.1 (Oct. 5, 1993), AR0007; 32 C.F.R. pt. 246, App. D (2025) (Stripes' contents "are not to be considered as the official views of, or endorsed by, the U.S. Government"). And another judge in this District has held that "Stars and Stripes is a newspaper for the purposes of First Amendment analysis." *Tripp v. Dep't of Def.*, 284 F. Supp. 2d 50, 57 (D.D.C. 2003). Defendants would confine *Tripp* to the reporter's privilege, Defs.' MSJ at 16 n.3, but the court resolved that question by rejecting the argument that Stripes' employees "are not entitled to First Amendment protections," and holding instead that Stripes "and its employees should be afforded First Amendment protections." 284 F. Supp. 2d at 55, 57.

Eager to avoid the obvious answer, Defendants ask the Court to skip the government-speech test altogether, reading *Shurtleff* to apply only when the government "invites the people to participate in a program." Defs.' MSJ at 16 (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)). But *Shurtleff* described when the line between government and private speech tends to blur; it did not limit the test to cases on the same facts. The D.C. Circuit treats the three *Shurtleff* criteria as "generally guid[ing] the determination of whether speech is attributable to

the government": "[T]he history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Small Bus. in Transp. Coal. v. Bowser*, No. 22-7102, 2023 WL 2770986, at *3 (D.C. Cir. Apr. 4, 2023) (per curiam) (*quoting Shurtleff*, 596 U.S. at 252). And courts here apply those criteria to speech the government itself commissioned, *see Small Bus. in Transp. Coal. v. Bowser*, 610 F. Supp. 3d 149, 154 (D.D.C. 2022) (street mural the Mayor commissioned), *aff'd*, 2023 WL 2770986; *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 22 (D.D.C. 2021) (same), and even speech "closely associated with the government," *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 412 (D.D.C. 2016) (Presidential Inaugural Committee). Applied here, the answer is not close. Defendants omit the analysis entirely, and every factor cuts against them. Pls.' MSJ at 40–41.

Defendants' own brief confirms that the *Shurtleff* criteria cut against them. On history, DoD's own regulations guaranteed readers news "without news management or censorship" for thirty years, 32 C.F.R. § 246.4(b) (2025), and directed Stripes to operate "as do commercial daily newspapers . . . in keeping with the principles of the First Amendment," *id.* § 246.4(f)(2) (2025), after Congress declared that Stripes' articles must "enjoy the full protection of the First Amendment," *Tripp*, 284 F. Supp. 2d at 56. On perception, Defendants describe Stripes as "an independent source of news and information," Defs.' MSJ at 1, 3, 13, and defend a directive that requires any "official DoW public affairs content" Stripes republishes to be "clearly labeled as such" to protect Stripes' "editorial independence," *id.* at 13 (quoting Parnell Directive § 3.1(a)(2)(d))—a rule that makes sense only if readers would not otherwise attribute Stripes' content to the government. *See also Tripp*, 284 F. Supp. 2d at 55 (observing that DoD describes Stripes as "every bit a newspaper in the traditional sense"). And on control, Defendants insist that Stripes' reporting is "free from command influence." Defs.' MSJ at 17. Defendants cannot

defend the Directive as preserving Stripes' independence, Defs.' MSJ at 13, and then claim Stripes' speech as their own.

Nor does it matter that Stripes' journalists are federal employees, or that DoD partially funds Stripes. Defs.' MSJ at 15; Parnell Directive § 3.1(c)(3), AR0188. Government funding does not make speech the government's. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–43 (2001) (federally funded program "designed to facilitate private speech, not to promote a governmental message"). And even if Stripes' content were government speech, the Directive would still restrict the "core editorial or journalistic functions" of Stripes' journalists, including their judgment about what to publish, which retain First Amendment protection. *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 374–77 (D.D.C. 2020).

Stripes' speech is therefore protected, and the Directive's restrictions on it are content based. Defendants say the commercial-news ban targets no topic, Defs.' MSJ at 17, but a law is content based if it defines regulated speech "by its function or purpose" as well as by subject matter. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The ban defines speech by function, prohibiting Stripes from "purchasing . . . commercial news" for reprint, Parnell Directive § 3.1(a)(2)(c), AR0186, and it "cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin*, LLC, 596 U.S. 61, 74 (2022). The result here is plain. Parnell announced that Stripes would focus on "warfighting, weapons systems, fitness, lethality, survivability, and ALL THINGS MILITARY," with "[n]o more repurposed DC gossip columns; no more Associated Press reprints." Sean Parnell (@SeanParnellASW), X (Jan. 15, 2026), https://perma.cc/D2G2-W457. The Directive does the same, eliminating commercial-news reprints. Parnell Directive § 3.1(a)(2)(c), AR0186. The ban removes the reporting of the AP, which Parnell named, and the Washington Post, whose columns

he derided, along with the national and world news and opinion they supply. That regulates what Stripes says, not how it says it. *See Reed*, 576 U.S. at 170 (speaker-based distinctions are content based when the "speaker preference reflects a content preference" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994))).

And Defendants say nothing about the other provisions that discriminate by content on their face. The Directive permits comics but bans editorial cartoons, which are political commentary by definition. Parnell Directive § 3.1(a)(2)(c)(1), AR0186; *see Reed*, 576 U.S. at 164 (sign codes are content based where they treated "Political Signs" differently from "Temporary Directional Signs"). It bars all controlled unclassified information, whatever its news value. Parnell Directive § 1.2(c), AR0182. And it bars content with a "direct, material, and immediate negative impact on military readiness and safety," a standard that turns entirely on what an article says. Parnell Directive § 3.1(a)(2)(e), AR0187; *see Reed*, 576 U.S. at 163 (law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed"). Those provisions are content based by any measure. Pls.' MSJ at 41–42.

The ban is also viewpoint based. Pls.' MSJ at 42–43. Parnell did not just identify the content DoD wanted gone; he condemned it as "woke." *Supra* Part II.B. That is disagreement with a perspective, not a neutral judgment about subject matter. Defendants respond that the Directive's text does "not target[] specific viewpoints," Defs.' MSJ at 17, but suppressing speech "because of disagreement with the message" is unconstitutional "even if [the] measure on its face appeared neutral." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Defendants contend that there is no "connection" between the post and the Directive. Defs.' MSJ at 17. The connection could not be plainer. On the day DoD repealed the Stripes Regulations, Parnell announced "[n]o more repurposed DC gossip columns; no more Associated Press reprints." *Supra* p. 21. The Directive then banned

both. Courts treat such "contemporaneous statements" as evidence of motive. *See, e.g.*, *N.Y. Times Co. v. Dep't of Def.*, 837 F. Supp. 3d 1, 16 (D.D.C. 2026) (collecting cases) (quoting *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 255 (D.D.C. 2025)).

The Directive also chills Stripes' reporting. Pls.' MSJ at 43–44. Defendants' only answer is that its "good order and discipline" requirement merely restates obligations Stripes personnel always had. Defs.' MSJ at 17–18. But the Stripes Regulations applied military law to Stripes' active-duty personnel, 32 C.F.R. § 246.4(d)(1) (2025), while keeping it out of editorial decisions. News could be withheld in only three circumstances (classified information, harm to national security, or clear danger to U.S. personnel), and never to suppress "news unfavorable to the Department of Defense." *Id.* § 246.4(e)(1)–(2) (2025). The Directive reverses that design. It requires Stripes' content to support "good order and discipline," a standard the Uniform Code of Military Justice enforces with criminal penalties, Parnell Directive § 3.1(a)(2)(e), AR0187; *see* 10 U.S.C. § 934, and to avoid undermining "readiness and safety," Parnell Directive § 3.1(a)(2)(e), AR0187. It defines neither standard, and Defendants do not defend the second at all. The resulting chill is not hypothetical. DoD has already moved against Stripes reporters whose speech it disliked. Pls.' MSJ at 21–22, 43.

Defendants leave the rest of Plaintiffs' First Amendment argument unanswered. They mention, but never address, the argument that the Directive is a prior restraint. Defs.' MSJ at 17; *see* Pls.' MSJ at 44. And they do not argue that the Directive survives strict scrutiny, which it cannot: DoD has shown neither a compelling interest nor narrow tailoring. Pls.' MSJ at 44.

## IV. Vacatur Is the Proper Remedy

Defendants concede that the D.C. Circuit "treats vacatur as the default remedy in APA cases." Defs.' MSJ at 21. That ends their argument, which rests on a single concurrence, that the APA does not authorize vacatur. *Id.* at 21–22 (citing *United States v. Texas*, 599 U.S. 670, 695

(2023) (Gorsuch, J., concurring in the judgment)). And under circuit precedent, skipping notice and comment is a "fundamental flaw" that "normally" requires vacatur. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009); *see City of Billings v. TSA*, 153 F.4th 46, 54 (D.C. Cir. 2025) (granting "the ordinary remedy of vacatur").

Plaintiffs applied both *Allied-Signal* factors. Pls.' MSJ at 44–45; *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Defendants do not say what explanation DoD could offer on remand, and none could cure DoD's failure to take public comment, its refusal to consider readers' reliance, or a Directive that discriminates based on content and viewpoint. Nor do they identify any disruption beyond an unspecified interest in "Stripes' governance." Defs.' MSJ at 22. Vacatur would simply restore the regulations that governed Stripes for three decades, *see Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam), and lift restrictions that took effect only months ago.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted and Defendants' motion for summary judgment should be denied.

November 4, 2026

Respectfully submitted,

*<u>/s/ Allyson R. Scher</u>*
Allyson R. Scher (D.C. Bar 1616379)
Paul R.Q. Wolfson (D.C. Bar 414759)
Elena Goldstein (D.C. Bar 90034087)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ascher@democracyforward.org
pwolfson@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*